TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
RUTH C. PINKEL (Cal. Bar No. 164770)
LINDSEY GREER DOTSON (Cal. Bar No. 266973)
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6077/4443/8452
    Facsimile: (213) 894-7631
    E-mail:    ruth.pinkel@usdoj.gov
             lindsey.dotson@usdoj.gov
             thomas.rybarczyk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:21-00485-DSF-1 |
|---|---|
| Plaintiff, | SUPPLEMENTAL BRIEF IN SUPPORT OF THE GOVERNMENT'S OPPOSITION TO DEFENDANT MARK RIDLEY-THOMAS'S MOTION TO SEVER |
| v. | |
| MARK RIDLEY-THOMAS, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Ruth C. Pinkel, Lindsey Greer Dotson, and Thomas F. Rybarczyk, hereby files its Supplemental Brief in Support of the Government's Opposition to Defendant MARK RIDLEY-THOMAS'S Motion to Sever, as ordered by the Court at the June 27, 2022 hearing on defendant RIDLEY-THOMAS's motion.

1    This brief is based upon the attached memorandum of points and

2 authorities, the files and records in this case, and such further

3 evidence and argument as the Court may permit.

4 Dated: June 29, 2022                Respectfully submitted,

5                                     TRACY L. WILKISON
                                      United States Attorney
6
                                      SCOTT M. GARRINGER
7                                     Assistant United States Attorney
                                      Chief, Criminal Division
8

9                                        */s/ Lindsey Greer Dotson*
                                      ───────────────────────────
10                                    RUTH C. PINKEL
                                      LINDSEY GREER DOTSON
11                                    THOMAS F. RYBARCZYK
                                      Assistant United States Attorneys
12
                                      Attorneys for Plaintiff
13                                    UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

I.    INTRODUCTION....................................................................1

II.   STATEMENT OF FACTS REGARDING THE CONSPIRACY....................2

      A.   The USC Admission, Full Scholarship, and Paid
           Professorship.............................................................2

           1.   At Defendant RIDLEY-THOMAS's Request, Defendant
                FLYNN Works to "Open Every Door" for Sebastian
                Ridley-Thomas by Securing Admission to USC With
                a Full Scholarship...............................................2

           2.   Defendant FLYNN Memorializes the Quid Pro Quo
                Deal With Defendant RIDLEY-THOMAS in a
                Confidential Letter That She Has Hand-Delivered
                to Him...............................................................4

           3.   Defendant FLYNN Delivers Promises of a
                Scholarship.......................................................5

           4.   Defendant RIDLEY-THOMAS Delivers Key Votes
                in Return..........................................................6

           5.   When the Professorship for Sebastian Ridley-
                Thomas Is Stalled, Defendant RIDLEY-THOMAS Steps
                in to Help Defendant FLYNN Secure a County
                Contract Amendment in Exchange for Her Help
                Facilitating the Professorship.........................8

           6.   Days After Defendant FLYNN Delivers on the
                Scholarship and Professorship, Defendant RIDLEY-
                THOMAS Promises to Deliver on the County Contract
                Amendment, Telling Defendant FLYNN: "Your Wish Is
                My Command".....................................................12

      B.   The $100,000 Payment Funneled Through USC................13

           1.   Defendant RIDLEY-THOMAS Fails in His Attempt to
                Donate $100,000 in Campaign Funds to His Son's
                Nonprofit.........................................................14

           2.   Defendants Covertly Funnel $100,000 in Campaign
                Funds Through USC to Sebastian Ridley-Thomas's
                Non-Profit by Way of False Statements and
                Material Omissions...........................................15

           3.   Once Defendant FLYNN Delivers on the $100,000
                Payment, Defendant RIDLEY-THOMAS Contacts
                Defendant FLYNN to Move County Contracts
                Forward............................................................19

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                              PAGE

        4.   Defendant FLYNN Acknowledges That She Made
             a "Deal" or "Arrangement" With Defendant
             RIDLEY-THOMAS and His Son...........................20

        5.   Defendant RIDLEY-THOMAS Delivers Another
             Key Vote...........................................21

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3      At the June 27, 2022 hearing on defendant MARK RIDLEY-THOMAS's

4  motion to sever (dkt. 61), the Court ordered the government to file a

5  supplemental brief setting forth the facts supporting the existence

6  of a conspiracy.  Below is a non-exhaustive summary of the evidence

7  the government intends to offer at trial to establish that defendant

8  RIDLEY-THOMAS and his co-defendant MARILYN LOUISE FLYNN conspired to

9  commit bribery and honest services fraud.[1]

10      As the Court noted, at this pretrial stage, the government need

11  only establish the existence of a conspiracy by a preponderance of

12  the evidence.  With the return of the indictment alone, there already

13  is probable cause to conclude that the charged conspiracy existed.

