E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
LINDSEY GREER DOTSON (Cal. Bar No. 266973)
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-4443/8452
        Facsimile: (213) 894-0141
        E-mail:    lindsey.dotson@usdoj.gov
                   thomas.rybarczyk@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-00485-DSF-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S MOTION *IN LIMINE* NO. 1 TO EXCLUDE EXPERT TESTIMONY OF ANN RAVEL PURSUANT TO FEDERAL RULES OF EVIDENCE 401, 402, 403, 702, AND 704; DECLARATION OF ASSISTANT U.S. ATTORNEY THOMAS F. RYBARCZYK |
| v. | |
| MARK RIDLEY-THOMAS, | |
| Defendant. | |
| | Hearing Date: February 13, 2023 |
| | Hearing Time: 8:30 a.m. |
| | Location:    Courtroom of the Honorable Dale S. Fischer |

        Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Lindsey Greer Dotson
and Thomas F. Rybarczyk, hereby files the Government's Motion In
Limine No. 1 to Exclude the Expert Testimony of Ann Ravel Pursuant to
Federal Rules of Evidence 401, 402, 403, 702, and 704.

This motion in limine is based upon the attached memorandum of points and authorities, the declaration of Assistant U.S. Attorney Thomas F. Rybarczyk and exhibits contained therein filed in support of the government's instant motion, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: January 13, 2023          Respectfully submitted,

                                 E. MARTIN ESTRADA
                                 United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division


                                  */s/ Thomas F. Rybarczyk*
                                 THOMAS F. RYBARCZYK
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.    INTRODUCTION.................................................1

II.   FACTUAL BACKGROUND...........................................3

      A.   Summary of Relevant Facts..............................3

           1.   Defendant's Initial Effort to Help His Son Become
                the Director of a Nonprofit (AACEP) Fails When
                the  Nonprofit's Sponsoring Organization
                Questions the  Optics of a $100,000 Payment from
                Defendant..........................................4

           2.   With Co-Defendant FLYNN's Help, Defendant Funnels
                a  $100,000 Payment Through USC to His Son's New
                Nonprofit (PRPI) to Disguise the True Source of
                the  Funds and Wash Its Connection to His
                Committee..........................................7

      B.   Ms. Ravel's Proffered Testimony.......................10

III.  ARGUMENT....................................................11

      A.   This Court Should Exclude Ms. Ravel's Testimony Under
           Rules   401, 402, and 702 Because It Lacks Relevance,
           Reliability,   and Legal Support and Thus Will Not Be
           Helpful to the Jury....................................11

           1.   Legal Standard....................................12

           2.   Ms. Ravel's Opinion Is Irrelevant Because It
                Pertains to Facts That Are Not in Dispute.........13

           3.   Ms. Ravel's Opinion Is Unreliable Because It
                Hinges upon Critical Omissions of Material Fact...14

           4.   Ms. Ravel's Opinion Lacks Necessary Legal Support...17

      B.   This Court Should Further Exclude Ms. Ravel's
           Testimony   Because Any Relevance Is Substantially
           Outweighed by the   Danger of Unfair Prejudice,
           Confusion, and Undue Delay............................18

      C.   Defendant Cannot Proffer Ms. Ravel's Testimony to
           Argue that He Did Not Have the State of Mind to Commit
           the Crime.............................................20

IV.   CONCLUSION..................................................21

i

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                          <u>PAGE</u>

***Cases***

<u>Bradley v. Armstrong Rubber Co.</u>,
   130 F.3d 168 (5th Cir. 1997) .................................... 17

<u>Daubert v. Merrell Dow Pharm., Inc.</u>,
   509 U.S. 579 (1993) ................................ 12, 13, 14, 18

<u>De Saracho v. Custom Food Mach., Inc.</u>,
   206 F.3d 874 .................................................... 17

<u>Kumho Tire Co. v. Carmichael</u>,
   526 U.S. 137 (1999) ........................................ 12, 13

<u>Lust v. Merrell Dow Pharmaceuticals, Inc.</u>,
   89 F.3d 594 (9th Cir. 1996) .................................... 12

<u>Newell Rubbermaid, Inc. v. Raymond Corp.</u>,
   676 F.3d 521 (6th Cir. 2012) ................................... 18

<u>United States v. Byers</u>,
   730 F.2d 568 (9th Cir. 1984) ................................... 13

<u>United States v. Frazier</u>,
   387 F.3d 1244 (11th Cir. 2004) ................................. 12

<u>United States v. Kuhrt</u>,
   788 F. 3d 403 (5th Cir. 2015) .................................. 14

<u>United States v. Morales</u>,
   108 F.3d 1031 (9th Cir. 1997) .................................. 20

<u>United States v. Ortland</u>,
   109 F.3d 539 (9th Cir. 1997) ................................... 13

