E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
LINDSEY GREER DOTSON (Cal. Bar No. 266973)
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
MICHAEL J. MORSE (Cal. Bar No. 291763)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-4443/8452/7367
     Facsimile:  (213) 894-0141
     E-mail:     lindsey.dotson@usdoj.gov
            thomas.rybarczyk@usdoj.gov
            michael.morse@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>     v.<br><br>MARK RIDLEY-THOMAS,<br><br>     Defendant. | No. CR 21-00485-DSF-1<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT MARK RIDLEY-THOMAS'S MOTION *IN LIMINE* NO. 1<br><br>Hearing Date: February 13, 2023<br>Hearing Time: 8:30 a.m.<br>Location:    Courtroom of<br>               the Honorable<br>               Dale S. Fischer |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Lindsey Greer Dotson, Thomas F. Rybarczyk, and Michael J. Morse, hereby files the Government's Opposition to Defendant Mark Ridley-Thomas's Motion In Limine No. 1.

1       This opposition is based upon the attached memorandum of points

2  and authorities, the Declaration of Assistant United States Attorney

3  Lindsey Greer Dotson and the exhibit filed in support of the instant

4  opposition, the files and records in this case, and such further

5  evidence and argument as the Court may permit.

6  Dated: January 22, 2023      Respectfully submitted,

7                      E. MARTIN ESTRADA
                      United States Attorney

8

9                      MACK E. JENKINS
                      Assistant United States Attorney
                      Chief, Criminal Division

10

11                  */s/ Lindsey Greer Dotson*
                      LINDSEY GREER DOTSON

12                      THOMAS F. RYBARCZYK
                      MICHAEL J. MORSE

13                      Assistant United States Attorneys

14                      Attorneys for Plaintiff
                      UNITED STATES OF AMERICA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

I.   INTRODUCTION...................................................1

II.  STATEMENT OF FACTS.............................................2

III. ARGUMENT......................................................5

     A.   Co-defendant FLYNN's Statements Were Made During and
          in Furtherance of the Conspiracy and Therefore Are
          Admissible Under Rule 801(d)(2)(E).......................5

          1.   Federal Rule of Evidence 801(d)(2)(E)..............5

          2.   A Preponderance of the Evidence Shows the
               Existence of a Conspiracy and Defendant's
               Knowledge of It....................................7

          3.   Co-defendant FLYNN's Statements Were Made
               During and in Furtherance of the Conspiracy
               with Defendant.....................................8

     B.   Co-defendant FLYNN's Statements Are Also Admissible
          Under Rule 803(3) Because They Provide Evidence of
          Her State of Mind and Intent, Which Are at Issue in
          a Conspiracy Case.......................................15

     C.   No "Unfair" Prejudice Substantially Outweighs the
          Immense Probative Value of Co-defendant FLYNN's
          Statements..............................................18

IV.  CONCLUSION...................................................20

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                        <u>PAGE</u>

***Cases***

<u>Bourjaily v. United States</u>,
     483 U.S. 171 (1987)......................................5, 7

<u>Rogers v. United States</u>,
     340 U.S. 367 (1951)........................................16

<u>United States v. Allen</u>,
     425 F.3d 1231 (9th Cir. 2005)...............................5

<u>United States v. Bailleaux</u>,
     685 F.2d 1105 (9th Cir. 1982)..........................18, 19

<u>United States v. Blitz</u>,
     151 F.3d 1002 (9th Cir. 1998)..............................19

<u>United States v. Bowman</u>,
     215 F.3d 951 (9th Cir. 2000)..............................5, 7

<u>United States v. Ciresi</u>,
     697 F.3d 19 (1st Cir. 2012)............................passim

<u>United States v. Curtin</u>,
     489 F.3d 935 (9th Cir. 2007)...............................18

<u>United States v. Day</u>,
     591 F.2d 861 (D.C. Cir. 1978)..............................18

<u>United States v. Escobar de Bright</u>,
     742 F.2d 1196 (9th Cir. 1984)..............................17

<u>United States v. Eubanks</u>,
     591 F.2d 513 (9th Cir. 1979)...............................15

<u>United States v. Kaplan</u>,
     836 F.3d 1199, (9th Cir. 2016).............................16

<u>United States v. Layton</u>,
     720 F.2d 548 (9th Cir. 1983)...........................passim

<u>United States v. Loveland</u>,
     825 F.3d 555 (9th Cir. 2016)...............................16

<u>United States v. Mahler</u>,
     452 F.2d 547 (9th Cir. 1972)...............................19

<u>United States v. Parker</u>,
     549 F.2d 1217 (9th Cir. 1977)..............................19

ii

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                      <u>PAGE</u>

