E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
LINDSEY GREER DOTSON (Cal. Bar No. 266973)
THOMAS F. RYBARCZYK (Cal. Bar No. 316124)
MICHAEL J. MORSE (Cal. Bar No. 291763)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-4443/8452/7367
     Facsimile: (213) 894-0141
     E-mail:    lindsey.dotson@usdoj.gov
              thomas.rybarczyk@usdoj.gov
              michael.morse@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 21-00485-DSF-1 |
|---|---|
| Plaintiff, | GOVERNMENT'S MOTION *IN LIMINE* NO. 4 TO ADMIT EVIDENCE TO REBUT DEFENDANT'S BIAS ARGUMENT |
| v. | |
| MARK RIDLEY-THOMAS, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Lindsey Greer
Dotson, Thomas F. Rybarczyk, and Michael J. Morse, hereby files the
Government's Motion in Limine No. 4 to Admit Evidence to Rebut
Defendant's Bias Argument, namely, evidence that the government
charged then-USC Dean Marilyn Flynn in connection with the
investigation that led to charges in this case.

1    This motion is based upon the attached memorandum of points and

2  authorities, the files and records in this case, and such further

3  evidence and argument as the Court may permit.

4  Dated: March 20, 2023            E. MARTIN ESTRADA
                                    United States Attorney
5
                                    MACK E. JENKINS
6                                   Assistant United States Attorney
                                    Chief, Criminal Division
7

8                                     /s/ Thomas F. Rybarczyk
                                    LINDSEY GREER DOTSON
9                                   THOMAS F. RYBARCZYK
                                    MICHAEL J. MORSE
10                                  Assistant United States Attorneys

11                                  Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2      On March 17, 2023, during a sidebar with the case agent on the

3 stand, the government informed the Court that because of the repeated

4 efforts of defendant MARK RIDLEY-THOMAS ("defendant") to attack the

5 government's investigation on the grounds that the testifying case

6 agent and USC were biased against and targeted defendant, the

7 government sought permission to introduce the fact that defendant's

8 co-conspirator and co-defendant MARILYN FLYNN had been charged.  (03-

9 17-2023 Reporter's Transcript ("RT") 1982:18-1984:10.)  This Court

10 denied the request but invited the government to brief the issue and

11 warned defendant that should he continue down this path in his case

12 or with this witness, the government would be able to elicit such

13 testimony.  (03-17-2023 RT 1984:11-1985:6.)  There is, however, no

14 need to wait for defendant to do more harm.  He has already opened

15 the door to permitting the government to introduce the mere fact that

16 defendant's co-conspirator, co-defendant FLYNN, has been charged in

17 the case.

18      Throughout this trial, beginning even with <u>voir dire</u>, defendant

19 has suggested, implicitly and even expressly, that the government and

20 USC had a bias, even a racial bias, against the defendant and his

21 son.  During the testimony of the government's lead investigator,

22 defendant sought to connect this alleged bias to the government's

23 investigation and suggest it led to the government targeting

24 defendant.  To rebut this claim that the government's investigation

25 targeted defendant alone, the government should be permitted to

26

27

28

1    introduce the mere fact that co-defendant FLYNN was charged.[1]  It

2    undermines the improper and unfounded arguments of racial bias or

3    that anyone at USC sought to refer this matter solely to target

4    defendant.

5         **First**, it is well-settled that the government may introduce

6    otherwise inadmissible evidence where defendant opens the door to the

7    introduction of such evidence.  See United States v. Segal, 852 F.2d

8    1152, 1155-56 (9th Cir. 1988) (affirming conviction for failure to

9    file currency transaction reports where government introduced

10   evidence of cocaine sales after defendant mentioned it in his opening

11   statement and concluding that the government could "step[] through

12   the 'open door'"); United States v. Quinones-Chavez, 641 F. App'x

13   722, 725 (9th Cir. 2016) (rejecting Confrontation Clause claim

14   challenging testimony referring to witnesses who did not testify at

15   trial because the testimony "emerged only after defense counsel

16   opened the door by eliciting testimony concerning these witnesses");

17   United States v. Schmitt, 770 F.3d 524, 536 (7th Cir. 2014) ("A

18   defendant opens the door to otherwise inadmissible evidence when he

19   affirmatively and 'genuinely place[s] at issue the specific matter

20   that the evidence is being offered to establish.") (internal

21   quotation marks omitted); Tanberg v. Sholtis, 401 F.3d 1151, 1166

22   (10th Cir. 2005) ("When a party opens the door to a topic, the

23

24        [1] At this time, the government does not seek to introduce the
     fact that co-defendant FLYNN pled guilty in this case.  If defendant
25   later chooses to suggest or insinuate that co-defendant FLYNN is not
     being prosecuted with defendant or being called as a government
26   witness because the government did not succeed in its prosecution of
     her, her testimony would not support the government's charges of
27   defendant, or offers further baseless insinuation that defendant was
     targeted and charged because of his race, then defendant will have
28   opened the door to the government introducing the fact of her guilty
     plea.

