DARALYN J. DURIE (SBN 169825)
ddurie@mofo.com
ARTURO J. GONZALEZ (SBN 121490)
agonzalez@mofo.com
GALIA Z. AMRAM (SBN 250551)
gamram@mofo.com
RAMSEY W. FISHER (SBN 334228)
ramseyfisher@mofo.com
JESSICA E. LANIER (SBN 303395)
jlanier@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415-268-7000
Facsimile: 415-268-7522

CHRISTINA M. RANDALL (SBN 320125)
crandall@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: 213-892-5200
Facsimile: 213-892-5454

Attorneys for Defendant
MARK RIDLEY-THOMAS

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARK RIDLEY-THOMAS, et al.,<br><br>Defendants. | Case No. 2:21-cr-00485-DSF<br><br>**DEFENDANT MARK RIDLEY-THOMAS'S NOTICE OF MOTION AND RULE 33 MOTION**<br><br>Date: June 26, 2023<br>Time: 8:30 a.m.<br>Courtroom: 7D<br>Judge: Hon. Dale S. Fischer |

DEFENDANT MARK RIDLEY-THOMAS'S
RULE 33 MOTION

1

## NOTICE OF MOTION AND MOTION

2     PLEASE TAKE NOTICE that on June 26, 2023, at 8:30 a.m. in the

3     courtroom of the Honorable Dale S. Fischer, or as soon thereafter as the matter may

4     be heard, counsel for Defendant Mark Ridley-Thomas will move the Court for a

5     for a motion for new trial based on Federal Rule of Criminal Procedure 33.  This

6     motion is based on the attached motion, the Declaration of Daralyn J. Durie and

7     exhibits filed concurrently herewith, the Constitution of the United States of

8     America, all applicable statutory and case law, and such argument as the Court will

9     entertain at the motion hearing.

10

11     Dated:  May 1, 2023                    MORRISON & FOERSTER LLP

12

13                                           By: */s/ Daralyn J. Durie*
                                               DARALYN J. DURIE

14                                             Attorneys for Defendant
15                                             MARK RIDLEY-THOMAS

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................1

II.   TRIAL ..............................................................................................1

III.  ARGUMENT .....................................................................................2

     A.    Legal Standards........................................................................2

         1.    Motion for a New Trial.................................................2

         2.    Harmless Error and Plain Error ...................................2

     B.    Discussion ................................................................................3

         1.    Multiple Errors Infected the Jury's Deliberations and ...............4

     C.    Argument That Section 666 Included Gratuities Was Inaccurate Statement of Law. ...................................................................17

     D.    Cumulative Errors Deprived Dr. Ridley-Thomas of His Right to a Fair Trial...............................................................................23

     E.    The Government Did Not Meet the Evidentiary Threshold for "Thing of Value" Under Section 666......................................24

     F.    Evidentiary Deficiencies, As Identified in the Rule 29 Motion, Justify a New Trial. ...............................................................24

IV.  CONCLUSION ...............................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5
*Fiore v. White*,
      531 U.S. 225 (2001) ......................................................................... 22

6

7
*McDonnell v. United States*,
      579 U.S. 550 (2016) ......................................................................... 16

8

9
*Morris v. YLST*,
      447 F.3d 735 (9th Cir. 2006) ............................................................. 5

10

11
*Napue v. Illinois*,
      360 U.S. 264 (1959) ........................................................................... 5

12

13
*Pantano v. Donat*,
      No. 3:08-cv-00685-ECR-VPC, 2012 WL 3929515 (D. Nev. Sept. 7,
      2012) ................................................................................................ 14

14

15
*Skilling v. United States*,
      561 U.S. 358 (2010) ......................................................................... 17

16

17
*United States v. Alston*,
      974 F.2d 1206 (9th Cir. 1992) ..................................................... 2, 25

18

19
*United States v. Atcheson*,
      94 F.3d 1237 (9th Cir. 1996) ............................................................. 3

20

21
*United States v. Brown*,
      327 F.3d 867 (9th Cir. 2003) ............................................................. 3

22

23
*United States v. Cabrera*,
      201 F.3d 1243 (9th Cir. 2000) ........................................................... 3

24

25
*United States v. Cox*,
      633 F.2d 871 (9th Cir. 1980) ............................................................. 8

26
*United States v. Fernandez*,
      722 F.3d 1 (1st Cir. 2013) ..................................................... 20, 21, 22

27

28

*United States v. Fletcher*,
   62 M.J. 175 (C.A.A.F. 2005) ................................................................. 13

*United States v. Foster*,
   711 F.2d 871 (9th Cir. 1983) .............................................................. 11

*United States v. Frederick*,
   78 F.3d 1370 (9th Cir. 1996) ............................................................ 2, 10

*United States v. Garrido*,
   713 F.3d 985 (9th Cir. 2013) .............................................................. 21

*United States v. Hamilton*,
   46 F.4th 389 (5th Cir. 2022) .............................................................. 20

*United States v. Jennings*,
   160 F.3d 1006 (4th Cir.1998) ............................................................. 22

*United States v. Kellington*,
   217 F.3d 1084 (9th Cir. 2000) .......................................................... 2, 25

*United States v. Kelly*,
   874 F.3d 1037 (9th Cir. 2017) ............................................................ 22

*United States v. Kerr*,
   981 F.2d 1050 (9th Cir. 1992) ........................................................... 7, 9

*United States v. LaPage*,
   231 F.3d 488 (9th Cir. 2000) .......................................................... 5, 6, 7

*United States v. Leon-Gonzalez*,
   24 F. App'x 689 (9th Cir. 2001) ......................................................... 23

*United States v. Lindberg*,
   39 F.4th 151 (4th Cir. 2022) .............................................................. 20

*United States v. Mechanik*,
   475 U.S. 66 (1986) .......................................................................... 25

*United States v. Medeiros*,
   No. CR 18-1966-JCH, 2022 WL 17819698 (D.N.M. Dec. 20, 2022) ......... 14, 15

*United States v. Millis*,
   621 F.3d 914 (9th Cir. 2010) ............................................................. 22

*United States v. Molina*,
934 F.2d 1440 (9th Cir. 1991) .......................................................... 11

*United States v. Olano*,
507 U.S. 725 (1993) ............................................................................ 3

*United States v. Perlaza*,
439 F.3d 1149 (9th Cir. 2004) ............................................................ 3

*United States v. Pimentel*,
654 F.2d 538 (9th Cir. 1981) .............................................................. 2

*United States v. Powell*,
469 U.S. 57 (1984) ............................................................................ 24

*United States v. Preston*,
845 Fed. App'x 526 (9th Cir. 2021) ............................................. 12, 13

*United States v. Raborn*,
575 F.2d 688 (9th Cir. 1978) ............................................................ 19

*United States v. Roberts*,
618 F.2d 530 (9th Cir. 1980), *cert. denied*, 452 U.S. 942 (1981) ...................... 10

*United States v. Rodrigues*,
No. 97-10113, 1998 U.S. App. LEXIS 36919 (9th Cir. Oct. 28,
1998) ................................................................................................. 23

*United States v. Rodriquez-Preciado*,
399 F.3d 1118 (9th Cir. 2005) ............................................................ 3

*United States v. Simas*,
937 F.2d 459 (9th Cir. 1991) ............................................................ 24