14  Beyond that, the existence of a conspiracy is clear based upon the

15  following: (1) the timing of benefits promised and provided by

16  defendant FLYNN (quids) vis-à-vis official acts promised and

17  performed by defendant RIDLEY-THOMAS (quos); (2) defendant FLYNN's

18  express statements evidencing a quid pro quo scheme; (3) defendant

19  FLYNN's statements showing that the benefits she provided Sebastian

20  Ridley-Thomas were intended to please his father, defendant RIDLEY-

21  THOMAS, in connection with obtaining County contracts and contract

22  amendments; (4) defendant RIDLEY-THOMAS's statements to defendant

23  FLYNN during the conspiracy regarding County business;

24  (5) defendants' efforts to disguise and conceal their scheme,

25

26  —————————————

27      [1] The government hereby summarizes and quotes from emails and
documents it intends to offer at trial and cites to expected witness
testimony based upon prior interview reports.  Should the Court wish

28  to examine any exhibit or interview report, the government can submit
those to the Court.

1  particularly with respect to funneling the $100,000 payment through
2  USC to Sebastian Ridley-Thomas's nonprofit; (6) defendants' false
3  statements and material omissions with respect to the $100,000
4  payment; and (7) defendants' respective motives to engage in the
5  conspiracy.

6  **II.  STATEMENT OF FACTS REGARDING THE CONSPIRACY**

7      In exchange for County contracts and amendments to existing
8  contracts, defendant RIDLEY-THOMAS solicited and demanded, and
9  defendant FLYNN offered and agreed to give, the following:
10 (1) admission to USC for Sebastian Ridley-Thomas to obtain a master's
11 degree; (2) a full tuition scholarship for Sebastian Ridley-Thomas to
12 attend USC; (3) a paid professorship for Sebastian Ridley-Thomas to
13 teach at USC while he was a student; and (4) the secret funneling of
14 $100,000 from defendant's campaign committee account through USC to a
15 nonprofit Sebastian Ridley-Thomas was spearheading called the Policy,
16 Research & Practice Initiative ("PRPI").  The conspiracy lasted from
17 at least May 2017 through August 1, 2018.

18      **A.   The USC Admission, Full Scholarship, and Paid Professorship**

19           1.   At Defendant RIDLEY-THOMAS's Request, Defendant FLYNN
20                Works to "Open Every Door" for Sebastian Ridley-Thomas
21                by Securing Admission to USC With a Full Scholarship

22      In May 2017, defendant RIDLEY-THOMAS's son, Sebastian Ridley-
23 Thomas, expressed an interest in obtaining a master's degree from the
24 University of Southern California ("USC").  On May 16, 2017,
25 defendant RIDLEY-THOMAS emailed defendant FLYNN and asked her to call
26 him.  The two defendants spoke on or around May 17, 2017 at which
27 time defendant RIDLEY-THOMAS conveyed his son's interests to
28 defendant FLYNN.  (Overt Act 1.)  At that time, when defendant

RIDLEY-THOMAS conveyed his son's interests, defendant FLYNN was
seeking defendant RIDLEY-THOMAS's assistance securing lucrative Los
Angeles County contracts and amendments to existing contracts.  The
next day, Sebastian Ridley-Thomas emailed defendant FLYNN to request
a meeting.  (Overt Act 2.)  Defendant FLYNN responded via email: "I
am glad to hear from you -- and so quickly!"  (Overt Act 3.)  She
told Sebastian Ridley-Thomas to schedule a meeting with her. (Id.)

     Soon thereafter, defendant FLYNN began working tirelessly for
the next few months to ensure that Sebastian Ridley-Thomas received
mostly anything he requested, including admission to USC and a full
tuition scholarship.  On May 24, 2017, defendant FLYNN emailed a USC
employee and told the employee to contact Sebastian Ridley-Thomas
"right away" to facilitate his postgraduate work at USC.  Despite the
fact that defendant FLYNN thought that Sebastian Ridley-Thomas "may
not have had a particularly good gradepoint (sic)" in college, she
intended "to open every door for him[.]"  (Overt Act 4.)  In
justifying her special treatment of Sebastian Ridley-Thomas, she
noted that he was "the son of Supervisor Mark Ridley Thomas."  (Id.)

     From multiple emails, defendant FLYNN's intent in offering the
scholarship was clear -- she hoped to obtain government funds by way
of lucrative County contracts for the USC Dworak-Peck School of
Social Work ("Social Work School") when the school was facing a
multimillion-dollar budget deficit.  For instance, on June 5, 2017,
she told University Official 1 that, in seeking County funds from
defendant RIDLEY-THOMAS, she intended to offer a full scholarship to
defendant RIDLEY-THOMAS's son.  (Overt Acts 5-7; Defense Ex. 3.)
She characterized her intended exchange as a "full scholarship for
our funds."  (Overt Act 7; Defense Ex. 3.)  In other words, defendant

FLYNN intended to offer Sebastian Ridley-Thomas a full scholarship in exchange for funds for the Social Work School.