<u>United States v. Sayre</u>,
   434 Fed. App'x 622 (9th Cir. 2011) ............................. 17

<u>United States v. Vallejo</u>,
   237 F.3d 1008 (9th Cir. 2001) .............................. 13, 18

<u>United States v. Vigil</u>,
   No. 05-2051, 2006 WL 5186537 (D.N.M. April 10, 2006) ............ 19

<u>United States v. Whittemore</u>,
   944 F. Supp. 2d 1003 (D. Nev. 2013) ............................ 19

## **TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

***Rules***

Federal Rule of Evidence 401................................ 3, 11, 13

Federal Rule of Evidence 402................................ 3, 11, 13

Federal Rule of Evidence 403................................... Passim

Federal Rule of Evidence 702................................... Passim

Federal Rule of Evidence 704................................ 3, 11, 19

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3      While Chairman of the Los Angeles County Board of Supervisors,

4 defendant MARK RIDLEY-THOMAS ("defendant") conspired with co-

5 defendant MARILYN LOUISE FLYNN, then-Dean of the University of

6 Southern California ("USC") Dworak-Peck School of Social Work

7 ("Social Work School"), to steer lucrative Los Angeles County

8 ("County") contracts to USC in exchange for a bevy of benefits for

9 defendant's son, Sebastian Ridley-Thomas.  In addition to offering

10 Sebastian Ridley-Thomas admission to USC, a full tuition scholarship,

11 and a paid professorship, co-defendant FLYNN helped disguise and

12 funnel a $100,000 payment from the Mark Ridley-Thomas Committee

13 ("Committee") for a Better L.A. to another nonprofit, United Ways of

14 California ("United Ways") for the benefit of the Policy, Research &

15 Practice Initiative ("PRPI"), a new nonprofit initiative founded by

16 Sebastian Ridley-Thomas.  By funneling the payment through USC,

17 defendant and co-defendant FLYNN attempted to disguise the true

18 source of the payment to make it appear as though USC, not defendant,

19 was the generous benefactor supporting his son and PRPI.

20      The government does not allege that any campaign finance laws

21 prevented defendant from donating that $100,000 from his Committee

22 directly to United Ways for the benefit of PRPI.  Doing so, however,

23 would have required public disclosure of the transaction and, as

24 witnesses will testify, would have prompted "optics" concerns by

25 United Ways, the same questions defendant faced earlier when another

26 nonprofit refused to go along with the same transaction.  To

27 circumvent these optics issues and ensure the donation's success,

28

defendant enlisted the help of co-defendant FLYNN to secretly route the payment through USC.

To mislead and confuse the jury with irrelevant opinion testimony and attempt to introduce impermissible testimony concerning defendant's intent to commit the crimes charged, defendant has proffered attorney Ann Ravel to testify as an expert witness.  While her time as a Commissioner on the Federal Election Commission ("FEC") and Chair of the California Fair Political Practices Commission ("FPPC") would serve her as a potential expert witness in a campaign finance matter, her experience and opinions have no relevance in this criminal bribery case.  The government has never once argued, nor intends to argue at trial, that campaign finance law prohibited a donation from defendant's Committee to either USC or United Ways.  Nor does the government intend to argue at trial that defendant violated campaign finance law by routing the payment through USC. Rather, the issue is this: by routing the funds through USC as a way to shield defendant and his son from the nepotistic optics of a politician donating campaign funds to benefit his son, USC and co-defendant FLYNN provided defendant a benefit.  And that benefit, the government alleges, was in exchange for defendant's promises of helping steer a lucrative County contract co-defendant FLYNN's way. At issue is not whether the benefit, in and of itself was legal, but whether the quid pro quo (the benefit in exchange for official action) was legal.  It was not.

As a result, this Court should exclude Ms. Ravel's testimony as irrelevant because it sheds no light on a fact in dispute.  Beyond that, her opinions are so factually-flawed as to render them useless to the factfinder in this case.  Furthermore, Ms. Ravel provides no

1  legal basis for her ultimate conclusion that defendant's campaign

2  donations in the purposefully deceptive manner in which they were

3  executed here were "lawful," as she contends.

4       Moreover, to the extent any of Ms. Ravel's opinions have even a

5  modicum of relevance (they do not), any marginal relevance is

6  substantially outweighed by the danger unfair prejudice, risk of

7  misleading and confusing the jury, and wasting the court's time with

8  testimony about issues that are not in dispute.  Having a former

9  commissioner from the FEC and FPPC bless a transaction that is an

10 essential part of the bribery scheme runs the significant and

11 unacceptable risk that the jury will confuse her testimony as saying

12 the bribery scheme itself was lawful.  Such legal conclusions are

13 impermissible under these facts.