<u>United States v. Shores</u>,
      33 F.3d 438 (4th Cir. 1994)...............................<u>passim</u>

<u>United States v. Traylor</u>,
      656 F.2d 1326 (9th Cir. 1981)..................................6

<u>United States v. Vallee</u>,
      807 F.3d 508 (2d Cir. 2015)...................................16

<u>United States v. Williams</u>,
      989 F.2d 1061 (9th Cir. 1993)..................................6

<u>Wagner v. Cnty. of Maricopa</u>,
      747 F.3d 1048 (9th Cir. 2013).................................15

***Rules***

Federal Rule of Evidence 801(d)(2)(E)..........................<u>passim</u>

Federal Rule of Evidence 803(3)................................<u>passim</u>

Federal Rule of Evidence 403...................................<u>passim</u>

***Other Authorities***

Ninth Circuit Model Criminal Jury Instructions,
      No. 11.1 (2022 ed.)..........................................16

1
## MEMORANDUM OF POINTS AND AUTHORITIES

2
## I.    INTRODUCTION

3
In his motion to sever, which this Court denied (dkt. 95),

4
defendant MARK RIDLEY-THOMAS ("defendant") argued that certain

5
statements by co-defendant MARILYN LOUISE FLYNN ("co-defendant

6
FLYNN") would be inadmissible hearsay and unfairly prejudicial at a

7
trial solely against him.  In its order denying the motion to sever,

8
the Court stated that while it was "not determining at this time

9
whether any of Flynn's challenged statements will be admitted," there

10
was "sufficient support for [the government's] position that Flynn's

11
challenged statements will be admissible."  (Dkt. 95, pp. 2-3.)  The

12
Court specifically found "sufficient reason to believe that the

13
statements were made in furtherance of the alleged conspiracy."  (Id.

14
at p. 3.)  Defendant now asks this Court to revisit its prior order

15
and rule that some of those same statements are not coconspirator

16
statements and therefore are inadmissible as hearsay.  He remains

17
incorrect.

18
First, consistent with the Court's prior order (dkt. 95), the

19
challenged statements are not hearsay because they are coconspirator

20
statements made during and in furtherance of the conspiracy under

21
Federal Rule of Evidence 801(d)(2)(E).  Second, independent of their

22
admissibility as coconspirator statements, the statements are also

23
admissible under Federal Rule of Evidence 803(3).  As defendant

24
concedes in his motion, the challenged statements all reflect co-

25
defendant FLYNN's state of mind.  (Dkt. 135, p. 1.)  Because her

26
state of mind is at issue in this conspiracy case, her statements are

27
admissible under Rule 803(3).  Finally, contrary to defendant's

28
claims, Federal Rule of Evidence 403 presents no bar to the

statements' admission.  None of the challenged statements are <u>unfairly</u> prejudicial.  And even if there were some unfair prejudice (there is none), it could not possibly "substantially outweigh" the statements' immense probative value, as it must to justify the extreme remedy of exclusion.  For these reasons, defendant's motion lacks merit and should be denied.

## II.  STATEMENT OF FACTS

The government hereby incorporates its Supplemental Brief, filed at docket no. 91, regarding the evidence the government will offer at trial to support the existence of a conspiracy.  The Court previously deemed the Supplemental Brief a "lengthy and detailed" brief that established the existence of a conspiracy by a preponderance of the evidence and "provid[ed] sufficient support for [the government's] position that Flynn's challenged statements will be admissible" at trial.  (Dkt. 95, p. 2.)  Below is a summary of the pertinent facts contained in the Supplemental Brief.[1]

In 2017, defendant's son, Sebastian Ridley-Thomas, was a Member of the California State Assembly and, unbeknownst to the public, the subject of a sexual harassment investigation.  Defendant was working behind the scenes to help his son navigate the unfolding crisis in the midst of the #MeToo movement.  In an attempt to skirt scandal and prevent the sexual harassment allegations from surfacing, Sebastian Ridley-Thomas decided to resign from public office, citing "health concerns."  But with his sudden and premature exit from public life, he needed a career and other landing spots to publicly justify his

---

[1] Should the Court wish to examine any exhibit or interview report, the government will submit those to the Court.

abrupt resignation and tackle mounting personal debt.  Defendant was looking for ways to provide his son with those landing spots.

At the same time, co-defendant FLYNN, then Dean of the University of Southern California ("USC") Suzanne Dworak-Peck School of Social Work ("Social Work School"), faced a significant threat to her career and legacy after two decades at the helm.  Under her leadership, the school was facing a multimillion-dollar budget deficit.  To salvage her deanship, the substantial compensation she received on account of her position as Dean, and her reputation within the field of social work, co-defendant FLYNN needed lucrative County contracts for the Social Work School.