                                       2

1  admission of rebuttal evidence on that topic becomes permissible."").

2  Here, defendant opened the door to admitting the mere fact that co-

3  defendant FLYNN had also been charged in this case by suggesting

4  throughout this trial that USC officials and employees had bias that

5  later infected the FBI investigation, causing it to unfairly target

6  the defendant.

7       **Second**, defendant has introduced or attempted to introduce

8  evidence that: (1) USC officials and employees had a bias in this

9  case against defendant, including going as far as insinuating those

10  individuals had a political or even a racial bias; and (2) suggesting

11  that this same bias infected the FBI's investigation and caused it to

12  target defendant.  Such evidence concerning the government's

13  investigation are irrelevant.  See United States v. Scrushy, 721 F.3d

14  1288, 1305-06 (11th Cir. 2013) (rejecting defendant's arguments that

15  his prosecution was "political" and holding that "[w]hether the

16  decision to prosecute [the defendant] was motivated by improper

17  reasons has no bearing on the integrity of the trial or the

18  verdict.").  But defendant has nevertheless attempted to present them

19  at trial.

20       With respect to USC's bias, the defendant started developing his

21  theory of that institution's bias first with a USC official who

22  handled his son's onboarding as a professor of practice at USC.[2]

23  While cross-examining that witness, the defense elicited testimony

24  that this witness was frustrated with having to process the

25

26  _____

27      [2] Defendant started his efforts to suggest racial bias may be a factor here for USC employees before testimony started when he

28  suggested a voir dire question related to affirmative action which, as the Court knows after seeing the evidence here, is not an issue in this case.

1 onboarding of defendant's son at the same time he had to onboard

2 another professor of practice.  (03-09-2023 RT 115:8-117:03.)

3 Defendant could have stopped there.  It did not.  Instead for no

4 apparent reason other than to improperly inflame the jury, the

5 defense impermissibly displayed a so-called "demonstrative" -- a

6 screenshot of the other professor of practice's USC biography page

7 that included his photograph -- who, like defendant's son, was

8 African American.  (03-09-2023 RT 117:4-16.)  Before doing so, the

9 defense never shared the exhibit with the government, nor did he ask

10 the Court's permission to publish it.[3]  When called on it by the

11 government, the defense ended its questioning in haste, further

12 suggesting the reason for displaying that "demonstrative" was to

13 impermissibly inflame the jury and suggest that the witness may have

14 had a racial bias.  Next, during questioning of another USC employee,

15 the defense sought to introduce a letter sent by a senior USC

16 official to the USC community after the internal investigation had

17 uncovered co-defendant and defendant's funneling of $100,000 and

18 certain benefits provided to defendant's son.  In explaining the

19 relevance to the Court, the defense argued the letter was admissible

20 to prove USC employees' minds had been poisoned by it and therefore

21 became predisposed to prejudice against him before the investigation

22 even began. (03-14-2023 RT 1254:7-1261:3.)  The defense asked the

23 witness if it learned USC's perspective on the "events at issue in

24 this case" to which the witness replied she learned "[o]ne person's

25 perspective."  (03-14-2023 RT 1258:2-7.)  Not satisfied, the defense

26 pushed further and said "[a]nd that person was a very, very senior

27 _____

28    [3] This Court admonished defense counsel the following morning
concerning her use of demonstratives.  (3-10-2023 RT 808:21-809:10.)

4

1  person" before the Court stopped the defense.  (03-14-2023 RT 1258:9-

2  11.)  The defense later referred to this person as "top dog" before

3  suggesting to the witness and jury that the "top dog['s]" statement

4  that "people will be held accountable" tainted the investigation.

5  (3-14-2023 RT 1260:21-25.)

6       After laying the foundation for USC's alleged bias with its

7  employees, during the cross-examination of case agent FBI Special

8  Agent Brian Adkins, the defense even suggested to the jury that

9  racial bias may be at play with respect to USC employees and

10  therefore the investigation.  (03-16-2023 1851:21-1852:2; 1854:2-22.)

11  In that line of questioning, defendant asked the case agent if

12  "implicit bias presents challenges for law enforcement" to which the

13  case agent agreed that it was "something . . . to be aware of" before

14  suggesting could affect how "an investigator looks for evidence."

15  (03-16-2023 RT 1854:2-9.)  The defense then attempted to suggest that

16  the USC witnesses suffered from "implicit bias" or "unconscious bias"

17  because they believed defendant's son to be unqualified, an obvious

18  effort to suggest race played a factor in the prosecution here.  (03-

19  16-2023 RT 1854:15-22.)  While the Court sustained the government's

20  objection to this line of questioning, the defense nevertheless

21  planted the seed in the jury's minds.