*United States v. Smith*,
962 F.2d 923 (9th Cir. 1992) ............................................................ 10

*United States v. Sun-Diamond Growers of California*,
526 U.S. 398 (1999) .................................................................... 16, 18

*United States v. Tavares*,
844 F.3d 46 (1st Cir. 2016) .............................................................. 16

*United States v. Urie*,
    183 F. App'x 608 (9th Cir. May 30, 2006) ........................................................ 10

*United States v. Washington*,
    263 F. Supp. 2d 413 (D. Conn.), *adhered to on reconsideration*,
    294 F. Supp. 2d 246 (D. Conn. 2003) ............................................................ 12

*United States v. Weatherspoon*,
    410 F.3d 1142 (9th Cir. 2005) ................................................................*passim*

*United States v. Weyhrauch*,
    623 F.3d 707 (9th Cir. 2010) (*Weyhrauch II*) .................................................. 17

**Statutes**

18 U.S.C. § 201 ................................................................................ 19, 20, 21

18 U.S.C. § 666 ....................................................................................*passim*

Comprehensive Crime Control Act, Pub. L. No. 98-473, § 1104(a), 98
    Stat. 1837, 2143-44 (1984) .......................................................................... 19

Criminal Law and Procedure Technical Amendments Act of 1986,
    Pub. L. No. 99-646, § 59, 100 Stat. 3592, 3612-13 ........................................ 20

**Other Authorities**

Fed. R. Crim. P. 29 ...............................................................................*passim*

Fed. R. Crim. P 33 .................................................................................... 1, 2

Fed. R. Crim. P. 52 .................................................................................... 2, 3

H.R. Rep. No. 99-797, at 16, 30, n.9 (1986), *reprinted in* 1986
    U.S.C.C.A.N. 6138 ..................................................................................... 19

S. Rep. No. 98-225, at 369, 370 (1983) ........................................................... 19

1   **I.      INTRODUCTION**

2          Under Federal Rule of Criminal Procedure 33, a trial court may vacate

3   judgment and grant a new trial "if the interest of justice so requires."  For the

4   reasons stated below, the Court should do so here.

5   **II.     TRIAL**

6          Dr. Ridley Thomas was charged with nineteen counts:  (i) conspiracy; (ii)

7   bribery under (iii) two counts of honest services mail fraud; and (iv) fifteen counts

8   of honest services wire fraud.  Dkt. 1.  During trial, after Agent Adkins testified, the

9   defense moved for a mistrial or, in the alternative, cautionary instruction.  Dkt. 256.

10  The Court did not rule on this motion.  Shortly after the close of the government's

11  case, Dr. Ridley-Thomas filed a Rule 29 Motion.  Dkt. 257.  The Court took the

12  motion under submission.  Declaration of Daralyn J. Durie, Ex. A "Trial Tr." at

13  2112:3-5.[1]

14         After closing arguments, the jury deliberated over the course of five days,

15  and, during that time, asked nearly a dozen questions.  One of those questions

16  concerned the evidence presented at trial (the jury asked that the testimony of

17  defense expert Ann Ravel be read back in full, Dkt. 288), and other questions

18  sought clarification about the law (for example, the jury asked, "Is violating

19  fiduciary duty in and of itself unlawful," Dkt. 291).

20         The jury ultimately found Dr. Ridley-Thomas not guilty of twelve counts of

21  mail and wire honest services fraud counts and guilty of conspiracy, bribery, and

22  five counts of honest services mail and wire fraud counts.  Dkt. 308.  The only

23  honest services mail and wire fraud counts on which the jury convicted Dr. Ridley-

24  Thomas were Counts Five, Fifteen, Sixteen, Nineteen, and Twenty, which

25  concerned:  (i) Dr. Ridley-Thomas's response to Dean Flynn's February 23, 2018

26  email concerning the 2018 Telehealth Contract amendment; (ii) the $100,000

27

---

28  [1] All exhibits cited herein are filed concurrently with the Durie Declaration.

donation from the Mark Ridley-Thomas Committee for a Better Los Angeles to the University of Southern California ("USC"); and (iii) the $100,000 donation from USC to United Ways of California ("United Ways").  *Id.*; Dkt. 1.

The defense addresses additional relevant facts in the argument below.

## III.   ARGUMENT

### A.   Legal Standards

#### 1.   Motion for a New Trial

The Court has discretion to grant a new trial in the interests of justice. *United States v. Pimentel*, 654 F.2d 538, 545 (9th Cir. 1981).  The Court's power to grant a Rule 33 motion for a new trial is "much broader" than its power to grant a motion for a judgment of acquittal under Rule 29.  *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).  On a motion for a new trial under Rule 33, the court is "not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Kellington*, 217 F.3d 1084, 1097 (9th Cir. 2000) (citation omitted). Even with an "abstract sufficiency of the evidence to sustain a verdict," a court may grant a motion for a new trial if "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred."  *Alston*, 974 F.2d at 1211-12 (citation omitted).  A single significant error can be sufficient to warrant a new trial, and multiple errors can cumulatively result in manifest injustice, warranting a new trial.  *See United States v. Frederick,* 78 F.3d 1370, 1381 (9th Cir. 1996) (citations omitted).  A criminal defendant is more likely to be prejudiced by the effect of cumulative errors where the government's case lacks overwhelming evidence of guilt.  *See id.* (citations omitted).

#### 2.   Harmless Error and Plain Error

Where defense counsel's objection during trial is overruled, the court reviews for harmless error.  Fed. R. Crim. P. 52(a).  If the court determines its previous ruling was a constitutional error, the court must reverse unless the error was

1  harmless beyond a reasonable doubt.  *United States v. Perlaza*, 439 F.3d 1149,

2  1171 (9th Cir. 2004) (citation omitted).  If the court determines the previous ruling

3  was a non-constitutional error, the court must reverse unless "it is more probable

4  than not that the error did not materially affect the verdict." *Id.* (citation omitted).

5       Where the defense has not objected to misconduct during trial, the court

6  reviews for plain error.  Fed. R. Crim. P. 52(b); *United States v. Rodriquez-*

7  *Preciado*, 399 F.3d 1118, 1132 (9th Cir. 2005).  Plain error that affects substantial

8  rights "may be considered even though [they were] not brought to the court's

9  attention."  Fed. R. Crim. P. 52(b).  The defendant has the burden to persuade the

10  court that a "plain error" was prejudicial.  *Olano*, 507 U.S. at 734.