           2.    Defendant FLYNN Memorializes the *Quid Pro Quo* Deal With Defendant RIDLEY-THOMAS in a Confidential Letter That She Has Hand-Delivered to Him

On June 23, 2017, defendant RIDLEY-THOMAS met with defendant FLYNN in her office.  (Overt Act 8.)  During this meeting, as evidenced by subsequent emails and defendant FLYNN's quarterly lobbying report, the two discussed Sebastian Ridley-Thomas's future at USC and the County contracts defendant FLYNN wanted defendant RIDLEY-THOMAS's help securing.  In her quarterly lobbying report, she acknowledged soliciting "official action" from defendant RIDLEY-THOMAS during this meeting.  (Id.)  Afterward, defendant FLYNN went on a lengthy vacation.  As soon as she returned, she got right back to work on securing lucrative County contracts and amendments to existing contracts from defendant RIDLEY-THOMAS.

On July 23, 2017, defendant FLYNN had a letter containing "confidential information" personally delivered to defendant RIDLEY-THOMAS.  (Overt Act 9; Defense Ex. 9.)  Despite communicating with defendant RIDLEY-THOMAS often via email, defendant FLYNN chose for this letter to be hand-delivered.  She emailed a copy of the letter to a Social Work School employee and asked for the letter to be printed on USC letterhead, placed in a sealed envelope, and taken to defendant RIDLEY-THOMAS's office.  (Id.)  During an interview, the employee made clear this request was unusual.  Defendant FLYNN had never asked this employee to hand-deliver a letter like this before.

The reason for the letter's sensitivity was clear -- it memorialized defendants' quid pro quo deal.  While of course the

words "quid pro quo" or "bribery" were not used in the letter, the exchange was apparent.  Defendant FLYNN would help defendant RIDLEY-THOMAS's son.  In turn, defendant RIDLEY-THOMAS would help defendant FLYNN with certain County contracts.  In the hand-delivered letter, defendant FLYNN wrote, "I am prepared to follow up on our discussion in my office."  She said, "I look forward to working with Sebastian" and will "take steps with him to plan the road ahead."  In the very next sentence, defendant FLYNN confirmed the "matters" with which defendant RIDLEY-THOMAS had agreed to provide assistance: (1) "Blocked movement of USC's Title IVe contract with DCFS;" (2) "USC role involvement in refurbished neighborhood parole office and current negotiations for possible IVe contract with Department of Probation;" and (3) "Stalled movement of USC Telehealth contract with Mental Health."  (Overt Act 9; Defense Ex. 9.)

> 3.   <u>Defendant FLYNN Delivers Promises of a Scholarship</u>

On July 26, 2017, three days after defendant FLYNN sent the hand-delivered letter to defendant RIDLEY-THOMAS, she promised Sebastian Ridley-Thomas a full scholarship, despite the fact that it has not been formally approved by USC.  (Overt Act 10.)  Internal emails between defendant FLYNN and USC personnel show how hard defendant FLYNN continued to work to secure this scholarship and accommodate defendant RIDLEY-THOMAS's son in any way she could.  For instance, one of the (many) ways in which defendant FLYNN tried to accommodate Sebastian Ridley-Thomas was by helping him obtain not just a master's degree from the Social Work School, but a joint master's degree from the Social Work School and the USC Price School of Public Policy ("Public Policy School").  (Overt Act 11.)  But this was proving difficult.  Defendant FLYNN told a colleague that there

was a "specific and very rigid sequence of courses alternating between [the Social Work School] and [Public Policy School] that [had] to be followed." (Overt Act 12.) Given Sebastian Ridley-Thomas's preferences, it would be difficult for him to adhere to that sequencing. However, defendant FLYNN again went out of her way to accommodate defendant RIDLEY-THOMAS's son and asked a colleague to "tackle this enigma" in order to find a way for him to receive a joint degree. (Id.) Ultimately, when it became clear that USC would have to create an entirely new online dual degree program just for Sebastian Ridley-Thomas, defendant FLYNN pushed the school to create this "first joint online degree" between the Social Work School and Public Policy School, all in an effort to appease Sebastian Ridley-Thomas, and more importantly, defendant RIDLEY-THOMAS. (See Overt Act 13.)