14      Finally, to the extent her testimony that the conduit

15 transaction was "lawful" is offered to suggest that defendant did not

16 have the requisite state of mind to engage in bribery, Federal Rule

17 of Evidence 704 expressly prohibits this type of expert testimony

18 concerning a defendant's mens rea.

19      Accordingly, for all of these reasons, Ms. Ravel's testimony

20 should be excluded under Federal Rules of Evidence 401, 402, 403,

21 702, and 704.

22 **II.   FACTUAL BACKGROUND**

23      **A.   Summary of Relevant Facts**[1]

24      In 2017, defendant's son, Sebastian Ridley-Thomas, was a Member

25 of the California State Assembly and, unbeknownst to the public, the

---

27      [1] For a more fulsome recitation of the conspiracy, please see
   the Government's Supplemental Brief in Support of the Government's
28 Opposition to Defendant MARK RIDLEY-THOMAS'S Motion to Sever.  (Dkt.
   91.)

subject of a sexual harassment investigation.  Defendant was working behind the scenes to help his son navigate the unfolding crisis in the midst of the #MeToo movement.  To skirt scandal and prevent the sexual harassment allegations from surfacing, Sebastian Ridley-Thomas decided to resign from public office, citing "health concerns."  But with his sudden and premature exit from public life, he needed a career and other landing spots to publicly justify his abrupt resignation and tackle mounting personal debt.

A number of the landing spots involved USC and co-defendant FLYNN.  In exchange for offers to exert influence over County department heads and help steer lucrative County contracts to USC, defendant solicited benefits for his son that included: (1) admission to USC for his son to receive an advanced degree; (2) a full tuition scholarship for his son to receive that degree free of charge; and (3) a paid professorship and prestigious faculty title.  But other landing spots did not, at least initially, involve USC at all.

> 1. Defendant's Initial Effort to Help His Son Become the Director of a Nonprofit (AACEP) Fails When the Nonprofit's Sponsoring Organization Questions the Optics of a $100,000 Payment from Defendant

In addition to the USC admission, full scholarship, and paid professorship, defendant sought another landing spot for his son -- director of a nonprofit.  Defendant first turned to Community Partners, Inc. and its CEO and President, P.V.  Community Partners was the fiscal sponsor for the African American Civic Engagement Project ("AACEP"), a nonprofit initiative long associated with defendant.  The problem with defendant's plan, however, was AACEP lacked sufficient funds.

1          To solve this problem, defendant offered to make a $100,000

2    donation from the account for his Committee to Community Partners for

3    the benefit of AACEP.  (He made this offer in early December 2017

4    just as the sexual harassment investigation in the State Assembly was

5    coming to a head and investigators were attempting to interview

6    Sebastian Ridley-Thomas.)  Defendant directed that a funding request

7    from Community Partners be drafted, which made it appear on paper as

8    though Community Partners had made the funding request to his

9    Committee, not the other way around.  (Declaration of Thomas

10   Rybarczyk, Exs. 509, 510.)[2]  While P.V. agreed to the request and

11   signed it, he also sought advice on whether accepting the payment was

12   legal.  (Ex. 510.)  Community Partner's lawyer told him it was but

13   noted that defendant would have to disclose the gift on his

14   Committee's FPPC Form 460, a semi-annual public disclosure form.

15   Days later, Community Partners received the $100,000 check from

16   defendant's Committee account and deposited it.  (Ex. 515.)

17   Defendant reported the donation on his Committee's FPPC Form 460.

18   (Ex. 480, p. 34.)

19         Unbeknownst to Community Partners at the time, while defendant

20   was working to fund AACEP, he was also maneuvering to keep the sexual

21   harassment investigation from becoming public.  He helped craft and

22   peddle a misleading public narrative that Sebastian Ridley-Thomas's

23   resignation from the California State Assembly was for a debilitating

24   health condition.  With the help of a public relations team,

25   defendant worked to ensure that that nearly everyone outside the

26

27   _____

28         [2] All exhibits cited herein are filed contemporaneously with the
     Rybarczyk Declaration.

                                    5

Ridley-Thomas inner circle would never learn of the multiple sexual harassment allegations leveled against his son.