Both uniquely positioned to help the other, defendant and co-defendant FLYNN soon came to each other's mutual aid.  In exchange for help securing County contracts and amendments to existing contracts, defendant solicited and demanded from co-defendant FLYNN and USC a variety of benefits primarily intended to help his son. Co-defendant FLYNN readily obliged, gladly offering any perk and benefit at her disposal to sway defendant in the performance of his official duties.  In exchange for County contracts and amendments to existing contracts, defendant solicited and demanded, and co-defendant FLYNN offered and agreed to give, the following: (1) admission to USC for Sebastian Ridley-Thomas to obtain a master's degree; (2) a full tuition scholarship for Sebastian Ridley-Thomas to attend USC; (3) a paid professorship for Sebastian Ridley-Thomas to teach at USC while he was a student; and (4) the secret funneling of $100,000 from defendant's campaign committee account through USC to a nonprofit Sebastian Ridley-Thomas was spearheading called the Policy, Research & Practice Initiative ("PRPI").

With respect to the $100,000 payment, defendant wanted to donate campaign funds to his son's new nonprofit (PRPI) but needed to do so covertly to ensure the donation's success after a prior, failed attempt (see Indictment, ¶¶ 4-10).  He enlisted co-defendant FLYNN's help funneling the payment through USC.  In May 2018, he directed a $100,000 "donation" from his campaign account to the Social Work School supposedly for the school's good work in the community.  But unbeknownst to USC leadership, defendant already had arranged with co-defendant FLYNN for USC to make a simultaneous $100,000 donation to PRPI's fiscal sponsor (United Ways of California) for PRPI's benefit.[2]  By funneling the $100,000 payment through USC, both defendants attempted to disguise the true nature of the payment to make it appear as though USC, not defendant, was the generous benefactor supporting Sebastian Ridley-Thomas and PRPI.  To execute their plan, both defendants concealed material facts and misled USC and United Ways of California to expeditiously funnel the $100,000 through USC to PRPI.

Ultimately, co-defendant FLYNN delivered on each of the requested benefits for defendant's son.  Defendant delivered, too.  Upon his son receiving the benefit (or at least the promise of it), defendant took official action, including by voting on at least three Board of Supervisors' agenda items and motions as co-defendant FLYNN requested and by exerting pressure on County department heads and public officials in ways co-defendant FLYNN sought.

---

[2] A fiscal sponsor provides support to smaller nonprofit initiatives, like PRPI, and allows the initiative to operate under the sponsor's tax-exempt, 501(c)(3) status.  The fiscal sponsor does not provide funding, however.  To operate and pay salaries, the initiative must perform its own fundraising.

**III. ARGUMENT**

**A.    Co-defendant FLYNN's Statements Were Made During and in Furtherance of the Conspiracy and Therefore Are Admissible Under Rule 801(d)(2)(E)**

1.    <u>Federal Rule of Evidence 801(d)(2)(E)</u>

Coconspirator statements made during and in furtherance of a conspiracy are, by definition, not hearsay and thus admissible at any trial against any fellow coconspirator.  Fed. R. Evid. 801(d)(2)(E).[3] "Under Rule 801(d)(2)(E), the statement of a co-conspirator is admissible against the defendant if the government shows by a preponderance of the evidence that [1] a conspiracy existed at the time the statement was made; [2] the defendant had knowledge of, and participated in, the conspiracy; and [3] the statement was made in furtherance of the conspiracy." <u>United States v. Bowman</u>, 215 F.3d 951, 960-61 (9th Cir. 2000) (citing <u>Bourjaily v. United States</u>, 483 U.S. 171, 175 (1987)).  While mere "[n]arrations of past events are inadmissible," the Ninth Circuit has held that that "expressions of future intent" as well as "statements that further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy" are admissible under Rule 801(d)(2)(E).  <u>Id.</u> at 961 (internal quotations and citation omitted). Moreover, the "reach of the co-conspirator exception" is so substantial that even narrations of past events are admissible as coconspirator statements where the narrations themselves served to

---

[3] Coconspirator statements admitted under Rule 801(d)(2)(E) present no Confrontation Clause issue.  <u>See, e.g.</u>, <u>United States v. Allen</u>, 425 F.3d 1231, 1235 (9th Cir. 2005) ("co-conspirator statements are not testimonial and therefore beyond the compass of <u>Crawford's</u> holding").