22       Defendant took this alleged bias from USC and connected it to

23  the government's investigation.  Seizing on the word "wishes" in the

24  case agent's notes from the referral meeting with USC officials, the

25  defense attempted to suggest that the government investigation here

26  was directed by USC and their bias.  Indeed, at sidebar when

27  discussing the "wishes" notation, the defense said "[w]ell, what I'm

28  trying to establish is that there were reasons to think that USC

witnesses had an agenda and were biased" and that the questioning of
the case agent was to determine whether the investigation "considered
whether the motivations of USC witnesses might be impacted by what
USC said they wanted." (03-16-2023 RT 1731:25-1732:2, 1733:9-10.)
The Court permitted the defense to inquire further of the case agent
and suggest to the jury, though the case agent did not agree, that
this bias affected the USC witnesses and therefore the government's
investigation.  (03-14-2023 RT 1733:23-1735:2.)  Just prior to doing
so, the defense sought to suggest that one of USC's attorneys who
brought the criminal referral to the FBI and the government used to
be the "boss" of the United States Attorney's office in what appeared
to be an effort to suggest that USC attorneys, the FBI, and the
United States Attorney's office are working in a coordinated effort
to target the defendant, with the FBI blindly following the lead of
the former "boss" of the United States Attorney's office.  (03-16-
2023 RT 1722:11-20.)  The following day, the defense once more asked
about USC's "wishes" the following day in multiple questions, even
after the case agent testified that he did not recall them using that
word.  (3-17-2023 RT 1990:12-1992:1.)  During this line of
questioning, the defense suggested to the jury that the government
may have even acted in tandem with USC in helping to bring about the
August 1, 2018 Los Angeles Times article by suggesting that the
article had "unnamed sources" -- the implication by defense's
questioning that those were unnamed government sources -- after the
agent indicated that USC wanted to make the referral public.  (03-17-
2023 RT 1990:22-1992:1.)  Again, while this Court sustained the
government's objection, the bell cannot be unrung.

1    Finally, the defense connected this alleged bias to the

2    government's investigation by suggesting that the case agent wanted

3    to bring a "public corruption" prosecution because he was in that

4    section and selectively only spoke to USC witnesses to further that

5    investigation.  (03-16-2023 RT 1735:6-22.)  The defense then

6    furthered that narrative by attempting to suggest the investigators

7    put blinders on and did not consider interviewing County staff or

8    others close to defendant, even though the government had reasons for

9    doing so.  (03-16-2023 RT 1743:7-1749:3.)  By connecting these two

10   narratives together, defendant sought to suggest the FBI

11   investigation had become biased against defendant by USC to discredit

12   the investigation.

13         **Third**, the proposed remedy here -- permitting the government to

14   indicate that co-defendant FLYNN was also charged -- would complete

15   the narrative for the jury which, at this point, only knows that the

16   government received a referral from USC in this investigation, has

17   called USC witnesses, and charged only defendant, not one of USC's

18   own.  Without knowing that co-defendant FLYNN was charged, the jury

19   will be left with the false perception that the FBI and the

20   government only sought to investigate, target, and charge the

21   defendant.  Aside from this allegation being irrelevant at trial,

22   United States v. Armstrong, 517 U.S. 456, 463 (1996) ("[a] selective-

23   prosecution claim is not a defense on the merits to the criminal

24   charge itself, but an independent assertion that the prosecutor has

25   brought the charge for reasons forbidden by the

26

27

28

                                    7

Constitution." (emphasis added)),[4] such a false perception of the investigation embraces the insinuations of defendant -- that USC sought only to deflect responsibility from itself; the government only charged an African-American defendant; and the FBI and the government followed USC attorneys blindly and did not charge co-defendant FLYNN, a Caucasian woman and USC employee, whose email and other communications are incriminating on their face and account for much of the government's evidence at trial.

Therefore, informing the jury that the government charged a Caucasian woman in addition to defendant would cure any of the improper racial bias alleged by the defense against the government's investigation here and provide the jury necessary context in evaluating defense's insinuations of USC bias.  As far as prejudice to defendant, Federal Rule of Criminal Procedure 403 is no barrier to admitting this evidence.  It is not hearsay and is a legally operative fact.  It presents no Bruton problem because it is not a statement of a co-defendant implicating him.  The proposed evidence would merely cure the unfair prejudice inflicted by the defense and his chosen manner of attacking the government's investigation.  The

_____

[4] See also United States v. Washington, 705 F.2d 489, 495 (D.C. Cir. 1983) (issue of selective prosecution "is one to be determined by the court, as it relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged" (citations omitted)); United States v. Abboud, 438 F.3d 554, 579-80 (6th Cir. 2006) ("The question of discriminatory prosecution relates not to the guilt or innocence . . ." and "is a matter for the court, not the jury." (citation omitted)); United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (selective prosecution claim is "ultimately separate from the issue of [the defendant's] factual guilt"); United States v. Napper, 553 F. Supp. 231, 232 (E.D.N.Y. 1982) (defendant's claim that the prosecutor brought the charges for a discriminatory reason is an issue "properly determined only by the Court, and may not be argued before the fact-finders").

government should be permitted to "step[] through the 'open door.'"
<u>Segal</u>, 852 F.2d at 1155.

        For all these reasons, the government respectfully requests that
the Court grant the government's motion <u>in limine</u> and permit it to
introduce into evidence the fact that co-defendant FLYNN was charged
in connection with this case.