11      Under either analysis, the error is substantial or prejudicial where it affected

12  the outcome of the district court proceedings.  *Id.*

13      **B.    Discussion**

14      A court should evaluate alleged prosecutorial misconduct and other errors in

15  the context of the entire trial.  *United States v. Cabrera*, 201 F.3d 1243, 1246 (9th

16  Cir. 2000) (citations omitted).  A new trial is justified if it appears more probable

17  than not that the errors materially affect the trial's fairness, denying the defendant

18  due process.  *Id.*; *United States v. Atcheson*, 94 F.3d 1237, 1244 (9th Cir. 1996).  A

19  court considers several factors when evaluating the trial's fairness in light of

20  misconduct:  (i) the nature of the prosecutor's remarks and conduct; (ii) the strength

21  of the case against the defendant; and (iii) the nature of effectiveness of curative

22  instruction or action.  *United States v. Weatherspoon*, 410 F.3d 1142, 1150-51 (9th

23  Cir. 2005); *United States v. Brown*, 327 F.3d 867, 871 (9th Cir. 2003).

24      Here, in light of the closeness of the case, the multiple instances of

25  misconduct, the lack of curative instructions, and the misstatements of the law,

26  Dr. Ridley-Thomas was deprived of his right to a fair trial.

27

28

DEFENDANT MARK RIDLEY-THOMAS'S RULE 33
MOTION                                                        3

1    **1.    Multiple Errors Infected the Jury's Deliberations and
          Denied Dr. Ridley-Thomas a Fair Trial**

2         **a.    This Case Was Close.**

3

4         The government did not present at trial overwhelming evidence of

5    Dr. Ridley-Thomas's guilt.  And, with respect to key elements of each of the crimes

6    charged, as documented extensively in the defense's supplemental Rule 29 briefing,

7    the government presented no evidence at all.  Notably, the government presented no

8    county testimony concerning Dr. Ridley-Thomas's support for and actions with

9    respect to the county agenda items at issue.  No witness testified that Dr. Ridley-

10   Thomas pressured them into taking action on these items, and no witness testified

11   that Dr. Ridley-Thomas pressured them with respect to the $100,000 donation from

12   his ballot committee to USC or the $100,000 donation from USC to United Ways.

13   The government presented no evidence that Dr. Ridley-Thomas was obligated by

14   ethical or fiduciary duty—or by law—to disclose to United Ways that his ballot

15   committee had also donated $100,000 to USC.  Multiple witnesses from USC

16   testified that Dean Flynn made misrepresentations and put pressure on her

17   employees.  But not one of those witnesses testified that Dr. Ridley-Thomas was

18   aware of her actions—*let alone that he condoned, endorsed, or demanded them*.

19        Relevant to the counts on which Dr. Ridley-Thomas was convicted, the

20   defense presented evidence concerning Dr. Ridley-Thomas's long-term support for

21   each of the agenda items, Department of Mental Health support for the 2018

22   Telehealth amendment, and county processes and procedures—all pertinent to

23   Dr. Ridley-Thomas's state of mind and whether he acted with corrupt intent.

24        To demonstrate that Dr. Ridley-Thomas acted with the requisite *mens rea*,

25   the government relied heavily on Agent Adkins's testimony.  For the reasons

26   explained below, Agent Adkins's testimony was tainted by improper questioning

27   and the government's refusal to correct his false statements under oath.

28

1

### b.  The Government Elicited and Then Failed to Correct Agent Adkins's False Testimony.

2

3      Under *Napue v. Illinois*, convictions obtained through the use of false

4 testimony violate due process.  360 U.S. 264, 269 (1959).  This violation occurs not

5 only when a prosecutor solicits false statements, but also when a prosecutor allows

6 false testimony to go uncorrected.  *Id.*; *see also United States v. LaPage*, 231 F.3d

7 488, 491 (9th Cir. 2000) ("It is fundamentally unfair for a prosecutor to knowingly

8 present perjury to the jury.").  A conviction will be reversed if:  (i) the prosecution

9 knowingly presented false evidence or testimony at trial; and (ii) it was material.

10 *Morris v. YLST,* 447 F.3d 735, 743 (9th Cir. 2006).  Both conditions are met here.

11      During trial, Agent Adkins made at least three false statements during his

12 testimony.  One false statement concerned his statement that he had reviewed all

13 400,000 documents produced in the case.  Trial Tr. at 1386:18-21; 1710:9-12;

14 1711:4-7.  On cross-examination, however, Agent Adkins admitted that he or

15 another agent would have reviewed the documents—but he did not know whether

16 the documents he had not reviewed had been reviewed by another agent.  Trial Tr.

17 at 1710:13-1712:5.  The Court issued a curative jury instruction, No. 14.

18      Special Agent Adkins also falsely testified about the March 2, 2018 Notice of

19 Intent to the Board of Supervisors concerning the Telehealth contract extension:

20      Q. Now, if we continue reading the justification, it says, The
       Blue Ribbon Commission, directed by a motion from your
21     Board in August of 2013, articulated a countywide mission to
       prioritize and address child safety issues.  The USC Telehealth
22     program aligns with the Blue Ribbon Commission's
       recommendations for a safety system that supports trauma-
23     focused assessment and interventions and delivery of critical
       mental health services to children and transitional age
24     youths.  Now, in the course of your investigation, did you
       uncover any evidence that the – that John Sherin's recitation of
25     the justifications for the contract extension were not genuine?
       A. Yes.
26     Q. By Dr. Sherin?
       A. Yes.
27     Q. … Is that based on something Dr. Sherin told you?
       A. That was based on my interview with Dr. Sherin.
28

DEFENDANT MARK RIDLEY-THOMAS'S RULE 33      5
MOTION

Trial Tr. at 1790:7-1791:1.

This is false.  Nowhere in Dr. Sherin's 302—or in the video of his surreptitiously recorded FBI interview—does he state or imply that his recitation of the justifications for the extension was not genuine.  Dkt. 260, Exs. B, C.

Special Agent Adkins further falsely testified:

> Q. ….In connection with the facts of this case, did you see any evidence that Mark Ridley-Thomas or his staff threatened to cancel or rescind any contract?
> A. That was brought up during interviews that we conducted.

Trial Tr. at 1995:19-23).

When confronted by the defense about this testimony, the government maintained that, here, Agent Adkins was referencing John Clapp's interview (and resulting 302).  Ex. B.  But Mr. Clapp said only that Dean Flynn told him that government officials **such as** Dr. Ridley-Thomas have the power to rescind contracts **in general**.  He did not state that Dr. Ridley-Thomas threatened to cancel or rescind a contract at issue in this case.  Dkt. 260, Exs. D-F.

After the government refused to stipulate that these two additional pieces of testimony were false, *see* Ex. B, the defense briefed these issues for the Court.  *See* Dkt. 253.  The Court did not issue a curative jury instruction about either of these statements.  Given the nature of the testimony and the jury's verdict, there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury."  *See LaPage*, 231 F.3d at 491 (citation omitted).

The only honest services fraud count relating to county business for which Dr. Ridley-Thomas was convicted pertained to his vocalized email support of the Telehealth amendment, the subject of one instance of Agent Adkins's false testimony.  His false testimony suggested that there were not legitimate reasons for extending the Telehealth contract, and that Dr. Sherin had made *false* representations in support of the extension.  And, from this, the jury could plausibly have made inferences that (i) his support was not genuine, and that (ii) Dr. Ridley-

1    Thomas had pressured him to support the amendment.  Moreover, this testimony
2    was the only evidence Dr. Sherin was anything other than fully supportive of the
3    2018 Telehealth amendment.  Agent Adkins's false statements therefore created the
4    only pathway for the jury to infer that support for the Telehealth amendment was
5    not genuine, which bears directly on Dr. Ridley-Thomas's intent.

6         Further, Agent Adkins's false testimony that Dr. Ridley-Thomas and his staff
7    threatened to cancel or rescind contracts bears directly on whether Dr. Ridley-
8    Thomas's support of county items was corrupt, the implication being that the
9    threats were designed to pressure USC to do as Dr. Ridley-Thomas's office wished.
10   There is also a reasonable likelihood that this false testimony affected the outcome.