4. Defendant RIDLEY-THOMAS Delivers Key Votes in Return

Defendant RIDLEY-THOMAS performed just as defendant FLYNN made clear she expected in the hand-delivered letter memorializing their quid pro quo arrangement. Just days after defendant FLYNN promised Sebastian Ridley-Thomas admission to USC with a full scholarship, defendant RIDLEY-THOMAS took official action with respect to defendant FLYNN's request in the hand-delivered letter for a new Title IV(e) contract with Probation. Defendant RIDLEY-THOMAS co-sponsored and voted in favor of Item No. 16 on the Board of Supervisors' August 1, 2017 agenda announcing a "Recommendations on a Memorandum of Understanding to establish a partnership with the University of Southern California's School of Social Work to enhance services, particularly around health, homelessness and case management." (Overt Acts 14-16.) The motion sought to provide

6

1   better and expanded services to Probation clients and specifically

2   named the Social Work School as a potential partner with the County

3   to provide these services.  Upon seeing this agenda item, defendant

4   FLYNN emailed a colleague: "Yes, I talked with Mark [defendant

5   RIDLEY-THOMAS] about this, and I am very happy to see that [defendant

6   RIDLEY-THOMAS] was <u>as good as his word</u>."  (Overt Act 15 (emphasis

7   added); Defense Ex. 5 (emphasis added).)

8   　　　Following his August 2017 vote, defendant RIDLEY-THOMAS took

9   further official action to facilitate an eventual partnership between

10  the Social Work School and Probation.  Defendant RIDLEY-THOMAS co-

11  sponsored Item No. 3 on the Board of Supervisors' October 17, 2017 to

12  advance "Probation University."  (Overt Act 17.)  Probation

13  University was a concept whereby an outside university, such as the

14  Social Work School, would help train Probation employees and, in

15  return, receive compensation for providing those services.  The

16  motion instructed high-level County officials to prepare a report

17  about the feasibility of Probation University and to identify

18  "funding streams" to pay for it.  Upon learning that this motion was

19  on the Board's agenda, defendant FLYNN emailed a colleague: "I am

20  holding my breath...<u>MRT [defendant RIDLEY-THOMAS] is really trying to</u>

21  <u>deliver here</u>."  (Overt Act 18 (emphasis added); Defense Ex. 7

22  (emphasis added).)  And deliver, he did.  On October 17, 2017,

23  defendant RIDLEY-THOMAS voted in favor of the Probation University

24  motion.  When she heard that the motion had passed, defendant FLYNN

25  responded: "I am THRILLED!"  (Overt Act 20.)

26  ///

27  ///

28  ///

7

5.   When the Professorship for Sebastian Ridley-Thomas Is
     Stalled, Defendant RIDLEY-THOMAS Steps in to Help
     Defendant FLYNN Secure a County Contract Amendment in
     Exchange for Her Help Facilitating the Professorship

Over the next several months, emails show defendant FLYNN
continuing to work behind the scenes at USC to deliver on the full
scholarship for Sebastian Ridley-Thomas.  But as it became clear in
the fall of 2017 that Sebastian Ridley-Thomas was going to be leaving
the State Assembly and would soon need a title and income from
another source, a free degree was not going to sate Sebastian Ridley-
Thomas or his father.  When Sebastian Ridley-Thomas's resignation was
imminent, he and his father began a full court press on securing the
paid professorship.  And when those efforts stalled, defendant
RIDLEY-THOMAS turned to defendant FLYNN for help, whilst dangling the
carrot of a lucrative County contract amendment to entice her to act.

As early as November 2017, emails show that both defendant
RIDLEY-THOMAS and Sebastian Ridley-Thomas were aware of the State
Assembly's internal sexual harassment investigation and that, in an
attempt to skirt scandal and keep the investigation from becoming
public, Sebastian Ridley-Thomas would resign under the guise of
health concerns.  Emails from defendant RIDLEY-THOMAS's personal
account show him carefully orchestrating the resignation and cover
story with a media relations team and consultants.  The goal was
simple -- keep the sexual harassment investigation from coming to
light in the era of the #MeToo movement and secure prestigious post-
Assembly jobs and titles for Sebastian Ridley-Thomas in order to
(1) preserve the reputations of both Sebastian Ridley-Thomas and
defendant RIDLEY-THOMAS by association, (2) quash any unpleasant

1 rumors about his sudden resignation, and (3) provide a stable income

2 for Sebastian Ridley-Thomas in light of his mounting personal debt.

3     On December 5, 2017, Sebastian Ridley-Thomas emailed University

4 Official 2 -- with a blind carbon copy ("bcc") to defendant RIDLEY-

5 THOMAS -- to follow up on a recent in-person meeting.  (Overt Act

6 24.)  Sebastian Ridley-Thomas said that he wanted a "Practioner-in-

7 Residence" title for his professorship, a salary in the range of

8 $25,000 for his "beginning compensation," and to "launch in January."

9 University Official 2 was caught off guard by the demands and rush.

10 Until that point, University Official 2 had assumed that Sebastian

11 Ridley-Thomas would be in the State Assembly and might voluntarily

12 speak on occasion to USC students.  On December 9, 2017, University

13 Official 2 broke the news to Sebastian Ridley-Thomas via email that

14 he did not believe a January start date was feasible and that he

15 would have to "create a part-time position with a salary," which

16 University Official 2 had not been anticipating.  (Overt Act 24.)

17     Sebastian Ridley-Thomas immediately forwarded University

18 Official 2's disappointing email to defendant RIDLEY-THOMAS.  (Overt

19 Act 25.)  The stalled professorship was particularly troubling

20 because that same morning there had been an article suggesting that

21 Sebastian Ridley-Thomas may be "the Next #MeToo to Go," meaning to be

22 forced out of the State Assembly on account of a sexual harassment

23 scandal.  (Overt Act 26.)  Defendant RIDLEY-THOMAS was aware of the

24 article, as he forwarded the link to his son on December 9, 2017.