Defendant pushed that false narrative with P.V. when he told the Community Partners CEO just days before Christmas that his son would soon be resigning from the Assembly for health reasons and would make a great director for AACEP.  This prompted P.V. to again check with Community Partners' lawyers concerning whether such a move was legal, especially in light of the receipt of the $100,000 from defendant's Committee.  Community Partners' lawyers advised P.V. and others that Community Partners could proceed with hiring Sebastian Ridley-Thomas as AACEP's director but only under certain parameters.  Community Partners continued to debate the propriety of proceeding forward with the transaction into January 2018.  Defendant pressed P.V. for an answer later that month, and on January 25, 2018, P.V. informed him that Community Partners would not agree to the hiring of Sebastian Ridley-Thomas as AACEP's Director because of the **optics** of the relationship.  Several days later, the attorney for defendant's Committee sent an email to the Community Partners CEO, its attorney, and one of its directors, in which he told them that Community Partners could have lawfully hired Sebastian Ridley-Thomas to be AACEP's director under certain conditions, though he also recognized concerns with the "optics of this arrangement."  (Ex. 544.)  That director forwarded the email to another Community Partners employee, who replied "[d]idn't really need a lawyer to tell us did we?"  (Ex. 545.)  Community Partners returned the $100,000 to defendant and his Committee shortly thereafter.  (Exs. 543, 605.)

//

//

2.    With Co-Defendant FLYNN's Help, Defendant Funnels a
$100,000 Payment Through USC to His Son's New
Nonprofit (PRPI) to Disguise the True Source of the
Funds and Wash Its Connection to His Committee

Less than a week after P.V. told defendant that Community Partners would not agree to having Sebastian Ridley-Thomas serve as AACEP's director, defendant set to work finding another landing spot for his son.  Defendant selected the nonprofit fiscal sponsor United Ways as the new sponsoring organization for PRPI, the successor organization to AACEP.  PRPI's director would be Sebastian Ridley-Thomas.  In March 2018, United Ways and PRPI entered into a Fiscal Sponsorship Agreement.  Per the agreement, PRPI could operate under United Ways' 501(c)(3) nonprofit status but had to secure donations in order to operate; United Ways would not provide funding.  With almost no money and a draft budget of nearly $450,000, including a planned salary of $75,000 for Sebastian Ridley-Thomas and $67,200 for an associate director, PRPI needed a substantial influx of cash. (Ex. 401.)

To fund PRPI, defendant would not make the same mistake twice and face the same questions concerning optics that he had previously with Community Partners and P.V.  Instead, he decided to use co-defendant FLYNN and USC to funnel the payment to United Ways/PRPI, thereby disguising the true source of PRPI's funding from nearly everyone, particularly the United Ways CEO and President, P.M., and the public.  In exchange for co-defendant FLYNN's agreement to funnel the funds, defendant offered his influence and support for an amendment to USC's Telehealth contract with the County.

//

1     On May 2, 2018, defendant arranged for his Committee to issue a

2  $100,000 payment to USC's Social Work School.  (Ex. 107.)

3  Accompanying that check was a letter from defendant in which he

4  wrote:



# M·R·T

### SUPERVISOR MARK RIDLEY-THOMAS

May 2, 2018

Dean Marilyn Flynn
Suzanne Dworak Peck School of Social Work
University of Southern California
214 MRF
Los Angeles, CA  90089

Dear Dean Flynn:

Please find enclosed tangible acknowledgement of the important work of the Suzanne Dworak Peck School of Social Work in Los Angeles and beyond.  As Dean, these funds can be used at your discretion in order to best facilitate the impressive policy and practical work of the School and its impact in the community.

I look forward to witnessing and supporting the Schools continuing achievements.

With hope,

MARK RIDLEY-THOMAS
Supervisor, Second District

Enclosure
($100,000.00 check #1168 )

26  (Id.)  Defendant reported the $100,000 as a donation to USC on his

27  Committee's FPPC Form 460.  (Ex. 481, p. 46.)  He omitted any mention

28  of United Ways or PRPI as the intended or ultimate recipient.

Defendant's email to co-defendant FLYNN the next day (as well as a series of others) made clear that his cover letter accompanying the $100,000 check was a sham to paper over the true purpose of the donation.  His $100,000 donation to USC was not to reward the Social Work School or provide any sort of "tangible acknowledgement" for its "important work" in the community.  It was also not intended to "facilitate the impressive policy and practical work" of the school.  As agreed upon during a meeting between defendant and co-defendant FLYNN on April 26, 2018, the money was to provide USC with the funds necessary to make a nearly-simultaneous $100,000 payment days later to United Ways so that PRPI could hire an associate director named Z.S. and have other cash on hand for its operating expenses.

On May 3, 2018, the day after sending the $100,000 donation from the Committee to USC, defendant emailed co-defendant FLYNN and Bcc'd his son.  (Ex. 335.)  Defendant told co-defendant FLYNN that it was "necessary" for her "to act with dispatch" so as to "facilitate the completion of [Z.S.'s] on-boarding with the United Way in a timely manner -- no later than May 15th."  (Id.)  Z.S. was defendant and Sebastian Ridley-Thomas's choice for PRPI's associate director.  They had offered her employment, but United Ways would not extend a formal contract unless and until PRPI had the funding required to hire her.