1    further some aspect of the conspiracy.  United States v. Layton, 720

2    F.2d 548, 556-57 (9th Cir. 1983), overruled on other grounds by

3    United States v. W.R. Grace, 526 F.3d 499 (9th Cir. 2008).

4         Coconspirator statements are not limited to conversations

5    between coconspirators.  United States v. Williams, 989 F.2d 1061,

6    1068 (9th Cir. 1993) ("It is not necessary that the statement be made

7    to another member of the conspiracy for it to come under rule

8    801(d)(2)(E).").  Statements to third parties are admissible under

9    Rule 801(d)(2)(E) provided that the statement was intended, at least

10   in part, to move some goal of the conspiracy forward.  Id.  Where a

11   coconspirator makes a statement to a third party to get some form of

12   assistance to achieve the conspiracy's objectives, that statement is

13   in furtherance of the conspiracy.  Layton, 720 F.2d at 556-57.  For

14   example, "[a] statement to someone to secure utensils and mixing

15   bowls for the mixing of drugs is sufficiently in furtherance of a

16   conspiracy to sell drugs, even if the person ordered to obtain the

17   materials was not part of the conspiracy."  Id. (citing United States

18   v. Traylor, 656 F.2d 1326, 1333 (9th Cir. 1981)); see also United

19   States v. Ciresi, 697 F.3d 19, 28 (1st Cir. 2012).  Indeed, "[t]o be

20   deemed 'in furtherance,' a statement need not be necessary or even

21   important to the conspiracy, or even made to a coconspirator, as long

22   as it can be said to advance the goals of the conspiracy in some

23   way."  Ciresi, 697 F.3d at 28 (internal quotation marks omitted).

24        Beyond that, a statement to a third party is still in

25   furtherance of a conspiracy "even though it is susceptible of

26   alternative interpretations and was not exclusively, or even

27   primarily, made to further the conspiracy, so long as there is some

28   reasonable basis for concluding that it was designed to further the

6

conspiracy." <u>United States v. Shores</u>, 33 F.3d 438, 444 (4th Cir. 1994) (internal quotation marks omitted).  Whether a statement is admissible under Rule 801(d)(2)(E) is a fact-specific inquiry, requiring a "careful examination of the context in which it was made." <u>Id.</u>  That is because oftentimes statements "at first blush" may "appear to be nothing more than casual conversation about past events," but when the full context of the statements develops at trial, one of the purposes of those statements may be to further some aspect of the conspiracy.  <u>Id.</u>

> 2.  <u>A Preponderance of the Evidence Shows the Existence of a Conspiracy and Defendant's Knowledge of It</u>

The government bears the burden of proving the existence of a conspiracy and defendant's knowledge of it by a preponderance of the evidence.  <u>Bowman</u>, 215 F.3d at 960.  In determining whether the government has met its burden, both Federal Rule of Evidence 104(a) and Supreme Court precedent confirm that the Court may consider any evidence, including the coconspirator statements themselves, subject only to the rules of privilege.  <u>Bourjaily</u>, 483 U.S. at 178-79.

Defendant does <u>not</u> contend in his motion <u>in limine</u> that the government has failed to meet its burden in this respect.  Indeed, as the Court previously ruled, the government's Supplemental Brief (dkt. 91) was "sufficient" to establish the existence of a conspiracy even "without the challenged statements" but further concluded that the challenged statements themselves were "also highly suggestive of a conspiracy."  (Dkt. 95, p. 3.)  The Court stated, "Flynn strongly implies that she is providing benefits to [defendant's] son with the expectation that [defendant] will aid in awarding a County contract to the USC School of Social Work."  (<u>Id.</u>)

There is no question that, based upon the evidence proffered in docket no. 91 and in accord with the Court's prior ruling, the threshold inquiry of whether a conspiracy existed by a preponderance of the evidence has been met.  And as the Court noted, if a conspiracy involving defendant existed, he must have known of it. (Id. at p. 2.)

### 3. Co-defendant FLYNN's Statements Were Made During and in Furtherance of the Conspiracy with Defendant

The three challenged statements were made during and in furtherance of the conspiracy and thus are admissible under Rule 801(d)(2)(E).  The government hereby addresses each statement made by co-defendant FLYNN in turn.

#### a. "Good news!  We're going to get the Telehealth contract, but I had to do a favor to get it."

In late April 2018, during a private meeting, co-defendant FLYNN told University Official 3, a high-level official at the Social Work School: "Good news!  We're going to get the Telehealth contract, but I had to do a favor to get it."  Co-defendant FLYNN winked at University Official 3 when she said this.  As detailed herein, co-defendant FLYNN's statement was made during and in furtherance of the conspiracy and thus is admissible under Rule 801(d)(2)(E).