11        Each of these false statements "polluted" the jury's deliberations.  *See*
12   *LaPage*, 231 F.3d at 492 ("All perjury pollutes a trial, making it hard for jurors to
13   see the truth.").  This is particularly so where the false statements came from the
14   government's mouthpiece and where no curative instruction was given.  The false
15   testimony pertained directly to Dr. Ridley-Thomas's state of mind, of which the
16   government had, at best, scant evidence.  Accordingly, Dr. Ridley-Thomas's
17   conviction "cannot stand."  *See id.*

18              **c.    The Government Improperly Vouched for Agent
                        Adkins and Elicited Improper Testimony Concerning
19                      Agent Adkins's Opinion of Dr. Ridley-Thomas's Guilt.**

20        Vouching is "placing the prestige of the government behind a witness"
21   through "personal assurances of the witness's veracity, or suggesting that
22   information not presented to the jury supports the witness's testimony."  *United*
23   *States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (citations omitted).
24   Vouching is prohibited for good reason:  "[T]he prosecutor's opinion carries with it
25   the imprimatur of the Government and may induce the jury to trust the
26   Government's judgment rather than its own view of the evidence."  *Id.* at 1147-48.
27   A prosecutor therefore has "no business telling the jury his individual impressions
28   of the evidence."  *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992).

1    Moreover, lay witnesses may not testify about their subjective interpretations of

2    evidence.  *United States v. Cox*, 633 F.2d 871, 875 (9th Cir. 1980).

3          Agent Adkins was the government's star witness:  He testified over the

4    course of three days, and his testimony touched nearly every material factual issue

5    in the case.  But his testimony was not limited to the facts.  He impermissibly

6    opined both on the law and on Dr. Ridley-Thomas's guilt, and he did so at the

7    prompting of the government.  For instance[2]:

8          BY MS. DOTSON:

9          Q. …Hypothetically speaking, if the defendant had supported
           every single agenda item we've been talking about here for a
10         hundred years, would you have stopped your investigation?

11         A. Of course not.
           Q. Hypothetically speaking, if telehealth or probation were
12         literally the best things for the community, would you have
           stopped your investigation?
13
           A. No.
14         Q. Why not?

15         A. Just because –
           MS. DURIE: I'm going to object.  It calls for a legal conclusion
16         –

17         THE COURT: Well, don't –
           MS. DURIE: -- and speculation.
18         THE COURT: -- give us a legal conclusion.

19         MS. DURIE: It also calls for speculation.
           THE COURT: Well –
20         MS. DOTSON: May I be heard, Your Honor?

21         THE COURT: -- I don't think anybody really believes there was
           a hundred years involved, so just answer the question.
22         BY MS. DOTSON:

23         Q. Why would you have not stopped your investigation if any of
           those things had been true?
24         A. Because the evidence showed that despite his support --

25         despite the defendant's support of these programs and despite

26

27   [2]Additional examples include:  Trial Tr. at 1463:4-17; 1921:9-20 1928:24-1929:7;
     1931:3-12; 1938:2-9; 1939:4-13; 1940:4-15; 1952:18-24; 1953:4-24; 1958:15-19;
28   1961:18-1962:7; 1980:3-1981:1.

1
2
3
4
5
6
7

> his seemingly normal aboveboard relationship with Marilyn
> Flynn, at some point in the summer of 2017, *that relationship*
> *appeared to turn corrupt*.  And that is often -- and that is quite
> common in corruption cases that I've been involved in.
> Q. Agent Adkins, based on your training and experience when
> you're conducting investigations –
> MS. DURIE: Your Honor, I move to strike the response under
> 403.
> THE COURT: Denied.

8   Trial Tr. at 1917:2-1918:15[3]

9       Agent Adkins's testimony went beyond describing mere investigatory steps,

10   as the government argued in its opposition to the defense's motion for mistrial.

11   Dkt. 273.  By adducing Agent Adkins's testimony that Dr. Ridley-Thomas's actions

12   "appeared to turn corrupt," the government "induce[d] the jury to trust" its

13   judgment—in the form of Agent Adkins's impermissible opinion--"rather than [the

14   jury's] own view of the evidence."  *See Weatherspoon*, 410 F.3d at 1148.

15       The defense raised this and other issues for the Court in a motion for mistrial

16   or, in the alternative, a curative instruction.  Dkt. 256.  The Court did not rule on the

17   motion and did not provide a curative instruction.  Nor did the Court strike Agent

18   Adkins's improper testimony—even when the defense specifically so moved.  *See*

19   Trial Tr. at 1917:2-1918:15.  The defense respectfully contends that these decisions

20   were errors and that the failure to provide a curative instruction and the failure to

21   strike Agent Adkins's improper testimony unfairly prejudiced Dr. Ridley-

22   Thomas—particularly given the importance the government placed on Agent

23   Adkins's testimony.  *See Kerr,* 981 F.2d at 1054 (plain error where key witness

24   testimony tainted by vouching).

25       Moreover, the government's questioning was designed to and did improperly

26   bolster the credibility of Agent Adkins and, by extension, the strength of the

27

28   [3] Emphases added for all transcript excerpts.

government's case.[4]  Accordingly, it is unlikely that any curative instruction would have been fully effective.  *See United States v. Urie*, 183 F. App'x 608, 612-13 (9th Cir. May 30, 2006) (curative instruction insufficient to cure prejudice).  Further, as Dr. Ridley-Thomas was ultimately convicted of conspiracy, it is distinctly possible that the jury was misled into giving more credence than it otherwise would have to indirect evidence based on Agent Adkins's endorsement.

The Ninth Circuit has often ruled that vouching is a prejudicial error—even when no objection was raised.  *E.g.*, *United States v. Roberts*, 618 F.2d 530 (9th Cir. 1980), *cert. denied*, 452 U.S. 942 (1981); *United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992) (reversing under plain error for prosecutorial vouching).  Here, the government's vouching prejudiced Dr. Ridley-Thomas.  This is so given the importance the government placed on Agent Adkins's testimony, the breadth of his testimony, and the closeness of the case.

> **d.    The Government's Closing and Rebuttal Improperly Impugned Defense Counsel's Character, Improperly Injected Personal Opinions of the Prosecutors, and Misstated the Law.**

The government committed further misconduct during closing and rebuttal— by disparaging defense counsel, improperly vouching and injecting personal opinion, and misstating the law.  This cumulatively prejudiced Dr. Ridley-Thomas.

> **(i)    The Government Improperly Impugned Defense Counsel's Character.**

It is improper for counsel to criticize opposing counsel's character—directly or by implication.  *United States v. Frederick*, 78 F.3d 1370, 1378 (9th Cir. 1996).  Arguing to the jury that defense counsel has misrepresented the record—without

---

[4] In its opposition to the defense's motion for a mistrial, the government argued that the defense opened the door to its improper vouching by asking Agent Adkins questions that highlighted the deficiencies of the government's investigation.  *See generally* Dkt. 273.  The government could have asked questions concerning investigative steps without inviting Agent Adkins to opine on Dr. Ridley-Thomas's ultimate guilt.  This it did not do.

factual support—maligns counsel's character in a way prejudicial to the defendant. *See United States v. Foster*, 711 F.2d 871, 883 (9th Cir. 1983) (citation omitted) (no misconduct where prosecutor retracted statement disparaging defense counsel). Yet, as the Court explicitly acknowledged, the government did precisely that:

> MR. MORSE: ***Counsel's displaying of what, I guess, was represented as testimony in the form of a transcript***, that's not evidence either.  You rely on your memory of the testimony, not what counsel put on the screen as to what the testimony was, as to what the testimony was that could be cherry-picked and taken out of context ***or even be incorrect***.  You rely on your memory.
> MS. DURIE: Your Honor, I object to the "incorrect" with respect to the final transcript.
> ...
> THE COURT: ...There are ways to make arguments that don't border on ***impugning the character of counsel***.  Those are the ways that you may use tomorrow.