25 (Id.)

26     Upon learning that the professorship was stalled, defendant

27 RIDLEY-THOMAS turned to defendant FLYNN.  On December 14, 2017, he

28 sent her an email.  (Overt Act 28; Defense Ex. 10.)  The subject line

had the name of County Official 2, who was a high-level public official in a position to help defendant FLYNN secure a lucrative amendment to the Telehealth-DMH contract from the County.  (Id.)  The email said: "[He/She]'s ready to go," following by a winking face emoji.  (Id.)  The email said nothing more, but defendant FLYNN knew the email's significance and what was expected of her in return. Within minutes of receiving this email, defendant FLYNN began sending a flurry of emails to accelerate both Sebastian Ridley-Thomas's scholarship and professorship.

In one email to Sebastian Ridley-Thomas and numerous USC officials, defendant FLYNN said that Sebastian Ridley-Thomas "is now ready to move forward with his plans to enroll in the VAC this semester."  (Overt Act 30.)  ("VAC" is the "Virtual Academic Center" and refers to the online master's program at the Social Work School.) Defendant FLYNN said that this issue should be given the "highest priority."  (Id.)  She asked for help to "tap our endowed funds" (at a time of great financial crisis for the school) so the Social Work School could "pay[] all of [Sebastian Ridley-Thomas's] tuition costs through a scholarship award."  (Id.)  She also noted that he would be the first to obtain his joint master's degree online.  (Id.)

Defendant FLYNN also emailed University Official 2.  She urged University Official 2 to "get the offer letter out before the holidays" for Sebastian Ridley-Thomas's professorship "in the interests of showing MRT [defendant RIDLEY-THOMAS] that we can deliver."  (Overt Act 31 (emphasis added).)  The explicitness of this email demonstrates defendant FLYNN's intent in securing the professorship.  Defendant RIDLEY-THOMAS had just delivered County Official 2, who represented the hope of an amendment to the

Telehealth-DMH contract; defendant FLYNN wanted to show that she could fulfill her end of the bargain by delivering the professorship, not for Sebastian Ridley-Thomas's benefit, but in the interests of showing defendant RIDLEY-THOMAS that she could "deliver" on her end of their bargain.  (Id.)

For the next few weeks, emails show defendant FLYNN working tirelessly to get everything approved for the scholarship and professorship despite the uniqueness of Sebastian Ridley-Thomas's requests and the lack of any legitimate urgency to their creation. At defendant FLYNN's direction, USC was making numerous exceptions to accommodate Sebastian Ridley-Thomas, including allowing him to obtain a joint degree and, at the same time, a paid professorship, even though his dual student-faculty status violated USC policy.

Sebastian Ridley-Thomas formally resigned from the State Assembly on December 31, 2017, citing undisclosed health concerns. On January 5, 2018, when neither the scholarship nor professorship had yet been delivered, defendant RIDLEY-THOMAS emailed defendant FLYNN to call him.  (Overt Act 34.)  Two days later, Sebastian Ridley-Thomas emailed defendant RIDLEY-THOMAS stating that he was awaiting his father's "check-in" with both defendant FLYNN and University Official 2.  (Overt Act 35.)  It was clear that defendant RIDLEY-THOMAS was the one responsible for pushing both the scholarship and professorship forward at USC.

///

///

///

6. __Days After Defendant FLYNN Delivers on the Scholarship__
   __and Professorship, Defendant RIDLEY-THOMAS Promises to__
   __Deliver on the County Contract Amendment, Telling__
   __Defendant FLYNN: "Your Wish Is My Command"__

On January 9, 2018, Sebastian Ridley-Thomas formally received a "full tuition scholarship," totaling over $26,000 in paid tuition from the Social Work School for the spring and summer of 2018. (Overt Act 36.)  He immediately forwarded the email containing news of the scholarship to defendant RIDLEY-THOMAS.  (Overt Act 37.)

On February 13, 2018, Sebastian Ridley-Thomas received an email informing him that USC had agreed to waive the usual hiring process and that he would soon receive a contract for the paid professorship. (Overt Act 38.)  Sebastian Ridley-Thomas immediately forwarded the email to his father.  (Overt Act 39.)  Defendant RIDLEY-THOMAS responded with a thumbs up and winking face emoji.  (Overt Act 40.)