Defendant connected co-defendant FLYNN with United Ways and engineered the entire process of funneling the $100,000 to ensure the money got delivered by May 15, 2018, in time for Z.S.'s onboarding.  Co-defendant FLYNN also worked with United Ways to get the money to them, including directing United Ways staff to create an invoice for USC indicating that the $100,000 donation from USC was for "[s]ponsorship for 2018 PRPI CA Survey" and that the funds would be

spent before June 30, 2018.  (Ex. 417.)  Co-defendant FLYNN knew both statements were false but understood that USC would not release the funds without these lies because USC policy (1) prohibited donations where the recipient organization intended to use the funds for salary and (2) required a commitment that the recipient organization use all the funds donated in the same fiscal year, which ended on June 30, 2018.  Throughout multiple conversations with both USC and United Ways staff, defendant and co-defendant FLYNN intentionally concealed that the $100,000 provided by USC was a conduit contribution from defendant's Committee.

On May 9, 2018, co-defendant FLYNN caused a $100,000 donation from USC to be made to United Ways.  (Ex. 611.)  After delivering on her promise, defendant delivered on his, first by arranging a key meeting between co-defendant FLYNN with a high-level, County health official to move forward with an amendment to the USC Telehealth contract and then later by supporting and voting on that same contract amendment.

**B.  Ms. Ravel's Proffered Testimony**

Defendant has proffered the testimony of Ms. Ravel, an attorney who previously served as a FEC Commissioner and FPPC Commissioner. (Ex. A, ¶¶ 2-3.)  In her report (Ex. A), Ms. Ravel stated that she reviewed "relevant documents" relating to the original $100,000 donation from defendant's Committee to Community Partners and his Committee's later $100,000 donation to USC, "which USC further donated to [PRPI]."  (Ex. A, ¶ 32.)  She also indicated that the foundation for her opinions will be based on her interpretation of the "relevant provisions" of California state campaign finance law, FPPC advice letters, and pattern and practice of how other

1  politicians use their campaign funds for donations to nonprofits.

2  (Ex. A, ¶¶ 16-19.)

3      With this background and foundation, Ms. Ravel intends to

4  testify that: (1) defendant's May 2, 2018 donation from his Committee

5  to USC "for the benefit of" PRPI, a project sponsored by United Ways,

6  was "lawful, properly reported, and consistent with the practice of

7  donating campaign funds to tax-exempt nonprofit organizations," and

8  (2) "[i]t would have been lawful and consistent with common practice

9  for [defendant] to have donated the $100,000 directly to [United

10  Ways]."  (Ex. A, ¶ 15.)

11  **III. ARGUMENT**

12      Ms. Ravel's proffered testimony fails to meet multiple threshold

13  requirements for admissibility under Rules 401, 402, and 702, raises

14  numerous grounds for exclusion under Rule 403, and attempts to

15  provide impermissible testimony on the ultimate issue of defendant's

16  <u>mens rea</u> in violation of Rule 704.  This Court should preclude Ms.

17  Ravel from testifying at trial.

18      **A.  This Court Should Exclude Ms. Ravel's Testimony Under Rules**

19          **401, 402, and 702 Because It Lacks Relevance, Reliability,**

20          **and Legal Support and Thus Will Not Be Helpful to the Jury**

21      Ms. Ravel's primary opinion is that the $100,000 donation from

22  defendant's Committee to USC "for the benefit of" PRPI was "lawful,

23  properly reported, and consistent with the practice of donating

24  campaign funds to tax-exempt nonprofit organizations."  (Ex. A,

25  ¶¶ 15, 43-51.)  Separate and apart from the plain Rule 403 issues and

26  unacceptable risk of misleading the jury (detailed herein), this

27  opinion must be excluded for three reasons.  <u>First</u>, it is irrelevant.

28  There is no factual dispute about the legality of defendant's

Committee donations within the context of <u>campaign finance law</u>.
<u>Second</u>, even if there were some factual dispute, Ms. Ravel's opinion
is so factually-flawed that it is irrelevant and unreliable.  <u>Third</u>,
Ms. Ravel fails to provide any legal support whatsoever for her
opinion that a transaction intended to conceal the true source of a
payment, like the one at issue, is "lawful."

      1.   <u>Legal Standard</u>

Rule 702 provides that "[a] witness who is qualified as an
expert by knowledge, skill, experience, training, or education may
testify in the form of an opinion, or otherwise if (a) the expert's
scientific, technical, or other specialized knowledge will help the
trier of fact to understand the evidence or to determine a fact in
issue; (b) the testimony is based on sufficient facts or data; (c)
the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the
facts of the case."