First, the statement was made during the life of the conspiracy. In fact, it was made during the height of it and certainly before the objectives of the conspiracy had been accomplished.  In April 2018, neither the full host of benefits had been delivered yet to Sebastian Ridley-Thomas, nor had defendant taken key official action to move the Telehealth contract amendment forward.  Co-defendant FLYNN had yet to funnel the $100,000 payment through USC (the funneling

occurred in May 2018).  Defendant also had yet to vote in favor of
Item No. 27, which extended the Telehealth contract another year on
the terms co-defendant FLYNN desired (the vote occurred on July 31,
2018).  Given that certain "quids" and certain "quos" had yet to be
performed as of April 2018, there is no question that the statement
was made while the conspiracy was ongoing.

Second, co-defendant FLYNN's statement was also made in
furtherance of the conspiracy.  One of the central goals of the
conspiracy was for the Social Work School to secure the Telehealth
contract, particularly on co-defendant FLYNN's desired terms.  The
amended contract would allow the Social Work School to continue to
provide mental health services to patients referred by the County in
exchange for County funds but now on improved financial terms for
USC.  Indeed, the entire reason co-defendant FLYNN engaged in the
conspiracy at all was to secure County contracts, including the
Telehealth contract, which she hoped would resurrect the Social Work
School's financial viability, preserve her job, and enshrine her
legacy.  Co-defendant FLYNN telling anyone at the Social Work School
about her expectations regarding the Telehealth contract or any other
County contract identified in the indictment was most certainly "in
furtherance of the conspiracy."  She needed those employees' help
facilitating the contracts, identifying beneficial contract terms,
negotiating those terms with the County, providing services required
under the contracts, and obtaining County funds in return for
services rendered.  Co-defendant FLYNN keeping co-workers abreast of
the status of County contracts and negotiations was integral to her
achieving her own goals with respect to those contracts.  As her
second-in-command, University Official 3 was positioned -- necessary

9

in fact -- to help co-defendant FLYNN achieve her own objectives regarding such contracts, including the Telehealth contract.

For instance, shortly before co-defendant FLYNN made this key statement, there had been a lengthy email exchange between co-defendant FLYNN, University Official 3, and another Social Work School employee about the status of the Telehealth contract and contract terms necessary to sustain the clinic. (Declaration of Lindsey Greer Dotson, Ex. 103.)  At that time in early April, without an improved contract whereby the County would refer more patients and reimburse the Social Work School for services rendered at an increased hourly rate, Telehealth would fail; the clinic was not financially viable.  The third USC employee explained: "It's the financial barriers that prevent us (Telehealth Clinic) from offering these services now.  We're on 'operation survival' attempting to make USC Telehealth self-sustaining in one year with a focus on maximizing our contract reimbursed services."  (Id. at p. 3.)  With respect to County negotiations, the employee stated it best: "Telehealth survival is a priority."  (Id. at p. 1.)  The fact that co-defendant FLYNN just weeks later told University Official 3 about her pivotal progress on this issue -- securing the amended Telehealth contract -- was absolutely in furtherance of the conspiracy.  Co-defendant FLYNN keeping Social Work School employees updated as to developments on a key contractual front, particularly someone like University Official 3 who was party to high-level discussions about its progress, was certainly geared toward furthering the goals of the conspiracy with respect to securing and implementing the contract.

Moreover, co-defendant FLYNN taking credit for securing the valuable contract served to boost her own importance and value within

the school community.  She was the head of a school at USC on the precipice of financial ruin.  By touting the fact that she secured the contract, which she told individuals could potentially bring in millions to the Social Work School, she served to anchor her position at the helm of the school.  Staying in power as Dean of the Social Work School no doubt facilitated the conspiracy's objectives because, at the helm, she controlled the levers and purse strings of the school.  As Dean, she would remain capable of funneling the $100,000 through USC (which she did in May 2018) and, long term, remain in a position of power to continue providing benefits to Sebastian Ridley-Thomas, such as renewing his scholarship and extending his paid professorship contract for the following year.

Accordingly, co-defendant FLYNN's statement about securing the Telehealth contract was in furtherance of the conspiracy.  And no matter how defendant interprets her comment, there is at least "some reasonable basis" on this record alone -- and certainly on a more fulsome trial record -- to conclude that at least one of co-defendant FLYNN's reasons for making the statement was to advance some aspect of the conspiracy, namely, securing and implementing the amended Telehealth contract.  Shores, 33 F.3d at 444; Layton, 720 F.2d at 556.

    b. *"At some point, I need to tell you about my deal with SRT and MRT."*

In June 2018, co-defendant FLYNN was voted out of office by her peers with a "no confidence" vote.  In mid-June, as co-defendant FLYNN was meeting regularly with University Official 3 to help him take over the school's reins, she told him, "At some point, I need to tell you about my deal with SRT and MRT."  University Official 3

later clarified that co-defendant FLYNN said either "deal" or "arrangement" when referring to her agreement with Sebastian Ridley-Thomas and defendant.