Trial Tr. at 2989:5-2990:10.  Though the Court indirectly sustained the defense's objection, its instruction to the government to avoid impugning counsel's character was given outside the presence of the jury.  And no curative instruction was given.

The government also improperly impugned defense counsel's character when it argued that counsel for Dr. Ridley-Thomas had "manufactured" a defense:

> You don't lie, you don't conceal and move this money through a university and hide it from everyone if there's nothing to see.  The only reason the defense has conceded this point at trial.  Because they have to.  You can't hide from these facts now.  You got the emails.  You got the bank wires.  It is so crystal clear.  So what do you do?  ***You come up with a manufactured defense***.  ***You come up with some reason conceivably why, nothing to see here, we always intended for it***.

Trial Tr. at 2879:10-21.  Such argument is plainly improper because it was inflammatory and entirely unsupported by the record.  *See United States v. Molina*, 934 F.2d 1440, 1444-45 (9th Cir. 1991) (prosecution may not denigrate the defense

as manufactured); *see also United States v. Washington*, 263 F. Supp. 2d 413, 434–35 (D. Conn.), *adhered to on reconsideration*, 294 F. Supp. 2d 246 (D. Conn. 2003) prosecutor may not "characterize a defense as 'fabricated'[.]") (citation omitted).

### (ii) Prosecutors—Multiple Times—Improperly Injected Personal Opinions Into Closing and Rebuttal.

As explained above, vouching is "dangerous" because the jury may "give weight to the prosecutor's opinion" instead of exercising its "independent judgment." *Weatherspoon*, 410 F.3d at 1147 (citation omitted). For this reason, prosecutors are afforded leeway for rhetorical flourishes in closing argument only to the extent they draw upon evidence in the record. It is improper for an attorney to inject personal opinions into argument. *United States v. Preston*, 845 Fed. App'x 526, 530 (9th Cir. 2021); *Weatherspoon*, 410 F.3d at 1147 n.3. Even so, the government repeatedly interjected its opinions of the case into their closing:

- "The one thing he didn't see was any other document, letter, email, where in one single document or email it was put together anything regarding benefits for Sebastian Ridley-Thomas and county business. Because that's a no-no. You don't put those two together. You try to silo and keep them separate because, otherwise, *you've got somebody like me standing up here saying, you know, there's a quid pro quo. Not a good look.*"[5] Trial Tr. at 2826:1-8.

- "Now the defense called an expert who, *I guess supposedly* said that it's okay under state campaign finance law to make a donation when you're intending to funnel the money and conceal the true source. Fine. Let's just say that's accurate. *That seems crazy*, but let's go with it." Trial Tr. at 2878:21-2879:1.

- "The defense in opening and throughout this case wants you to believe there's nothing to see here. This money was always intended to go through USC and there's some purpose and there's some nothing burger here. *Nonsense*. Use your reason and common sense. You don't lie, you don't conceal and move this money through a university and hide it from everyone if there's nothing to see. The only reason the defense has conceded this point

---

[5] Defense counsel objected to this as vouching and asked for a curative instruction, but the court overruled the objection.

at trial.  Because they have to.  You can't hide from these facts now.  You got the emails.  You got the bank wires.  ***It is so crystal clear.***"  Trial Tr. at 2879:6-17.

- "He willingly accepts all of those things, agrees to accept all of those things, and ***there is no doubt*** – not only is he intending to be influenced but, ***my goodness***, intending to be rewarded in connection with L.A. County business."  Trial Tr. at 2817:20-24.

- "Paul Vandeventer—'fan' is probably an understatement of Mark Ridley-Thomas.  I think at one point he said during testimony that even if he had known about the sexual harassment stuff, he still would have hired Sebastian if he could but for all of his staff, you know, raising such a ruckus.  And his organization could've taken the media hit from it.  ***I mean, this is man who would do almost anything for this man sitting here***."  Trial Tr. at 2857:13-21.

- "And before I move on to that, look at those emails, all the emails from December.  That is the clearest window into the true nature of the relationship between the Defendant and Marilyn Flynn.  Because that's when the veil is removed.  It's a crisis moment.  ***He needs to get it done.  And it's completely transparent if you look at the timing.…  But I guess it's a coincidence*** that the Defendant sent $100,000 to USC and then just days later $100,000 goes out the door to Sebastian Ridley-Thomas for the benefit of Sebastian Ridley-Thomas."  Trial Tr. at 3037:6-11, 3051:16-19.

- "First, ask yourself: Was Dean Marilyn Flynn giving the Defendant these benefits in the form of what she did for Sebastian Ridley-Thomas, in the form of funneling those $100,000?  ***Was she doing that because she believed that the Defendant would do things for her on the county side?  The answer to that question is clearly yes.***"  Trial Tr. at 3059:11-17.

- "And then [defense expert Ann Ravel] was asked: Well, this is whole thing is okay to you?  And she's like: Yes.  ***And she kind of smirked because it's ridiculous.***"  Trial Tr. at 3045:24-3046:2.

These examples fall outside the bounds of appropriate argument.  *See Preston*, 845 Fed. App'x at 530 (prosecutor's argument must be drawn from the record); *United States v. Fletcher*, 62 M.J. 175, 180–81 (C.A.A.F. 2005) ("clear,"

1    "nonsense," "ridiculous," "unbelievable" all improper interjections of counsel's

2    personal opinion).  Each remark individually reveals the prosecutors' personal

3    opinions about Dr. Ridley-Thomas's guilt—not their opinions about what the

4    evidence shows.  Considered collectively, there can be little doubt that these

5    inappropriate remarks impaired the jury's ability to separate the evidence in the

6    case from prosecutors' personal views of that evidence.  *See Pantano v. Donat*,

7    No. 3:08-cv-00685-ECR-VPC, 2012 WL 3929515, at *16 (D. Nev. Sept. 7, 2012)

8    ("There's no doubt he's guilty" statement by prosecutor improper).

9         This is particularly evident considering that nearly all of the inappropriate

10   remarks at closing concerned the $100,000 donations, which the government

11   prejudicially described as "funneling."  This inflammatory term was designed to

12   imply to the jury that these legal donations were criminal.  But, as Ms. Ravel

13   testified, each of the $100,000 donations was legal under California law and

14   publicly reported where required.  *E.g.*, Trial Tr. at 2627:4-2634:19.  The

15   government adduced no evidence to suggest otherwise.  Nonetheless, the

16   government—in opening, in questioning, and in closing—referred to this series of

17   transactions ***more than fifty times*** as "funneling."  Further, as noted above, the

18   government went so far as to argue in closing that it was "crazy" that it was

19   "supposedly" legal to donate money in this fashion.  Trial Tr. at 2878:21-2879:1.