Now that his son had received news of the scholarship and professorship, defendant RIDLEY-THOMAS was prepared to deliver again on his end of the bargain vis-à-vis County business.  On February 13, 2018, the same day he learned that the usual hiring process had been waived and his son would be offered the paid professorship, he emailed defendant FLYNN about a "Probation Department overhaul proposal" and told defendant FLYNN there was "[l]ots to discuss."  He bcc'd his son, despite the fact that his son had no apparent role in County business other than reaping the benefits of defendants' quid pro quo scheme.

That same day -- February 13, 2018 -- defendant RIDLEY-THOMAS emailed defendant FLYNN again, this time with the subject line: "Probation Reform motion."  (Overt Act 41.)  Defendant RIDLEY-THOMAS

12

wrote, "[w]ould like to discuss this with you in the near term."
(Id.)  Defendant FLYNN responded to defendant RIDLEY-THOMAS via email
and wrote that she had "an excellent meeting last night with [County
Official 2] and [County Official 3]," who were two high-ranking
public officials in a position to help defendant FLYNN obtain a
lucrative amendment to the Telehealth-DMH contract and secure the
Probation contract with the Social Work School.  (Overt Act 42.)
Defendant FLYNN said that she was "very encouraged" and thanked
defendant RIDLEY-THOMAS "for facilitating all these important
relationships and opportunities."  (Id.)

On February 23, 2018, after delivering both the scholarship and
professorship, defendant FLYNN emailed defendant RIDLEY-THOMAS
regarding "an extremely important request for contract amendment that
will be on the Board's agenda next week" regarding "our TeleHealth
contract with DMH."  (Overt Act 44; Defense Ex. 11.)  Among other
things, defendant FLYNN told defendant RIDLEY-THOMAS that the
contract needed "to expand billable services and to increase the flat
rate for services to a level comparable to other county contract
agencies," which would result in the Social Work School receiving
greater compensation from the County for its services.  (Id.)
Defendant RIDLEY-THOMAS responded and bcc'd Sebastian Ridley-Thomas,
again despite his son having no apparent role in County business or
contracts.  (Id.)  He told defendant FLYNN: "Your wish is my
command."  (Id. (emphasis added).)

**B.   The $100,000 Payment Funneled Through USC**

At the same time that defendant RIDLEY-THOMAS was working with
defendant FLYNN to secure Sebastian Ridley-Thomas's scholarship and
professorship, he was also working on another landing spot for his

son.  Following his abrupt departure from the State Assembly, at his father's suggestion, Sebastian Ridley-Thomas planned to head a nonprofit organization.  Defendant RIDLEY-THOMAS wanted to use his campaign funds to support that endeavor.

At first, Sebastian Ridley-Thomas's other landing spot did not involve USC or defendant FLYNN at all.  But after defendant RIDLEY-THOMAS had difficulty funneling campaign funds to his son because the involved organization felt uncomfortable being utilized in defendant RIDLEY-THOMAS's requested manner, defendant RIDLEY-THOMAS reached out to defendant FLYNN.  Once again, defendant FLYNN readily assisted defendant RIDLEY-THOMAS in any way she could, knowing full well that at least one critical County contract amendment hung in the balance.

    1. <u>Defendant RIDLEY-THOMAS Fails in His Attempt to Donate $100,000 in Campaign Funds to His Son's Nonprofit</u>

As detailed in Introductory Allegations 6 through 9 of the indictment, in late 2017 Sebastian Ridley-Thomas was attempting to take over the African American Civic Engagement Project ("AACEP") as its new director.  AACEP was a small nonprofit initiative designed to increase African American participation in elections.  Community Partners was AACEP's fiscal sponsor.

A fiscal sponsor is an umbrella organization that provides administrative support to smaller entities and allows them to operate under the sponsor's tax-exempt, 501(c)(3) status.  The fiscal sponsor does not provide funding to the entity, however.  Accordingly, as Community Partners employees will testify at trial, Sebastian Ridley-Thomas needed to raise funds for AACEP in order for him to receive compensation, obtain healthcare benefits, and hire staff.

To secure funding for AACEP and thus benefit his son, defendant RIDLEY-THOMAS attempted to donate $100,000 in late 2017 from the Mark Ridley-Thomas Committee for a Better L.A. (defendant RIDLEY-THOMAS's campaign committee) to Community Partners for the benefit of AACEP. Bank records show that Community Partners deposited a $100,000 check from defendant RIDLEY-THOMAS's campaign committee on December 13, 2017.  The check was made payable to "Community Partners fbo AACEP."

But there were red flags.  As Community Partners employees will testify, the organization was uncomfortable with the donation. One witness worried that the donation would make Community Partners look like the "Ridley-Thomas family charity."  That witness will testify that he told defendant RIDLEY-THOMAS that the optics of a politician donating campaign committee funds to support his son would not reflect well on Community Partners.  The donation would need to be disclosed on the campaign committee's Form 460s, and thus the fact of the donation would be publicly known and subject to scrutiny.  As a result, Community Partners ultimately refunded the $100,000 on January 30, 2018, and Sebastian Ridley-Thomas abandoned his efforts to take over AACEP.