In evaluating proposed expert testimony under Rule 702, courts
play a critical gatekeeping role because of the powerful and
potentially misleading effect of expert evidence on a jury.  <u>See</u>
<u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592-95 (1993);
<u>United States v. Frazier</u>, 387 F.3d 1244, 1260 (11th Cir. 2004)
(stressing that the gatekeeping function "cannot be overstated" and
is "especially significant since the expert's opinion can be both
powerful and quite misleading because of the difficulty in evaluating
it[]").  This gatekeeping role applies to all expert testimony, not
just scientific testimony.  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S.
137, 147 (1999).  The proponent of the expert testimony bears the
burden of demonstrating its admissibility.  <u>Lust v. Merrell Dow</u>

1    _Pharmaceuticals, Inc._, 89 F.3d 594, 598 (9th Cir. 1996).  District

2    courts enjoy wide latitude in excluding expert testimony, _United_

3    _States v. Byers_, 730 F.2d 568, 571 (9th Cir. 1984), which is why such

4    decisions are reviewed for abuse discretion, _United States v._

5    _Ortland_, 109 F.3d 539, 544 (9th Cir. 1997).

6         Evaluating expert opinions, however, does not require trial

7    courts to abandon first principles.  Indeed, "[t]he proper

8    exercise of [the District Court's] gatekeeping function is critically

9    important 'to ensure the reliability and _relevancy_ of expert

10   testimony.'"  _Jinro America, Inc. v. Secure Investments, Inc._, 266

11   F.3d 993, 1005 (9th Cir. 2001) (quoting _Kumho Tire Co._, 526 U.S. at

12   152) (emphasis added)).  Accordingly, expert testimony, like all

13   other evidence, may be excluded if it is irrelevant under Federal

14   Rules of Evidence 401 and 402.  _See_ _United States v. Vallejo_, 237

15   F.3d 1008, 1015-16 (9th Cir. 2001) (evaluating expert testimony under

16   Rule 401).  Expert testimony is only admissible if it "will assist

17   the trier of fact to understand or determine a fact in issue."

18   _Daubert_, 509 U.S. at 592.  Stated differently, it must be

19   "sufficiently tied to the facts of the case that it will aid the jury

20   in resolving a factual dispute."  _Daubert_, 509 U.S. at 592.

21        2.   Ms. Ravel's Opinion Is Irrelevant Because It

22             Pertains to Facts That Are Not in Dispute

23        Ms. Ravel's opinion is irrelevant.  When Ms. Ravel opines that

24   the donation was "lawful," she purports to mean within the context of

25   campaign finance law.  That is not in dispute.  The government has

26   never argued that defendant's donation from his Committee to USC

27   violates _campaign finance law_.  Nor does the government contend that

28   USC violated any campaign finance laws with its donation to United

Ways for the benefit of PRPI.  In fact, the government even <u>agrees</u> with Ms. Ravel that, had he wanted to do so, defendant could have donated directly from his Committee to United Ways/PRPI.  The entire point is that, instead of donating directly, he chose the secreted, circuitous route through USC to circumvent perceptions of nepotism and the risk that United Ways would reject the donation based upon those optics.

Because there is no "factual dispute" about the legality of the donations with respect to campaign finance law, that should end the inquiry.  <u>Daubert</u>, 509 U.S. at 592.  Expert testimony is impermissible unless it "will aid the jury in resolving a factual dispute."[3]  <u>Id.</u>; <u>see also</u> <u>United States v. Kuhrt</u>, 788 F. 3d 403, 421-22 (5th Cir. 2015) (affirming exclusion of expert testimony concerning whether defendants complied with accounting disclosure rules where the allegations were they "actively participated in the fraud and took affirmative action," not whether they complied with accounting ethics and principles).

> ### 3.   Ms. Ravel's Opinion Is Unreliable Because It Hinges upon Critical Omissions of Material Fact

Even if there were some factual dispute with respect to the contours of campaign finance law (there is not), Ms. Ravel's opinion is so factually-flawed that it is irrelevant and unreliable.  She paints the $100,000 transaction as legal, normal in fact, as if all

---

[3] In her report, Ms. Ravel devotes three pages to so-called "behest payments" -- donations made by company or entity to a nonprofit at the request or direction of a candidate or official. (Ex. A, ¶¶ 28-31.)  Such testimony would irrelevant.  There is no allegation or even suggestion that defendant engaged in a behested payment, and she does not characterize any of the donations associated with his Committee or USC as a behested payment. Accordingly, this proffered opinion is irrelevant.

politicians do what defendant did.  It is a rather shocking
suggestion, until one looks to the host of material facts missing
from her report.