The timing of her statement is key. Co-defendant FLYNN made this statement to University Official 3 in the middle of June 2018 -- immediately after her removal as Dean and just as University Official 3 had begun preparations to take over and run the Social Work School in her absence. At that time, the conspiracy was in full effect. Co-defendant FLYNN had delivered on her end of the bargain, having helped defendant funnel the $100,000 payment through USC in May 2018 for the benefit of his son's nonprofit. But defendant had not delivered yet on his end. He had not voted yet on the amended Telehealth contract. (He did not vote on the Telehealth contract until July 31, 2018.) The reason co-defendant FLYNN planned to read in University Official 3 on the "deal" or "arrangement" with defendant and his son was so that, as her successor, University Official 3 could carry on the plan she had developed with defendant. She wanted that amended Telehealth contract from the County and needed the new leader of the Social Work School to be "in the know" to ensure the success of her bargain with defendant, even after her removal as Dean. That is why she chose to confide in (1) her successor (2) during a transition meeting where she was preparing University Official 3 to lead the school. Her legacy depended on the Social Work School becoming financially viable, and she believed the amended Telehealth contract would be its saving grace.[4]

---

[4] She ultimately never followed through on explaining the "deal" or "arrangement" because shortly thereafter, co-defendant FLYNN became aware that USC had opened an internal investigation of her

*(footnote cont'd on next page)*

12

1        Accordingly, even on this limited pretrial record alone, there

2   is more than a "reasonable basis" to conclude that at least one of

3   co-defendant FLYNN's purposes in making her statement to University

4   Official 3 was to advance some aspect of the conspiracy.  Shores, 33

5   F.3d at 444; Layton, 720 F.2d at 556.  Indeed, it was made to advance

6   a critical aspect of the conspiracy -- ensuring that the Social Work

7   School got the amended Telehealth contract defendant promised to her

8   and the school and that her "deal" with defendant and his son

9   continued unfettered in her absence.

10                  c.    *"Yes, I talked with Mark about this, and I am*

11                        *very happy to see that he was as good as his*

12                        *word."*

13        Item No. 16 on the Board of Supervisors' August 1, 2017 agenda

14   directed the Chief Probation Officer to report to the Board of

15   Supervisors on the following: "Recommendations on a Memorandum of

16   Understanding to establish a partnership with the University of

17   Southern California's School of Social Work to enhance services,

18   particularly around health, homelessness and case management."  When

19   this item appeared on the public agenda the day before the vote, a

20   colleague working with co-defendant FLYNN on County business alerted

21   her to this agenda item.  Co-defendant FLYNN responded, "Yes, I

22   talked with Mark about this, and I am very happy to see that he was

23   as good as his word."

24        Defendant does not contest that co-defendant FLYNN's statement

25   was made during the conspiracy.  Rather, he claims that her statement

26   was not made in furtherance of it.  (Dkt. 135, p. 5.)  He is wrong.

27

28   conduct vis-à-vis defendant and his son and then took steps to
     conceal the arrangement.

                                      13

Co-defendant FLYNN telling anyone at the Social Work School about her expectations regarding County contracts and progress with respect to those contracts was most certainly "in furtherance of the conspiracy." As previously noted, she needed those employees' help facilitating the contracts, identifying beneficial contract terms, negotiating those terms with the County, providing services required under the contracts, and obtaining County funds in return for services rendered. Although defendant claims this was merely a narration of past events (dkt. 135, p. 5), the "reach of the co-conspirator exception" is so substantial that even narrations of past events are admissible as coconspirator statements where the narrations themselves serve to further some aspect of the conspiracy. Layton, 720 F.2d at 556-57. Co-defendant FLYNN keeping co-workers abreast of her progress related to County contracts and her negotiations was integral to her achieving her own goals with respect to those contracts and the goals of the conspiracy. It was also necessary for her to communicate with her subordinates about things she wanted, as they had to implement her wishes and vision. She could not do it alone.

"To be deemed 'in furtherance,' a statement need not be necessary or even important to the conspiracy, or even made to a coconspirator, as long as it can be said to advance the goals of the conspiracy in some way." Ciresi, 697 F.3d at 28 (internal quotation marks omitted). Beyond that, a statement to a third party is still in furtherance of a conspiracy "even though it is susceptible of alternative interpretations and was not exclusively, or even primarily, made to further the conspiracy, so long as there is some reasonable basis for concluding that it was designed to further the

conspiracy." Shores, 33 F.3d at 444 (internal quotation marks omitted). Because the government has provided a "reasonable basis" to conclude that at least one of co-defendant FLYNN's purposes in making her statement to was to advance some aspect of the conspiracy, it is admissible under Rule 801(d)(2)(E). Id.; Layton, 720 F.2d at 556.[5]

### B. Co-defendant FLYNN's Statements Are Also Admissible Under Rule 803(3) Because They Provide Evidence of Her State of Mind and Intent, Which Are at Issue in a Conspiracy Case

Separate and apart from the fact that co-defendant FLYNN's statements are admissible under Rule 801(d)(2)(E), they are also independently admissible under Federal Rule of Evidence 803(3) to establish co-defendant FLYNN's "state of mind," including her "motive, intent, or plan," as well as her then-existing "emotional" condition and "mental feeling." Fed. R. Evid. 803(3).