20   As the only evidence in the record was that the donations were legal, the record

21   does not support the use of this prejudicial pejorative.  This misconduct likely

22   tainted the jury's consideration of whether Dr. Ridley-Thomas's role in these

23   donations was in fact a crime.

24        Allowing prejudicial language like "funneling" that implies criminality

25   without evidentiary support is an error and can be grounds for a new trial.  For

26   instance, in *United States v. Medeiros*, No. CR 18-1966-JCH, 2022 WL 17819698,

27   at *27 (D.N.M. Dec. 20, 2022), a witness testified that the "structuring technique"

28   the defendants used to avoid gift taxes was "a fraud indicator"—even though the

DEFENDANT MARK RIDLEY-THOMAS'S RULE 33   14
MOTION

structuring did not violate tax law—and the prosecution described legal gifting at issue as a "shuffle." *Id.* The court ruled that this inflammatory language, in conjunction with other errors, warranted a new trial.[6] *Id.* at \*27, \*29.

The *Madeiros* facts are remarkably similar to those at hand, and the likelihood of prejudice here, as in *Madeiros*, looms over this verdict. It is no coincidence that the jury acquitted Dr. Ridley-Thomas of the majority of the honest services mail and wire fraud counts only to convict him of the ones implicated by the $100,000 donations to USC and then to United Ways. This result is very possibly a consequence of the government's misconduct.

Ample instances of prosecutorial misconduct, as described above, denied Dr. Ridley-Thomas his right to a fair trial. A new trial is warranted based on this alone. As explained below, however, multiple misstatements of the law during trial further prejudiced Dr. Ridley-Thomas and is likewise grounds for a new trial.

### (iii) The Government Misstated the Law on Honest Services Fraud Multiple Times During Closing Argument.

In closing, with respect to the mail and wire fraud charges, the government argued that Ex. 316, a February 2018 email from Dean Flynn to Dr. Ridley-Thomas discussing the 2018 Telehealth amendment, constituted an official act because Dr. Ridley-Thomas forwarded the email to Emily Williams, one of his deputies. Trial Tr. at 2854:11-2855:9 ("Emily Williams has no idea that there's anything nefarious going on here, but he's advising somebody on his staff to do certain things. ***That's an official act.***"). This argument implies that informing a deputy of a constituent idea and requesting exploration of that idea can constitute an official act, which is an incorrect statement of the law.

"Setting up a meeting, hosting an event, or calling an official (or agreeing to

---

[6]The potential prejudice of this unnecessarily loaded and inaccurate descriptor was only compounded by the Court's decision not to give at least the defense's proposed jury instructions 37(c), 37(d), and 38(b). *See* Dkt. 175 at 89, 91, and 109.

do so) merely to talk about a research study or to gather additional information, however, does not qualify as a decision or action on the pending question whether to initiate the study." *McDonnell v. United States*, 579 U.S. 550, 571, 573 (2016) (quoting *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 408 (1999)).  Further, as even more directly applicable to Exhibit 316, "sending a subordinate to such a meeting, event, or call—similarly does not qualify as a decision or action on the study, as long as the public official does not intend to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an 'official act.'" *Id*. at 573.  Exhibit 316, an email forward from Dr. Ridley-Thomas to his deputy stating "FYI" with a subsequent statement of "We should have a follow up" is therefore not an official act for the purposes of honest services fraud.  *See id*. at 578-79 (asking a subordinate to attend a meeting without more is not an official act—even if official accepted loans and gifts from company CEO with business before the official); *United States v. Tavares*, 844 F.3d 46, 57 (1st Cir. 2016) (an official's meeting with another official concerning a proposed legislative amendment, without more, not official act).

The government also misstated the law with respect to honest services fraud when it argued to the jury that a conflict of interest was a proper basis to convict. In closing, the government stated repeatedly that Dr. Ridley-Thomas "monetized" his position as a public official because of the $100,000 donation from the Mark Ridley-Thomas Committee for a Better Los Angeles to United Ways, by way of USC.  *See, e.g.*, Trial Tr. at 2891:11-12; 2996:18-19.  Yet, as the government did not contest, neither Dr. Ridley-Thomas nor Sebastian Ridley-Thomas received money from this donation.  And, though the government improperly argued, as noted above, that it was "crazy" that this series of donations was legal, the government never asserted that the $100,000 donations were themselves illegal. *E.g.*, Trial Tr. at 3047:23-24 ("[i]t doesn't have to be illegal").

Instead, despite its representations to the Court, Trial Tr. at 2744:8-25, the

government argued that the benefit Dr. Ridley-Thomas gained was the funneling of the $100,000 donation, which enabled him to hide a conflict of interest relating to his son's relationship with USC.  Trial Tr. at 3023:12-19 ("That is called a conflict of interest.").  But, as the Supreme Court has held, a defendant cannot be convicted for honest services fraud based on conflicts of interest or a failure to disclose theory.  *Skilling v. United States*, 561 U.S. 358, 408, 410 (2010) ("… A reasonable limiting construction of § 1346 must exclude this amorphous category [schemes of non-disclosure and concealment of material information] of cases."); *United States v. Weyhrauch*, 623 F.3d 707, 708 (9th Cir. 2010) (*Weyhrauch II*) (overturning conviction of honest services fraud based on failure to disclose).

Each of these incorrect statements of law at closing improperly invited the jury to convict Dr. Ridley-Thomas for conduct not prohibited by the statute, lowering the threshold for criminality.  The prejudice is obvious, and it deprived Dr. Ridley-Thomas of his right to a fair trial.

### C.   Argument That Section 666 Included Gratuities Was Inaccurate Statement of Law.

Multiple times during closing, the government argued that a reward for an action Dr. Ridley-Thomas had already taken or an action he had already intended to take was sufficient to convict under section 666.  As explained below, these arguments misstated the law, inviting the jury to convict Dr. Ridley-Thomas for a crime not charged—the receipt of illegal gratuities.  The government argued:

- "But what you cannot do, what it is wrong to do, what it is corrupt to do— and make no mistake about it—what it is illegal to do is put that hand out and make anyone think that they've got to pay to play; that they have to give you or your family member or friend something in connection with ***that thing you're already going to do*.**  Trial Tr. at 2819:2-7.

- "You do not ever get to go out with your hand out and make people ***think that something that's already going to happen or you intend to do*** is in any

way connected with somebody having to give you or your family, your friends, or your dog, or whatever, a nice series of benefits and perks."  Trial Tr. at 2822:4-9.

- "Remember, ladies and gentlemen, public officials do not -- do not get to monetize their public service.  It doesn't matter if what they're working on is also good for citizens.  ***Doesn't matter if they always intend to vote for something or do something***."  Trial Tr. at 2891:11-15.

The government argued in rebuttal:

- "Sometimes he did things in his official capacity for Dean Marilyn Flynn ***that he had already intended to do***.  Sometimes he did things for Dean Marilyn Flynn in his official capacity that he would not have otherwise done."  Trial Tr. at 2996:11-14.

- "It is not a defense that any acts taken in this case were for the good of the community or were acts that the Defendant would have or should have taken without the bribe.  In other words, ***even if he were going to do certain things, if he did those things and he accepted a reward for those things, it's still bribery***."  Trial Tr. at 2998:11-16.