2. Defendants Covertly Funnel $100,000 in Campaign Funds Through USC to Sebastian Ridley-Thomas's Non-Profit by Way of False Statements and Material Omissions

Given the roadblocks with Community Partners and AACEP, Sebastian Ridley-Thomas decided to start a new nonprofit initiative. He founded PRPI with United Ways of California ("United Ways") as its fiscal sponsor.  Defendant RIDLEY-THOMAS still wanted to donate to his son's initiative but needed to do so in a more covert way in order to cleanse the money's connection to him and thus better ensure

15

the donation's success.  He also needed a willing financial partner
to join in his covert plan.  This is where defendant FLYNN again
entered the picture.

As the Social Work School was facing a multimillion-dollar
budget deficit, defendant FLYNN told multiple people that the school
desperately needed the amended Telehealth-DMH contract, which she
estimated to be worth $9 million per year.  (Overt Act 53.)  Each
needing something the other could provide, defendants expanded their
quid pro quo scheme in a meeting on April 26, 2018.  What occurred
during that meeting is clear from defendant FLYNN's lobbying report,
her conversations with colleagues, defendants' emails, and the
actions both defendants took in the days following that meeting.

In her quarterly USC lobbying report, defendant FLYNN
acknowledged soliciting "official action" from defendant RIDLEY-
THOMAS and discussing a "gift agreement" during that meeting.  (Overt
Act 51.)  Around the time of that meeting, University Official 3
recalls defendant FLYNN saying that USC suddenly would get the
Telehealth contract.  (Overt Act 56.)  Defendant FLYNN told
University Official 3: "Good news, we're going to get the Telehealth
contract, but I had to do a favor to get it."  (Id.; Defense Ex. 1.)
Defendant FLYNN winked at University Official 3 when she talked about
doing a "favor" in exchange for the contract.  (Id.)

Defendant FLYNN's "favor" soon became clear.  On May 2, 2018,
defendant RIDLEY-THOMAS caused a letter to be mailed to defendant
FLYNN with a $100,000 check made payable to the Social Work School.
(Overt Act 58.)  The letter read: "Please find enclosed tangible
acknowledgement of the important work of the Suzanne Dworak Peck
School of Social Work in Los Angeles and beyond.  As Dean, these

16

funds can be used at your discretion in order to best facilitate the impressive policy and practical work of the School and its impact in the community."  (See id.)

But these funds were never intended to be used at defendant FLYNN's discretion, nor were they to be used to facilitate any policy work by the Social Work School.  In a secret deal between defendants, the two had arranged for the $100,000 to be funneled through USC by way of a nearly simultaneous $100,000 donation from USC to United Ways for the benefit of PRPI and Sebastian Ridley-Thomas.  Contrary to defendant RIDLEY-THOMAS's donor letter, the funds were not a "tangible acknowledgment" of the Social Work School's "important work" in the community.  Defendant RIDLEY-THOMAS did not donate the funds to reward the school for its good work; he donated the funds to provide USC with the $100,000 necessary to make the nearly simultaneous $100,000 payment to United Ways and PRPI.

On May 3, 2018, the day after the formal donor letter was sent saying that defendant FLYNN could use the $100,000 donation at her discretion to advance the policy work of the Social Work School, defendant RIDLEY-THOMAS made clear in a private email to defendant FLYNN (with a bcc to Sebastian Ridley-Thomas) that USC needed to immediately donate $100,000 to United Ways so that PRPI could hire an employee, Individual 1.  (Overt Act 60.)  Defendant RIDLEY-THOMAS told defendant FLYNN: "Attached is the information you requested [the United Ways IRS exemption letter and United Ways donor form].  At this point it is necessary to act with dispatch so as to facilitate the completion of [Individual 1's] on-boarding with the United Way in a timely manner -- no later than May 15th."  (Id.)  From this and other emails, defendants knew that, per their secret deal, USC was

17

supposed to make an immediate donation to United Ways so that PRPI could use the donation to hire Individual 1.

Upon hearing that she needed to "act with dispatch," defendant FLYNN hustled to get the $100,000 released from USC to United Ways by defendant RIDLEY-THOMAS's May 15th deadline.  The government will offer witness testimony and defendant FLYNN's emails at trial showing all the ways in which defendant FLYNN urgently maneuvered within USC to facilitate the $100,000 payment.