     To begin, Ms. Ravel omits the concealed nature of the
transaction and intentional deception surrounding it.  She omits that
defendant and co-defendant FLYNN never disclosed to USC and United
Ways that defendant's payment to USC was intended for United Ways,
PRPI, or defendant's son.  She fails to consider that no one at USC
(apart from co-defendant FLYNN) even knew the $100,000 from defendant
was a so-called "conduit" payment.  She ignores that defendant's May
2 letter to USC accompanying the $100,000 donation conveniently
omitted the fact that the payment was intended for United Ways and
PRPI.  Indeed, she entirely skips over the duplicity of defendant's
letter, which made it appear to the unsuspecting reader as though
defendant offered the funds to support the Social Work School -- in
defendant's words, as a "tangible acknowledgement" of the school's
important work and to be used at co-defendant FLYNN's "discretion in
order to best facilitate the impressive policy and practical work of
the School and its impact in the community" -- when, in truth,
defendant had secretly arranged with co-defendant FLYNN for the money
to be routed through USC to United Ways for his son's non-profit.
(Ex. 107.)

     Ms. Ravel further omits from her report the fact that neither
defendant, nor co-defendant FLYNN told United Ways that the $100,000
from USC originated from defendant's Committee.  In fact, both of
them actively concealed their efforts to funnel the $100,000 through
USC.  Defendant and his son led United Ways to believe that PRPI had
been awarded a prestigious "grant" from USC.  (Exs. 413, 334, 343.)

15

Co-defendant FLYNN also played a critical role in deceiving United Ways, duping its staff into submitting a false invoice to USC in an effort to ensure that USC would release the money to United Ways by defendant's requested deadline.[4]  (Ex. 417.)

Beyond that, Ms. Ravel fails to consider that USC and United Ways witnesses have uniformly told the government that they were completely in the dark as to this secreted arrangement between defendant and co-defendant FLYNN.  They have also said that, had USC or United Ways known that defendant's $100,000 donation to USC was intended to be routed through USC to United Ways/PRPI, both USC and United Ways would have rejected the donation.  Indeed, once sunlight hit and the truth surrounding the circumstances of the arrangement became clear, USC refunded the $100,000 donation to defendant's Committee.  United Ways later followed suit, returning the $100,000 payment it received from USC.  And USC referred the whole episode to the U.S. Attorney's Office.  Contrary to what Ms. Ravel suggests, these circumstances make this transaction anything but a normal political contribution.[5]

---

[4] The invoice falsely stated that United Ways/PRPI intended to use the $100,000 from USC to commission a survey and would expend the entirety of the funds by June 30, 2018 (the end of USC's fiscal year).  Both of those statements were false, as co-defendant FLYNN knew.  In truth, PRPI intended to use the funds to pay Z.S.'s salary and would not use all of the $100,000 payment from USC by June 30, 2018.  These lies were material because USC policy prohibited donations where the recipient organization intended to use the money for salary and required that any payment be used in full by June 30, 2018 or else USC would not issue the payment.  USC would not have made the $100,000 payment to United Ways/PRPI had it known the truth.

[5] In addition to these material omissions, Ms. Ravel also failed to provide other examples of public officials who purposefully disguised the true source of their donations to a nonprofit by using an intermediary nonprofit as a "conduit."  Accordingly, her opinion that what defendant did here was "consistent with the practice of donating campaign funds to tax-exempt nonprofit organizations[]" is without foundation and irrelevant. (Ex. A, ¶ 15.)

16

1    Because Ms. Ravel fails to grapple with any of these critical
2    facts, relying instead on a grossly misleading factual predicate, her
3    proffered testimony "'will not speak to the case at hand and hence
4    will be irrelevant.'"  See De Saracho v. Custom Food Mach., Inc., 206
5    F.3d 874, 879 n. 5 (9th Cir. 2000) (quoting Bradley v. Armstrong
6    Rubber Co., 130 F.3d 168, 177 (5th Cir. 1997)).  It must be excluded.
7            4.   Ms. Ravel's Opinion Lacks Necessary Legal Support
8        Furthermore, beyond Ms. Ravel's failure to account for material
9    facts and apparent reliance on a grossly misleading factual record,
10   she offers no legal support for her opinion that the so-called
11   "conduit" donation through USC was lawful.  While she cites laws
12   permitting donations to nonprofits and the general ways in which
13   campaign funds may be used (e.g., Ex. A, ¶¶ 16-19), she offers no
14   legal basis for her bold proclamation that a transaction rife with
15   intentional deception was "lawful" and properly "reported."  (Ex. A,
16   ¶¶ 15, 50-51.)  She provides no legal foundation explaining how such
17   conduct would be lawful, particularly when most campaign finance laws
18   requiring disclosure of donations are intended to promote
19   transparency of the source of the donation, not concealment of it.
20   All Ms. Ravel provides is her say-so.  But her say-so is insufficient
21   to admit her opinions under Federal Rule of Evidence 702.  See United
22   States v. Sayre, 434 Fed. App'x 622, 624 (9th Cir. 2011) (affirming
23   district court's exclusion of a defense expert and observing that
24   "[N]othing in either Daubert...or the Federal Rules of Evidence
25   requires a district court to admit opinion evidence that is connected
26   to existing data only by the ipse dixit of the expert").
27       Ultimately, for all of these reasons, Ms. Ravel's opinions --
28   prepared solely for litigation -- lack a sufficient and reliable

17

basis for admission.  See, e.g., Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity.  In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion." (citation omitted)).