For instance, upon seeing Item No. 16 on the Board of Supervisors' agenda, co-defendant FLYNN responded, "Yes, I talked with Mark about this, and **I am very happy** to see that he was as good as his word." (Emphasis added.) A statement about her own mental state and emotional condition upon seeing this agenda item certainly falls within the Rule 803(3) exception. See, e.g., Wagner v. Cnty. of Maricopa, 747 F.3d 1048, 1053 (9th Cir. 2013) ("The statements were offered to show his state of mind at the time of the

---

[5] Defendant attempts to cast co-defendant FLYNN's statements here as "casual admission[s] of culpability" and, in doing so, relies on United States v. Eubanks, 591 F.2d 513 (9th Cir. 1979) for support to exclude those statements as inadmissible hearsay. (Dkt. 135, p. 5.) His effort fails because unlike the idle chit-chat shared by the coconspirator with his common-law wife in Eubanks, co-defendant FLYNN's statements to University Official 3 and her employees were, as discussed above, necessary to achieve the conspiracy's objectives.

conversation, thus satisfying any contemporaneity requirement."). Moreover, because defendant and co-defendant FLYNN were charged together in a conspiracy, her state of mind remains relevant even at a trial solely against defendant.

To establish a conspiracy, the government must prove (1) that there was an agreement between at least two people to commit at least one crime in the indictment; (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy. United States v. Kaplan, 836 F.3d 1199, 1212 (9th Cir. 2016). Unlike other charges, conspiracy is unique in that it requires the government to prove the intent of at least two individuals. One cannot conspire with oneself. Rogers v. United States, 340 U.S. 367, 375 (1951) ("[A]t least two persons are required to constitute a conspiracy."); United States v. Vallee, 807 F.3d 508, 522 (2d Cir. 2015) ("We have taken a bilateral approach to the crime of conspiracy: at least two people must agree."). As the Ninth Circuit Model Criminal Jury Instructions make clear: "To prove an agreement to commit a crime, it is not sufficient for the government to prove that the defendant committed the crime in question. It must prove that the defendant agreed with at least one other person to commit that crime." Ninth Circuit Model Criminal Jury Instructions, No. 11.1 (2022 ed.) (citing United States v. Loveland, 825 F.3d 555 (9th Cir. 2016)). The government's burden of establishing the "agreement" or criminal partnership requires it to present evidence, not just of defendant's intent, but also of his alleged coconspirators, too. That is because, without a "meeting of

16

minds," there can be no conspiracy.  <u>United States v. Escobar de</u>
<u>Bright</u>, 742 F.2d 1196, 1199 (9th Cir. 1984) (conspiracy requires a
"meeting of minds" between defendant and "at least one bona fide co-
conspirator").

To that end, in his motion to sever, defendant made a telling,
but true, concession -- "each" of co-defendant FLYNN's statements "go
to a core element in the case against Ms. Flynn: her state-of-mind
and intent." (Dkt. 61, p. 1.) He made a similar concession in his
motion <u>in limine</u>: "The statements at issue in this motion reflect
only *Ms. Flynn's* stated beliefs and state-of-mind." (Dkt. 135, p. 1
(emphasis in original).) In making these arguments, defendant
concedes the basis for admission under Rule 803(3) but assumes that
co-defendant FLYNN's intent is irrelevant. He is wrong. In a
conspiracy case, a coconspirator's state of mind, motive, and intent
matter. <u>See</u> <u>Escobar de Bright</u>, 742 F.2d at 1199.

Here, to convict defendant of conspiracy, the government must
present evidence of both his <u>and</u> co-defendant FLYNN's intent. The
government must establish that co-defendant FLYNN agreed with
defendant to commit bribery and/or honest services fraud, became a
member of the conspiracy with defendant, and acted with the intent to
advance or further some object or purpose of the conspiracy, not
merely in a way that happened to please defendant. To prove that co-
defendant FLYNN was a bona fide coconspirator, as the government
must, any trial will require evidence of <u>her</u> intent. What co-
defendant FLYNN wanted from defendant matters. What she intended
when she secured a bevy of benefits for Sebastian Ridley-Thomas
matters. What she understood from her conversations with defendant
matters. Indeed, her state of mind, plan, and intent at every step

matters.  Thus, even in this trial now against defendant alone, her state of mind remains at issue.  And because defendant concedes that all of co-defendant FLYNN's challenged statements demonstrate her state of mind and intent, her statements are admissible under Rule 803(3), which carves out an exception to the hearsay rule for statements establishing the declarant's state of mind (including her motive, intent, or plan) or emotional condition (including mental feeling).