- "It doesn't matter whether the Defendant ***was always going to vote*** in favor of these amendments or contracts ***or if he was always going to do what he did***."  Trial Tr. at 3058:23-3059:1.[7]

What the government described again and again during closing and rebuttal was payment of an illegal gratuity—which occurs when an individual gives something of value to a public official as a "tip" for an action previously performed or an action that the official has already resolved to take.  *Sun–Diamond,* 526 U.S. at 404-05.  The Ninth Circuit has never held, however, that the bribery statute under which Dr. Ridley-Thomas was charged, 18 U.S.C. § 666, criminalizes gratuities as well as bribery.  Indeed, the plain language and legislative history of section 666

---

[7] The government's theory of guilt under section 666 was also based on two county items, Item 3 (Probation University) and Item 16 (the Vermont Street Re-entry Center).  Yet, the "bribes," Dr. Ridley-Thomas allegedly received for these items all occurred *after* each was passed by the Board of Supervisors.  These, too, are illegal gratuities, not bribes, which, as explained here, are not criminalized by section 666.

demonstrate that section 666 is limited to bribery.  The government's argument in closing therefore conflates 18 U.S.C. § 666 with 18 U.S.C. § 201, a statute that criminalizes both bribery and gratuities by federal public officials.  *See e.g.*, *United States v. Raborn*, 575 F.2d 688, 691 (9th Cir. 1978).

Section 201 is the older of the two statutes.  It separates its treatment of illegal bribes and illegal gratuities into two sections.  Section 201(b) prohibits federal public officials to receive bribes, making it illegal to "corruptly demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value" in order to be "influenced in the performance of any official act."  Section 201(c) prohibits illegal gratuities to federal public officials, making it illegal for a public official to "demand[], seek[], receive[], accept[], or agree[] to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person."

The purpose of section 666, which was passed in 1984, was to "augment" the federal government's ability to prosecute "theft, fraud, and bribery" involving federal money disbursed to state or local governments.  S. Rep. No. 98–225, at 369, 370 (1983).  Section 666 was amended two years later.  The statute currently makes it illegal for a state or local public official to "corruptly solicit[] or demand[]… or accept[] or agree[] to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more."  18 U.S.C. § 666 (a)(1)(B).  The statute does not mention gratuities explicitly or implicitly.

Key changes from the original language to the operative language underscore Congressional intent to limit section 666 to bribery.  *See* H.R. Rep. No. 99-797, at 16, 30, n.9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6138.  First, the 1986 amendment replaced "for or because of" language with "intending to be influenced or rewarded."  *Compare* Comprehensive Crime Control Act, Pub. L. No. 98-473,

1    § 1104(a), 98 Stat. 1837, 2143-44 (1984) *with* Criminal Law and Procedure

2    Technical Amendments Act of 1986, Pub. L. No. 99-646, § 59, 100 Stat. 3592,

3    3612-13.  This change is important because the eliminated language ("for or

4    because of") of section 666 tracks language in section 201(c)—which, as noted

5    above, is the subsection prohibiting gratuities—and replaced it with language

6    ("intending to be influenced or rewarded") mirroring that in section 201(b), the

7    subsection prohibiting bribery.  Second, the amendment added the word

8    "corruptly," which appears in section 201(b) (bribery) but, notably, not section

9    201(c) (gratuities).  *Id.*  As the Fifth Circuit relatively recently noted, that Congress

10   modified the language of section 666 so that it was more similar to section 201(b)

11   and less similar to 201(c), points toward the "sensible conclusion that § 666 is more

12   like § 201(b), and that Congress meant for § 666 to be similarly limited."  *United*

13   *States v. Hamilton*, 46 F.4th 389, 397-98 (5th Cir. 2022); *see also United States v.*

14   *Fernandez*, 722 F.3d 1, 26 (1st Cir. 2013) (statute's modifications "suggest[] the

15   true targets of § 666 are bribes, not gratuities."); *United States v. Lindberg*, 39 F.4th

16   151, 172 (4th Cir. 2022) (observing Fourth Circuit "skeptical" section 666 includes

17   gratuities).

18        The penalties for violating section 201(b), (c), and section 666 also point

19   toward this "sensible conclusion."  The penalty for violating section 666—up to ten

20   years—is more analogous to the penalty under section 201 for bribery (up to fifteen

21   years)—not gratuities (up to two years).[8]  The First Circuit analyzed these

22   discrepancies in its 2013 decision ruling that section 666 excluded gratuities:

23

24        This dramatic discrepancy in maximum penalties between § 666
25        and § 201(c) makes it difficult to accept that the statutes target
         the same type of crime—illegal gratuities.  The difference in
26        sentences contemplated by § 201(b) and § 666 is both less

27   _____
     [8]The government acknowledged this discrepancy in its objections to the defense's
28   proposed jury instruction 37(c).  Dkt. 175 at 90.

     DEFENDANT MARK RIDLEY-THOMAS'S RULE 33    20
     MOTION

1
2
3
4

> dramatic and more understandable: § 201(b) targets (primarily)
> federal officials, while § 666 targets non-federal officials who
> happen to have a connection to federal funds.  It is reasonable to
> assume that the federal government viewed corrupt federal
> officials involved in the receipt of bribes as more culpable.

5   *Fernandez,* 722 F.3d at 20–28.  Section 666 does not include gratuities.

6     Dr. Ridley-Thomas anticipates that the government will argue that *United*

7   *States v. Garrido* stands for the proposition that section 666 includes gratuities.  But

8   *Garrido* concerned solely whether section 201's "official act" requirement should

9   be imported to section 666—a proposition the Ninth Circuit rejected.  *United States*

10  *v. Garrido*, 713 F.3d 985, 1001 (9th Cir. 2013).  In fact, the only time *Garrido* uses

11  the word "gratuity" is in the context of section 201, discussing what that statute

12  does and does not prohibit.  *Id.*  The Ninth Circuit has not yet been called to

13  determine whether section 666 prohibits gratuities as well as bribes.

14    Dr. Ridley-Thomas also anticipates that the government will argue that the

15  word "reward" in section 666 (". . . intending to be influenced or rewarded . . .")

16  signifies that the statute also criminalizes gratuities.  At least the First and Fifth

17  Circuits have grappled with this argument and concluded that the word "reward" in

18  the context of section 666 merely clarifies that, in furtherance of a bribe, the

19  conveyance of a thing of value can occur either (i) at the time the agreement to

20  accept a thing of value is made, or (ii) after the official act occurs:

21
22
23
24
25
26
27

> "Influence" would be used in situations in which, for instance, a
> payment was made to a local government commissioner in order
> to induce him to vote in a certain way on a particular matter.
> "Reward" would be used if a *promise* of payment was made,
> contingent upon that commissioner's vote; once the
> commissioner voted in the way the payor requested, a "reward"
> would follow.  Both of these situations involve a quid pro quo,
> and both therefore constitute bribes.  What matters, of course, is
> that the *offer* of payment precedes the official act.

28

DEFENDANT MARK RIDLEY-THOMAS'S RULE 33
MOTION   21

*Fernandez*, 722 F.3d at 20–28 (emphasis in original); *see also United States v. Jennings,* 160 F.3d 1006, 1015 n. 3 (4th Cir.1998) ("Reward" stands for the proposition "that a bribe can be promised before, but paid after, the official's action on the payor's behalf" in accord with "the traditional meaning of the term 'reward' *as something offered to induce another to act favorably on one's behalf* (for example, a bounty offered for the capture of a fugitive"). (emphasis added)).