Meanwhile, defendant RIDLEY-THOMAS acted with dispatch too.  He (as well as his son) lobbied United Ways to formally hire (or "on-board") Individual 1 and tried to assure United Ways that USC would provide the necessary financial means to do so.  (See, e.g., Overt Act 66.)  For example, on May 4, 2018, defendant RIDLEY-THOMAS emailed United Ways Employee 2 "the resume we discussed" (for Individual 1) and said: "Dean Marilyn Flynn of USC will follow up with you on the financial details.  All good."  Defendant RIDLEY-THOMAS told defendant FLYNN that she needed to call United Ways Employee 2 and "assure him of the School's commitment and that you have begun the funds transfer process."  (Overt Act 64.)  He told defendant FLYNN to "confirm receipt" and keep him "in the loop," followed by a winking face emoji.  (Id.)  Defendant RIDLEY-THOMAS then emailed United Ways Employee 2 again on May 4, 2018, telling the employee: "Here's the offer letter [Individual 1] received and accepted with the salary adjustment of $70k as we discuss (sic) earlier.  It is my understanding that the USC financial support comes in at $100k."  (Overt Act 66.)

Throughout all of their emails and conversations with USC and United Ways employees, both defendants engaged in a scheme involving multiple misrepresentations and material omissions to facilitate the $100,000 payment.  Most notably, defendants concealed their secret deal from USC, United Ways, and the public.  Defendant RIDLEY-THOMAS submitted a false donor letter to USC to paper over the true purpose of the payment and give it an air of legitimacy.  Defendant FLYNN made multiple material misrepresentations to USC employees in order to expeditiously facilitate USC's $100,000 donation to United Ways for the benefit of PRPI.  (See, e.g., Overt Acts 71-74.)  USC employees will testify that but for the misrepresentations and omissions, USC never would have made the $100,000 donation.  Similarly, United Ways employees will testify that had they known the true source of the $100,000 payment, United Ways likely would have rejected the payment -- just as Community Partners had rejected the $100,000 payment earlier that year.

3.   Once Defendant FLYNN Delivers on the $100,000 Payment,
Defendant RIDLEY-THOMAS Contacts Defendant FLYNN to
Move County Contracts Forward

USC mailed the $100,000 to United Ways for the benefit of PRPI on May 9, 2018.  (Overt Act 76.)  On May 10, 2018, at approximately 3:49 p.m., defendant RIDLEY-THOMAS received an email confirming that his $100,000 payment was a success and that Individual 1 would be offered employment by United Ways/PRPI.  (Over Act 78.)  Minutes later he emailed Sebastian Ridley-Thomas and said, "My piece is done," followed by a fist bump emoji.  (Overt Act 79.)  Defendant RIDLEY-THOMAS then emailed defendant FLYNN to "debrief" and talk "confidentially."  (Overt Act 80.)  Defendant RIDLEY-THOMAS again

bcc'd his son.  The following day, defendant RIDLEY-THOMAS emailed defendant FLYNN to discuss "master [County] contract stuff and somehow use yesterday's 'discussion' to advance it," followed by a winking face emoji.  (Overt Act 82.)  With these emails, defendant RIDLEY-THOMAS's pattern was again clear -- as soon as defendant FLYNN would deliver on her promises vis-à-vis benefits for Sebastian Ridley-Thomas, defendant RIDLEY-THOMAS would again engage on County business favorable to defendant FLYNN.

        4.   <u>Defendant FLYNN Acknowledges That She Made a "Deal" or "Arrangement" With Defendant RIDLEY-THOMAS and His Son</u>

In early June 2018, prior to any public reporting about the suspect $100,000 donation, Social Work School faculty conducted a "no confidence" vote to remove defendant FLYNN from her position as dean for her perceived poor performance.  After the vote, defendant FLYNN and University Official 3 had multiple transition meetings in June in order to prepare University Official 3 to help lead the Social Work School.  University Official 3 will testify that in one such meeting defendant FLYNN said: "<u>At some point, I need to tell you about my deal [or arrangement] with SRT [Sebastian Ridley-Thomas] and MRT [defendant RIDLEY-THOMAS]</u>."  (Overt Act 85; Defense Ex. 2.)  University Official 3 could not recall whether defendant FLYNN said "deal" or "arrangement" but was clear that the deal/arrangement was with Sebastian Ridley-Thomas and defendant RIDLEY-THOMAS.  (Defense Ex. 2.)  In addition, another Social Work School employee will testify that <u>defendant FLYNN said that the $100,000 donation from USC to United Ways/PRPI was for Sebastian Ridley-Thomas's benefit and that defendant FLYNN expected "money from Mark [defendant RIDLEY-THOMAS] down the road</u>" in return.

5.   <u>Defendant RIDLEY-THOMAS Delivers Another Key Vote</u>

On July 31, 2018, after defendant FLYNN had funneled the $100,000 through USC, the Board of Supervisors voted on the Telehealth-DMH contract amendment.  (Overt Act. 86.)  Defendant RIDLEY-THOMAS voted in favor of the motion, which approved the terms defendant FLYNN requested in her February 23, 2018 email to him. (<u>Id.</u>)  The motion passed.  (<u>Id.</u>)