**B.    This Court Should Further Exclude Ms. Ravel's Testimony Because Any Relevance Is Substantially Outweighed by the Danger of Unfair Prejudice, Confusion, and Undue Delay**

Like all evidence, a district court may refuse to admit relevant expert testimony under Rule 403, Vallejo, 237 F.3d at 1021, which permits exclusion of otherwise relevant evidence where its probative value "is substantially outweighed by a danger of...unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  The Supreme Court has observed: "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses."  Daubert, 509 U.S. at 595 (internal quotation marks omitted).

Here, even if this Court were to find Ms. Gravel's testimony relevant and reliable, her testimony would be substantially outweighed by the danger of unfair prejudice, confusion, and a waste of time, particularly because she would spending time opining on issues that are not in dispute.  The gravest risks of all, however, are unfair prejudice and confusion.  Ms. Gravel's opinion that the

so-called "conduit" transaction was "lawful" presents a substantial and significant risk that the jury will believe, improperly, that she is opining that the bribery transaction itself was "lawful."  The reason this testimony would almost certainly confuse and mislead the jury is that co-defendant FLYNN's agreement to secretly funnel the $100,000 from defendant's Committee through USC to his son's nonprofit was an integral part of the quid pro quo arrangement.  Co-defendant FLYNN agreed to do it in exchange for County funds.  Having Ms. Gravel opine then that this arrangement was "lawful" runs the real risk the jury will believe her opinion is that the entire arrangement was lawful.  Such an expert opinion coming from a former FEC and FPPC Commissioner would be the equivalent of an impermissible legal conclusion and a misleading one at that.  See United States v. Whittemore, 944 F. Supp. 2d 1003, 1010-12 (D. Nev. 2013), aff'd, 776 F.3d 1074 (9th Cir. 2015) (excluding linguistics expert's testimony that defendant's interpretation of a campaign finance statute was "reasonable" because it stated a legal conclusion and was unhelpful to the jury); United States v. Vigil, No. 05-2051, 2006 WL 5186537 at *1 (D.N.M. April 10, 2006) (granting government's motion in limine to exclude expert testimony that defendant "complied with all campaign reporting requirements under New Mexico law and the regulations of the New Mexico Office of Secretary of State"); Fed. R. Evid. 704 advisory comm. note ("Under Rule 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time.  These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.").

1   For all of these reasons, the Court is well within its power to

2   exclude Ms. Ravel's testimony under Rule 403 -- and should do so.

3   **C.    Defendant Cannot Proffer Ms. Ravel's Testimony to Argue**

4   **that He Did Not Have the State of Mind to Commit the Crime**

5   Finally, in the event that defendant intends to use Ms. Ravel's

6   testimony to suggest that he did not have a corrupt state of mind

7   when he entered into the bribery agreement with co-defendant FLYNN,

8   that too would be an impermissible use of Ms. Ravel's testimony.

9   See, e.g., Ninth Circuit Model Criminal Jury Instructions, No. 10.2

10  (2022 ed.) (requiring the government to prove defendant acted

11  corruptly to be convicted of bribery); Ninth Circuit Model Criminal

12  Jury Instructions, No. 15.34 (2022 ed.) (requiring government to

13  prove defendant acted with intent to defraud).  Such testimony

14  suggesting that defendant's conduct is lawful could then only used to

15  demonstrate that he believed what he did was legal and therefore

16  could not have been corrupt.  This state of mind evidence is

17  forbidden by Federal Rule of Evidence 704(b), which prohibits

18  admission of expert testimony "about whether the defendant did or did

19  not have a mental state or condition that constitutes an element of

20  the crime charged or of a defense.  Those matters are for the trier

21  of fact alone."  See also United States v. Morales, 108 F.3d 1031,

22  1036-37 (9th Cir. 1997) (explaining that "[a] prohibited 'opinion or

23  inference' under Rule 704(b) is testimony from which it necessarily

24  follows, if the testimony is credited, that the defendant did or did

25  not possess the requisite mens rea.").  Therefore, Ms. Ravel's

26  proffered testimony should excluded under Rule 704(b), too.

27

28

20

**IV.   CONCLUSION**

    For the foregoing reasons, the government respectfully requests that this Court GRANT the government's motion <u>in limine</u> to exclude the expert testimony of Ms. Ravel.