### C. No "Unfair" Prejudice Substantially Outweighs the Immense Probative Value of Co-defendant FLYNN's Statements

Finally, the "'only' conditions justifying the exclusion of [otherwise admissible] evidence are those described in Rule 403: unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or needless presentation of cumulative evidence."  United States v. Curtin, 489 F.3d 935, 944 (9th Cir. 2007).  "In determining whether the probative value is substantially outweighed by the danger of unfair prejudice, it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the offense charged." United States v. Day, 591 F.2d 861, 878 (D.C. Cir. 1978) (internal quotation marks omitted).  Evidence is unfairly prejudicial only to the extent that it "provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged."  United States v. Bailleaux, 685 F.2d 1105, 1111 (9th Cir. 1982), overruled on other grounds, Huddleston v. United States, 485 U.S. 681 (1988).  Evidence "'is not rendered inadmissible because it is of a highly prejudicial nature...The best

1  evidence often is.'" <u>United States v. Parker</u>, 549 F.2d 1217, 1222

2  (9th Cir. 1977) (quoting <u>United States v. Mahler</u>, 452 F.2d 547, 548

3  (9th Cir. 1972)); <u>see also</u> <u>United States v. Blitz</u>, 151 F.3d 1002,

4  1009 (9th Cir. 1998) ("[E]ven if...[the] evidence resulted in some

5  prejudice (as all unfavorable evidence about a defendant does), it

6  was not 'unfair prejudice' and did not 'substantially outweigh' the

7  high probative value of the evidence.").

8       Here, Rule 403 presents no obstacle.  To begin, there is simply

9  no <u>unfair</u> prejudice.  Nothing about the evidence is intended to

10  "provoke[] an emotional response in the jury" or otherwise "adversely

11  the jury's attitude toward the defendant wholly apart from its

12  judgment as to his guilt or innocence of the crime charged."

13  <u>Bailleaux</u>, 685 F.2d at 1111.  The fact that the statements lend

14  credence to existence of a <u>quid pro quo</u> scheme and thereby provide

15  critical evidence in support of the government's case does not render

16  the statements "unfairly" prejudicial.  Rather, the statements are

17  prejudicial because they tend to inculpate defendant, not because

18  they are unfair.  <u>Parker</u>, 549 F.2d at 1222 (Evidence "is not rendered

19  inadmissible because it is of a highly prejudicial nature...The best

20  evidence often is.") (internal quotations and citation omitted).

21       Moreover, even assuming there were some <u>unfair</u> prejudice (there

22  is none), Rule 403 remains inapplicable given the immense probative

23  value of the statements.  Co-defendant FLYNN's statements strike at

24  the heart of this case -- the existence of a <u>quid pro quo</u> agreement

25  between defendant and co-defendant FLYNN, what co-defendant FLYNN

26  hoped to secure from defendant, and which contracts and Board of

27  Supervisors' agenda items she saw as valuable to the Social Work

28  School.  Her statements provide important context and clarity for her

motivations and understanding of the agreement with defendant and therefore must be admitted.

Accordingly, given the immense probative value of the statements, no alleged unfair prejudice "substantially outweighs" the probative value, as it must in order to justify the extreme remedy of wholesale exclusion.  Defendant's sole argument in favor of exclusion -- that the statements do not reflect <u>his</u> intent -- goes to weight, not admissibility.  He is free to argue, as he does in his motion, that co-defendant FLYNN was mistaken or misinterpreted their conversations.  But he cannot prevent the jury from hearing and considering such substantial evidence of his guilt.[6]

**IV.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court DENY Defendant Mark Ridley-Thomas's Motion <u>In Limine</u> No. 1.

---

[6] Finally, even if there were some modicum of unfair prejudice (there is none), limiting instructions are generally sufficient to cure any prospective prejudicial impact.  <u>See</u> <u>Dubria v. Smith</u>, 224 F.3d 995, 1002 (9th Cir. 2000) ("Ordinarily, a cautionary instruction is presumed to have cured prejudicial impact."); <u>United States v. Hadley</u>, 918 F.2d 848, 852 (9th Cir. 1990); <u>United States v. Boise</u>, 916 F.2d 497, 501 (9th Cir. 1990).  No such instruction is necessary here though.  The evidence is neither unfairly prejudicial, nor so "confusing" that the jury must be instructed on how to consider it.