The rule of lenity further counsels in favor of construing section 666 to exclude gratuities.  True, some circuits have ruled that section 666 includes gratuities.  The circuit split at minimum demonstrates that the meaning of section 666 with respect to gratuities is ambiguous.  Consistent with the rule of lenity, that ambiguity should be construed against the government.  *United States v. Millis*, 621 F.3d 914, 916-17 (9th Cir. 2010) (citations omitted).  In this context, that means construing section 666 in a way that forecloses a statutory interpretation under which section 666 includes illegal gratuities.  *Fernandez*, 722 F.3d at 40 (J. Howard, concurring).  Here, "where text, structure, and history fail to establish that the Government's position is *unambiguously* correct," the rule of lenity resolves the ambiguity in Dr. Ridley-Thomas's favor.  *See United States v. Kelly*, 874 F.3d 1037, 1049 (9th Cir. 2017) (citations omitted) (emphasis in original).

Under these circumstances, where the government invited the jury to convict on an improper theory of gratuities, it is impossible to exclude the possibility that the jury convicted Dr. Ridley Thomas of accepting something of value in exchange for an official action he had already decided to do or had already completed— which is not prohibited by section 666.  It is further impossible to ascertain the degree to which the jury's tainted deliberations on section 666 pervaded their analysis of the other crimes charged.  The Court therefore should vacate Dr. Ridley-Thomas's conviction.  *See Fiore v. White,* 531 U.S. 225, 228 (2001) (holding that conviction of defendant for conduct that a "criminal statute, as properly interpreted, does not prohibit ... violate[s] due process").

1

### D.   Cumulative Errors Deprived Dr. Ridley-Thomas of His Right to a Fair Trial.

2

3          Each instance of prosecutorial misconduct and misstatement of the law were

4  errors.  Given the volume and severity of these errors, "[t]he extent of the distortion

5  is difficult to measure," particularly where the errors implicate each of the counts

6  for which Dr. Ridley-Thomas was convicted  *See United States v. Rodrigues*,

7  No. 97-10113, 1998 U.S. App. LEXIS 36919, at *30 (9th Cir. Oct. 28, 1998).

8          Prejudicial impact is higher for cases without overwhelming evidence of

9  guilt.  This was an unusually close case.  *See United States v. Leon-Gonzalez*, 24 F.

10  App'x 689, 692 (9th Cir. 2001) (prejudicial statements in "very close case"

11  mandated new trial).  The government's evidence was by no means overwhelming,

12  and, in fact, as argued in Dr. Ridley-Thomas's supplemental Rule 29 brief, the

13  government's evidence was materially deficient in multiple respects.

14          The defense has noted above where it posed objections to misconduct during

15  trial.  The correct standard of review for those errors is harmless error.  Each of the

16  errors identified here, however, satisfies the more stringent standard of review—

17  plain error—because each error implicates Dr. Ridley-Thomas's right to a fair trial.

18          The credulousness juries afford the government, *see e.g.*, *Weatherspoon*, 410

19  F.3d at 1147, make it particularly important for the government to respect the lines

20  courts have drawn with respect to permissible statements at argument and lines of

21  questioning.  The government here crossed those lines, and, in most instances, the

22  jury received no curative instruction.  Given the state of the record, the nature of the

23  misconduct, the lack of curative instructions, and the multiple misstatements of law

24  (some misconduct, some not), it is likely, if not probable, that the errors described

25  above tipped the scales toward conviction.  The result was the deprivation of

26  Dr. Ridley-Thomas's due process right to a fair trial.

27

28

E.   **The Government Did Not Meet the Evidentiary Threshold for "Thing of Value" Under Section 666.**

Section 666 requires a showing beyond a reasonable doubt that the county items at issue in the bribe were valued at $5,000 or more.  *See United States v. Simas*, 937 F.2d 459, 463 (9th Cir. 1991).  The government has claimed that the value of the bribe itself may be considered in evaluating whether the county transactions involved were worth $5,000 or more.  As argued in the defense's Rule 29 motion, this is contrary to the plain language of the statute.

But even this incorrect interpretation of the statute does not salvage the government's deficient proof:  The only things of "value" that could conceivably be considered to meet the $5,000 threshold for a conviction under section 666— Sebastian Ridley-Thomas's USC benefits—were rejected by the jury.  The government, therefore, cannot point to those benefits as evidence of value to support a conviction on Section 666.  Interpreting the verdicts consistently, then, the only remaining *potential* thing of value to measure the supposed bribe's worth is the $100,000 donation—from which neither Dr. Ridley-Thomas nor Sebastian Ridley-Thomas received money.

The government may attempt to categorize the defense's position as an attempted end-run around *United States v. Powell*, 469 U.S. 57, 67 (1984), which holds that inconsistent jury verdicts are not sufficient grounds for a judgment of acquittal.  The Court should reject any such attempt.  As explicitly noted above, the defense is advocating for an interpretation of the verdicts as *consistent*.

F.   **Evidentiary Deficiencies, As Identified in the Rule 29 Motion, Justify a New Trial.**

As argued in Dr. Ridley-Thomas's supplemental brief in support of its Rule 29 motion and immediately above, the government's evidence is insufficient as a matter of law to sustain a conviction.  Even if, however, the Court determines that the numerous evidentiary deficiencies do not rise to the threshold required for a

1   judgment of acquittal, the Court should consider the weakness of the government's

2   case in its analysis of this motion for a new trial.  *See Alston*, 974 F.2d at 1211-12

3   (citation omitted) (even where "abstract sufficiency of the evidence to sustain a

4   verdict" exists, court may grant new trial).  In a motion for a judgment of acquittal,

5   the Court must view the evidence in the light most favorable to the verdict.

6   *Kellington*, 217 F.3d at 1097.  The Court has no such obligation with respect to a

7   motion for a new trial and can grant a new trial where there is a risk of "serious

8   miscarriage of justice," as there is here.  *See Alston*, 974 F.2d at 1211-12 (citation

9   omitted).

10   **IV.    CONCLUSION**

11        The "societal costs of reversal and retrial are an acceptable and often

12   necessary consequence when an error in the first proceeding has deprived a

13   defendant of a fair determination of the issue of guilt or innocence."  *United States*

14   *v. Mechanik*, 475 U.S. 66, 72 (1986).  For all the reasons explained above,

15   Dr. Ridley-Thomas respectfully requests that this Court grant his motion for a new

16   trial.

17

18    Dated:  May 1, 2023                    MORRISON & FOERSTER LLP

19

20                                           By: */s/ Daralyn J. Durie*
                                                  DARALYN J. DURIE

21                                           Attorneys for Defendant
22                                           MARK RIDLEY-THOMAS

23

24

25

26

27

28

1

## **CERTIFICATE OF SERVICE**

2

I hereby certify that on May 1, 2023 the within document was filed with the

3

Clerk of the Court using CM/ECF which will send notification of such filing to the

4

attorneys of record in this case.

5

6

                                                    */s/ Daralyn J. Durie*
                                                    DARALYN J. DURIE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28