DARALYN J. DURIE (SBN 169825)
ddurie@mofo.com
ARTURO J. GONZALEZ (SBN 121490)
agonzalez@mofo.com
GALIA Z. AMRAM (SBN 250551)
gamram@mofo.com
RAMSEY W. FISHER (SBN 334228)
ramseyfisher@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415-268-7000
Facsimile: 415-268-7522

CHRISTINA M. RANDALL (SBN 320125)
crandall@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
Telephone: 213-892-5200
Facsimile: 213-892-5454

Attorneys for Defendant
MARK RIDLEY-THOMAS

## IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MARK RIDLEY-THOMAS, et al., <br><br> Defendants. | Case No. 2:21-cr-00485-DSF <br><br> **DEFENDANT MARK RIDLEY-THOMAS'S NOTICE OF MOTION AND MOTION FOR BAIL PENDING APPEAL** <br><br> Date:      October 30, 2023 <br> Time:      8:30 a.m. <br> Courtroom: 7D <br> Judge:     Hon. Dale S. Fischer |

1

## <u>NOTICE OF MOTION AND MOTION</u>

2      PLEASE TAKE NOTICE that on October 30, 2023, at 8:30 a.m. in the

3 courtroom of the Honorable Dale S. Fischer, or as soon thereafter as the matter may

4 be heard, counsel for Defendant Mark Ridley-Thomas will move the Court for bail

5 pending appeal.  This motion is based on the attached motion, the Declaration of

6 Galia Z. Amram and exhibits filed concurrently herewith, the Constitution of the

7 United States of America, all applicable statutory and case law, and such argument

8 as the Court will entertain at the motion hearing.

9

10   Dated:     October 2, 2023         MORRISON & FOERSTER LLP

11

12                          By:  */s/ Galia Z. Amram*

                             GALIA Z. AMRAM

13

                           Attorneys for Defendant

14                           MARK RIDLEY-THOMAS

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................1

II.    LEGAL STANDARD ...........................................................................2

III.   ARGUMENT .........................................................................................3

    A.   Dr. Ridley-Thomas Does Not Present Any Flight Risk or
        Danger to the Community........................................................... 3

    B.   Dr. Ridley-Thomas's *Batson* Challenges Raise Substantial
        Appellate Questions Likely to Result in Reversal or a New Trial ........4

        1.   *Batson* legal standard.................................................... 5

        2.   Analysis of *Batson* issues ............................................. 5

    C.   Dr. Ridley-Thomas Will Raise Substantial Questions on
        Appeal That Are Likely to Result in Reversal, A New Trial
        or at Minimum, a Substantially Reduced Sentence ............................ 12

        1.   The Official Act Requirement For Honest Services
            Fraud Involved Unique Facts Not Covered by the
            Controlling Precedents................................................... 12

        2.   Dr. Ridley-Thomas Raises a Substantial Question
            as to Whether the Government was Required to Prove
            Breach of Fiduciary Duty and Whether He Breached
            Any Duty ...................................................................... 14

        3.   There is a "Substantial Question" about Whether the
            Materiality Requirement was Met ................................. 15

        4.   There is a "Substantial Question" as to the Threshold
            Value of the Telehealth Contract................................. 16

        5.   Substantial Questions Exist as to Whether the
            Government Invited the Jury to Convict Under a
            Conflict of Interest Theory .......................................... 17

        6.   Substantial Questions Exist as to Whether a Loss of
            One's Own Funds Can Constitute a Bribe ................... 21

        7.   Substantial Questions Exist as to Whether there Can
            be a Deprivation of Honest Services ........................... 22

        8.   Substantial Questions Exist as to Whether the
            Government Invited the Jury to Convict Under a
            Gratuities Theory and Whether a Conviction Based
            on that Theory Can Be Upheld...................................... 23

        9.   Cumulative Errors Warrant Bail Pending Appeal .................... 25

1
        10.    There Are Substantial Questions Concerning Circuit
               Splits and the Court's Denial of Various Requested Jury
2              Instructions ...............................................................................28

3   IV.    CONCLUSION..............................................................................36

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ali v. Hickman,*
    584 F.3d 1174 (9th Cir. 2009) ................................................................. 8

*Batson v. Kentucky,*
    476 U.S. 79 (1986) .................................................................... *passim*

*Beck v. United States,*
    298 F.2d 622 (9th Cir. 1962) .............................................................. 20

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 ................................................................................ 35

*Dorn v. Burlington N. Santa Fe,*
    397 F.3d 1183 (9th Cir. 2005) ............................................................ 25

*Flowers v. Mississippi,*
    139 S. Ct. 2228 (2019) ..................................................................... 5

*Gonzales v. Police Dep't, City of San Jose, Cal.,*
    901 F.2d 758 (9th Cir. 1990) ............................................................ 25

*Green v. Lamarque,*
    532 F.3d 1028 (9th Cir. 2008) ............................................................ 5

*Harwin v. Goleta Water Dist.,*
    953 F.2d 488 (9th Cir. 1991) ............................................................ 33

*J.E.B. v. Alabama ex rel. T.B.,*
    511 U.S. 127 (1994) ....................................................................... 7

*Jamerson v. Runnels,*
    713 F.3d 1218 (9th Cir. 2013) ............................................................ 8

*Johnson v. California,*
    545 U.S. 162 (2005) ....................................................................... 5

*Kesser v. Cambra,*
    465 F.3d 351 (9th Cir. 2006) .............................................................. 8

*McCormick v. United States,*
   500 U.S. 257 (1991) ................................................................... 32, 33

*McCutcheon v. Fed. Election Comm'n,*
   572 U.S. 185 (2014) ................................................................... 31, 36

*McDonnell v. United States,*
   136 S. Ct. 2355, 195 L. Ed. 2d 639 (2016) ................................ 15, 33

*McNally v. United States,*
   483 U.S. 350 (1987) ........................................................................ 22

*Nguyen v. Frauenheim,*
   45 F.4th 1094 (9th Cir. 2022) ......................................................... 11

*People v. Motton,*
   39 Cal.3d 596 (1985) ....................................................................... 11

*Percoco v. United States,*
   598 U.S. 319 (2023) (Gorsuch, J., concurrence) ........................... 1, 22

*Skilling v. United States,*
   561 U.S. 358 (2010) ................................................................. *passim*

*SmithKline Beecham Corp. v. Abbott Labs.,*
   740 F.3d 471 (9th Cir. 2014) ........................................................ 5, 7

*Snyder v. Louisiana,*
   552 U.S. 472 (2008) ........................................................................ 10

*Sorich v. United States,*
   555 U.S. 1204 (2009) (Scalia, J., dissenting) ............................. 22, 23

*Towery v. Schriro,*
   641 F.3d 300 (9th Cir. 2010) .......................................................... 26

*United States v. Agurs,*
   427 U.S. 97 (1976) .......................................................................... 26

*United States v. Alanis,*
   335 F.3d 965 (9th Cir. 2003) ......................................................... 9, 10

*United States v. Allen,*
   10 F.3d 405 (7th Cir. 1993) ........................................................ 29, 33

*United States v. Alvarado*,
   923 F.2d 253 (2d Cir. 1991) ................................................................... 7

*United States v. Antico*,
   123 F. Supp. 2d 285 (E.D. Pa. 2000) .................................................... 15

*United States v. Arehart*,
   No. 88-24-04-FR, 1989 U.S. Dist. LEXIS 8283 (D. Or. July 19,
   1989) ....................................................................................................... 4

*United States v. Arthur*,
   544 F.2d 730 (4th Cir. 1976) ................................................................ 34

*United States v. Bello-Bahena*,
   411 F.3d 1083 (9th Cir. 2005) ............................................................... 28

*United States v. Bondaruk*,
   No. 2:11-cr-00450-TLN, 2019 U.S. Dist. LEXIS 9451 (E.D. Cal.
   Jan. 18, 2019) .......................................................................................... 4

*United States v. Boulware*,
   No. CR 99-239 ER, 2007 WL 9717801 (D. Hawaii Nov. 15, 2007) .......... 30, 32

*United States v. Collins*,
   551 F.3d 914 (9th Cir. 2009) .............................................................. 6, 7

*United States v. Fernandez*,
   722 F.3d 1 (1st Cir. 2013) ..................................................................... 31

*United States v. Flores*,
   No. CR 06-641-GAF, 2007 U.S. Dist. LEXIS 107436 (C.D. Cal.
   July 27, 2007) ........................................................................................ 28

*United States v. Ford*,
   435 F.3d 204 (2d Cir. 2004) ................................................................. 31

*United States v. Frederick*,
   78 F.3d 1370 (9th Cir. 1996) ................................................................ 28

*United States v. Garcia*,
   340 F.3d 1013 (9th Cir. 2003) ........................................................... 2, 25

*United States v. Garcia*,
   992 F.2d 409 (2d Cir. 1993) ................................................................. 21

*United States v. Garrido*,
   713 F.3d 985 (9th Cir. 2013) .................................................. 19, 20, 31

*United States v. Goldman*,
   No. 91–CR–59, 1993 WL 48906 (N.D.N.Y. Feb. 24, 1993) ...................... 30, 32

*United States v. Greenhut*,
   No. 2:15-cr-477-CAS, 2017 U.S. Dist. LEXIS 29026 (C.D. Cal.
   Feb. 27, 2007) .................................................................. 15

*United States v. Griffin*,
   154 F.3d 762 (8th Cir. 1998) ..................................................... 31

*United States v. Hamilton*,
   46 F.4th 389 (5th Cir. 2022) ..................................................... 31

*United States v. Handy*,
   761 F.2d 1279 (9th Cir. 1985) ............................................. *passim*

*United States v. Heller*,
   830 F.2d 150 (11th Cir. 1987) ................................................... 21

*United States v. Inzunza*,
   3:03-CR-2434, Dkt. 576 (S.D. Cal.) ............................................... 1

*United States v. Jennings*,
   160 F.3d 1006 (4th Cir. 1998) ............................................... 31, 33

*United States v. Johnson*,
   621 F.2d 1073 (10th Cir. 1980) .................................................. 33

*United States v. Jordan*,
   No. 4:18-CR-087, 2022 U.S. Dist. LEXIS 167750 (E.D. Tex. Sept.
   16, 2022) ....................................................................... 32

*United States v. Kail*,
   No. 18-cr-00172-BLF-1, 2021 WL 3773613 (N.D. Cal. Aug. 25,
   2021) ........................................................................... 35

*United States v. Kidd*,
   752 F. App'x 399 (9th Cir. 2018) ................................................ 17

*United States v. Kincaid-Chauncey*,
   556 F.3d 923 (9th Cir. 2009) ............................................... 34, 36

*United States v. LaPage*,
   231 F.3d 488 (9th Cir. 2000) .......................................................................... 25, 26

*United States v. Leon-Gonzalez*,
   24 F. App'x 689 (9th Cir. 2001) ........................................................................... 28

*United States v. Mandel*,
   591 F.2d 1347 (4th Cir. 1979) .............................................................................. 14

*United States v. McAllister*,
   693 F.3d 572 (6th Cir. 2012) .................................................................................. 8

*United States v. Medeiros*,
   No. CR 18-1966-JCH, 2022 WL 17819698 (D.N.M. Dec. 20, 2022) .............. 27

*United States v. Miller*,
   953 F.3d 1095 (9th Cir. 2020) .............................................................................. 35

*United States v. Millis*,
   621 F.3d 914 (9th Cir. 2010) ................................................................................ 24

*United States v. Milovanovic*,
   678 F.3d 713 (9th Cir. 2012) (en banc) ............................................................... 14

*United States v. Montoya*,
   945 F.2d 1068 (9th Cir. 1991) .............................................................................. 32

*United States v. Nader*,
   542 F.3d 713 (9th Cir. 2008) ................................................................................ 13

*United States v. Ring*,
   1:08-CR-274-ESH, Dkt. 297 (D.D.C.) ................................................................... 2

*United States v. Robles*,
   2:04-CR-1594-SVW, Dkt. 384 (C.D. Cal.) ............................................................ 1

*United States v. Rodriguez*,
   45 F.3d 302 (9th Cir. 1995) .................................................................................. 28

*United States v. Rude*,
   88 F.3d 1538 (9th Cir. 1996) ................................................................................ 27

*United States v. Sarno*,
   73 F.3d 1470 (9th Cir. 1995) ................................................................................ 27

*United States v. Sawyer*,
  85 F.3d 731 (1st Cir. 1996) ........................................................ 34, 36

*United States v. Seymour*,
  684 F. App'x 662 (9th Cir. 2017) ................................................ 16, 17

*United States v. Siegelman*,
  640 F.3d 1159 (11th Cir. 2011) ........................................................ 29

*United States v. Silver*,
  203 F. Supp. 3d 370 (S.D.N.Y. 2016) ................................................ 15

*United States v. Simas*,
  937 F.2d 459 (9th Cir. 1991) ............................................................ 16

*United States v. Sun-Diamond Growers of Cal.*,
  526 U.S. 398 (1999) ................................................................*passim*

*United States v. Terry*,
  707 F.3d 607 (6th Cir. 2013) ............................................................ 29

*United States v. Thompson*,
  484 F.3d 877 (7th Cir. 2007) ............................................................ 22

*United States v. Tomsha-Miguel*,
  766 F.3d 1041 (9th Cir. 2014) .......................................................... 27

*United States v. Wallace*,
  No. CR 13-00264-SJO-3, 2016 U.S. Dist. LEXIS 200364 (C.D.
  Cal. Jan. 19, 2016) ............................................................................ 3

*United States v. Warner*,
  No. 02 CR 506-1,4, 2006 U.S. Dist. LEXIS 77228 (N.D. Ill
  Oct. 13, 2006) ............................................................................ 30, 32

*United States v. Weyhrauch*,
  623 F.3d 707 (9th Cir. 2010) ........................................................ 17, 20

*United States v. Wright*,
  665 F.3d 560 (3d Cir. 2012) ............................................................ 29

*United States v. Yates*,
  16 F.4th 256 (9th Cir. 2021) ............................................................ 20

*Weyhrauch v. United States,*
    No. 08-1196, 8-9............................................................................20

**Federal Statutes**

18 U.S.C. § 201.................................................................................30, 31

18 U.S.C. § 666.............................................................................*passim*

18 U.S.C. § 1341...................................................................................14

18 U.S.C. § 1346.............................................................14, 20, 21, 22

18 U.S.C. § 3143.................................................................................1, 2

1   **I.      INTRODUCTION**

2          Pursuant to 18 U.S.C. § 3143(b), Defendant Mark Ridley-Thomas

3   respectfully requests that the Court order his release during the pendency of his

4   appeal.  Dr. Ridley-Thomas satisfies all three criteria established by § 3143.  First,

5   he is not likely to flee and does not pose a danger to the safety of any other person

6   in the community.  As underscored by the over 130 individuals in the community

7   who wrote letters of support, Dr. Ridley-Thomas has an otherwise proven track

8   record of abiding by the law and remaining close to his community in South Los

9   Angeles.  Dr. Ridley-Thomas faithfully observed the conditions of his bail for

10  nearly two years while awaiting a decision from the jury.  The same would be true

11  pending a decision on appeal.

12         Second, his appeal raises over a dozen substantial questions of law or fact,

13  including multiple issues in which there is a circuit split.  These issues are

14  therefore, by definition, "debatable."  The convictions involved statutes which, as

15  recently as this past Supreme Court term, have been questioned for their

16  constitutionality.  *See Percoco v. United States*, 598 U.S. 319, 337 (2023)

17  (Gorsuch, J., concurrence) (noting that honest services fraud judicial decisions are

18  effectively writing honest services law "bit by bit in decisions spanning decades

19  with the help of prosecutors and lower courts who present us with one option after

20  another.").  And there are "unique facts" for which there is no controlling

21  precedent.

22         Third, if Dr. Ridley-Thomas prevails on any of these appellate issues, the

23  Court of Appeals will likely order a reversal of his conviction or a new trial.  As the

24  Supreme Court has repeatedly noted, cases involving honest services fraud or

25  public corruption often raise significant legal questions.  *See Percoco*, 598 U.S. at

26  327-28 (noting history of honest services fraud cases and vagueness challenges).

27  Accordingly, courts often grant bail pending appeal in these types of cases.  *See,*

28  *e.g.*, *United States v. Robles*, 2:04-CR-1594-SVW, Dkt. 384 (C.D. Cal.); *United*

DEFENDANT MARK RIDLEY-THOMAS'S          1
MOTION FOR BAIL PENDING APPEAL

*States v. Inzunza*, 3:03-CR-2434, Dkt. 576 (S.D. Cal.); *United States v. Ring*, 1:08-CR-274-ESH, Dkt. 297 (D.D.C.).  Bail pending appeal should similarly apply here because of the complex legal and factual issues presented on appeal that are, at minimum, "fairly debatable."

## II.    LEGAL STANDARD

Under 18 U.S.C. § 3143(b), a district court "shall order the release" of a defendant pending the appeal of his conviction if two conditions are met.  18 U.S.C. § 3143(b)(1).  First, the court must find by clear and convincing evidence that the defendant "is not likely to flee or pose a danger to the safety of any other person or the community."  *Id.*, § 3143(b)(1)(A).  Second, the court must find that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i) reversal,

(ii) an order for a new trial,

(iii) a sentence that does not include a term of imprisonment, or

(iv) a reduced sentence to a term of imprisonment less than the total of the
    time already served plus the expected duration of the appeal process.

*Id.*, § 3143(b)(1)(B).

The Ninth Circuit has held that "a 'substantial question' is one that is 'fairly debatable,' or 'fairly doubtful.'"  *United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985) (citations omitted).  This is not a stringent standard.  In adopting this standard, the Ninth Circuit rejected a narrower interpretation limiting "substantial" questions to those that are "close" or "that very well could be decided the other way."  *Id.* at 1284 (Farris, J., dissenting) (citing *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)).  Dr. Ridley-Thomas, "in other words, need not, under *Handy*, present an appeal that will likely be successful, only a non-frivolous issue that, if decided in [his] favor, would likely result in reversal or could satisfy one of the other conditions."  *United States v. Garcia*, 340 F.3d 1013, 1021 n.5 (9th Cir.

1  2003).

2  **III.    ARGUMENT**

3          **A.    Dr. Ridley-Thomas Does Not Present Any Flight Risk or Danger to**
4                  **the Community**

5          Dr. Ridley-Thomas is neither a flight risk nor danger to the community.  The

6  government has never alleged otherwise.  Los Angeles County is, in a literal sense,

7  Dr. Ridley-Thomas's community.  It is where he was born, where his family is, and

8  where he has maintained lifelong residency.  It is where he dedicated more than 30

9  years of his life to public service.  Prior to this case, Dr. Ridley-Thomas was never

10 arrested or charged with any offense.  He is a first-time offender and was convicted

11 of a non-violent crime, involving no improper diversion of public funds for his own

12 personal gain or economic harm to the community.  Indeed, Dr. Ridley-Thomas's

13 circumstances and ties to his community led the Probation Office to recommend a

14 significant variance from the Sentencing Guidelines.

15         As further demonstrated by the exhibits filed with Dr. Ridley-Thomas's

16 Sentencing Memorandum (Dkt. No. 403, Ex. E) and the Probation Officer's

17 Presentence Investigation Report (Dkt. 390 at 19), Dr. Ridley-Thomas's health also

18 provides substantial evidence why there is no flight risk in this matter.  Bail

19 pending appeal will allow him to continue his care while his appeal proceeds.

20         From the outset of this case, Dr. Ridley-Thomas complied with all terms of

21 his pre-trial release without incident.  As documented by the Probation Officer,

22 Dr. Ridley-Thomas maintains close relationships with his living siblings, his wife

23 of 44 years, his sons, and his grandchildren, who are all supportive of him.  He

24 lived in Los Angeles all his life.  The over 130 letters of support show that he

25 continues to be a beloved and supportive member of his community.  Dr. Ridley-

26 Thomas's unbroken record of complying with all release conditions in this case

27 supports granting bail pending appeal.  *See, e.g.*, *United States v. Wallace*, No. CR

28 13-00264-SJO-3, 2016 U.S. Dist. LEXIS 200364, at *6 (C.D. Cal. Jan. 19, 2016)

(finding defendant neither a danger nor flight risk where "Defendant made every appearance in this case, complied with the conditions of supervised release by United States Pretrial Services, and does not have a violent criminal history."); *United States v. Bondaruk*, No. 2:11-cr-00450-TLN, 2019 U.S. Dist. LEXIS 9451, at *7-8 (E.D. Cal. Jan. 18, 2019) (finding defendant is "unlikely to flee or pose a danger to the Sacramento community" where there was "no evidence to suggest that Defendant failed to comply during that time with the conditions of his pretrial release"); *United States v. Arehart*, No. 88-24-04-FR, 1989 U.S. Dist. LEXIS 8283, at *3 (D. Or. July 19, 1989) (defendant "has complied with all conditions of release and has appeared at court proceedings in this case").  The record is more than sufficient to establish by clear and convincing evidence that Dr. Ridley-Thomas is not a flight risk or a danger to others.

> **B.**     **Dr. Ridley-Thomas's *Batson* Challenges Raise Substantial Appellate Questions Likely to Result in Reversal or a New Trial**

This case involved one of the most prominent Black officials in Los Angeles who has had a substantial impact on the Black community.  The government's desire to remove Black jurors—it succeeded in removing half—was apparent during voir dire:  It disparately questioned Black jurors, particularly Black women jurors, asked only the Black jurors open-ended questions, which appeared designed to elicit reasons for excluding them, and provided pretextual reasons for its strikes. The government exercised half of its peremptory strikes against half the Black jurors in the panel, including all the Black female jurors.  Though the Court upheld the government's strikes, it raised concern.  In fact, after voir dire, the following exchange occurred on the record:

> THE COURT:  Why are you trying to build error into this case?
>
> MS. DOTSON:  We are not, Your Honor.
>
> THE COURT:  Well, you're working on it.

1  Trial Tr. at 528:15-18.

2       There is therefore at least a fairly debatable question as to whether two

3  *Batson* violations existed here.  *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2241

4  (2019).

5              **1.**    ***Batson* legal standard**

6       When a defendant challenges a *Batson* violation, the district court is required

7  to engage in a three-part burden shifting test to determine if the potential juror was

8  challenged on the basis of impermissible discrimination.  *Green v. Lamarque*, 532

9  F.3d 1028, 1029-30 (9th Cir. 2008).  First, the defendant must make a prima facie

10  showing that the challenge was based on an impermissible ground, such as race.  *Id.*

11  at 1029.  Second, "if the trial court finds [that] the defendant has made a prima facie

12  case of discrimination, the burden then shifts to the prosecution to offer a race-

13  neutral reason for the challenge that relates to the case."  *Id.* at 1030.  Finally, if the

14  prosecutor offers a race neutral explanation, the trial court must decide, given the

15  totality of the circumstances, whether the defendant has proven that the

16  prosecutor's motive for the strike was purposeful racial discrimination.  *Id.*

17              **2.**    **Analysis of *Batson* issues**

18                   **a.**    **There was legal error on the prima facie standard for**
19                           **Juror No. 13**

20       There is at least a "fairly debatable question" about whether the wrong legal

21  standard was used to find that there was no prima facie *Batson* violation as to Juror

22  No. 13.  The first step in the *Batson* inquiry has a deliberately low threshold.

23  *Johnson v. California*, 545 U.S. 162, 170 (2005).  To establish a prima facie case, a

24  defendant must show that:  (1) he is a member of a cognizable group; (2) the

25  prosecutor has removed members of ***that group***; and (3) the totality of the

26  circumstances raises an inference that the strike was motivated by race.  *See*

27  *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471, 476 (9th Cir. 2014)

28  (burden is one of production, not persuasion).  Although a pattern of striking panel

members from a cognizable racial group is probative of discriminatory intent, a prima facie case does not require a pattern. *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009).

During voir dire, the Court polled the jury on whether legacy admissions were appropriate. Juror No. 13, a Black female juror, and Juror No. 16, a White female juror, raised their hands. Trial Tr. at 107:5-108:2. The government only questioned the Black juror, asking questions designed to elicit opinion of the law on legacy admissions. Trial Tr. at 114:17-19. When Juror No. 13 clarified that she could only speak to her understanding of current practice from her experience, not on the law, the government continued to ask her about her opinions. Trial Tr. at 115:3-4 ("Do you think that's fair? Do you think that's unfair? You have no opinion? What do you think?). The government immediately used its peremptory strike against Juror No. 13, later arguing that it struck her because she had no opinion as to legacy admissions and had prior experience with local government. *Id.* at 121:20-21; 128:2-7. In finding no prima facie *Batson* violation, the Court focused on how it had "never seen a panel with this few white people" and noted that it was "rather early in the process to make any real analysis about any of the other issues" because the prosecutor had also questioned another minority juror, Juror No. 15 (Juror No. 15 had indicated her experience with local government, but was allowed to serve). *Id.* at 131:4-18, 132:7-8; 137:18-19.

On appeal, the defense will argue that the Court applied the wrong legal standard when it used members of other, non-Black racial groups to determine that there was no inference of discriminatory intent. Where a Black defendant argues that the prosecutor struck a Black juror because of the juror's race, *Batson* is clear that the question is whether the prosecution engaged in race-based discrimination, not whether in general the jury panel was non-White. *Batson v. Kentucky*, 476 U.S. 79, 96 (1986). And because this case involved a Black public official who was convicted of bribery in connection with donating to a nonprofit working on Black

1   voter awareness, there is a greater inference that the strike was based on race.

2   *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 137-38 (1994) (in paternity and child

3   support action, *Batson* violated where counsel excluded males from jury based on

4   belief that men would be more sympathetic to father defendant); *SmithKline*, 740

5   F.3d at 476  ("when the [protected characteristic] of the juror coincided with the

6   subject matter of the case, the potential for an impermissible strike based on [that

7   protected characteristic] increases substantially").

8       The low threshold for a prima facie *Batson* violation was easily met here.

9   The defense argued that the prosecutor only asked questions of the minority jurors

10  and asked more extensive questions of the Black jurors, which seemed designed to

11  elicit bases on which to strike them.  The Court noted that it was too early in the

12  process to make any real analysis about disparate questioning because a non-Black

13  minority juror was also questioned.  Trial Tr. at 131:4-18.  But that non-Black juror

14  was allowed to serve on the jury, and requiring a pattern of discriminatory strikes at

15  step one of the *Batson* analysis is legal error.  *Collins*, 551 F.3d at 920 (court

16  applied improper standard by requiring defendant to demonstrate pattern of strikes

17  against a cognizable racial group before requiring government to state a reason).

18  Moreover, the Court improperly considered the government's race-neutral

19  explanations **before** ruling on whether a prima facie case was made.  *See United*

20  *States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) ("the initial question is

21  whether appellants presented a *prima facie* case sufficient to require explanations;

22  that determination must be made before the explanations are considered").  At the

23  very least, it is fairly debatable whether the Court's analysis at step one was flawed.

24      Moreover, should the Court now consider steps two and three, it is also

25  "fairly debatable" whether the totality of the circumstances supported a finding of

26  purposeful discrimination.  As noted above, with respect to step two, the prosecutor

27  provided the purportedly race-neutral explanation that Juror No. 13 raised her hand

28  in response to a question about legacy admission but, when pressed, "she expressed

no opinion regarding legacy and we're interested in knowing that." Trial Tr. at 128: 4-6. Despite this proffered justification, the Court failed to proceed to step 3. *See United States v. McAllister*, 693 F.3d 572, 581 (6th Cir. 2012) (the district court may not "perfunctorily accept[] the prosecutor's race-neutral explanation and combin[e] steps two and three.").

Had the Court done so, it would likely have found that the totality of the circumstances favored the finding of a *Batson* violation. While, on its face, the government's justification was arguably race-neutral, the Court did not consider whether or not it was an impermissible pretextual explanation. A comparative analysis of Juror No. 13, a Black female juror who was excused, and Juror No. 16, a White female who was allowed to serve, tends to prove purposeful discrimination. Both Juror No. 13 and Juror No. 16 raised their hands when the government asked the jury if prospective members believed it was appropriate for a university to consider race or legacy as a factor in admission. Trial Tr. at 107:5-108:2. As noted above, the government extensively questioned Juror No. 13 and failed to question Juror No. 16 at all. There is no non-discriminatory reason why the government would be so interested in Juror No. 13's opinion on legacy admission that her failure to provide one warranted excusal but, conversely, would be so disinterested in Juror No. 16's opinion on the same topic that it did not even ask her follow-up questions in response to her raising her hand. The sole distinct and salient difference between the two women was their race. It is thus fairly debatable whether the government's racially-motivated exercise of its preemptory strike denied Dr. Ridley-Thomas due process. *See Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013); *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) ("if a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise-similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step") (alterations in original) (citation and quotations omitted); *Ali v. Hickman*, 584 F.3d

1174, 1195-96 (9th Cir. 2009) (when a prosecutor's proffered "race-neutral" reasons for striking a black juror apply equally to a white juror who was not struck, the reasons are "pretextual" and insufficient to carry the prosecution's burden).

### b. There was legal error on step 3 of the *Batson* analysis for Juror No. 1

Juror No. 1, the second Black female on the jury panel, was excused after step three of the *Batson* analysis. But, again, the wrong legal standard was applied at this step. Rather than focus on whether the government's race-neutral explanation was "plausible," the Court should have conducted a "sensitive inquiry into such circumstantial and direct evidence of intent as may [have] be[en] available." *Batson*, 476 U.S. at 93. This was not done.

The Ninth Circuit emphasized in *Alanis* that "the trial court has a **duty** to proceed to step three to answer the 'critical question' of whether the prosecutor's justifications for peremptory strikes are persuasive." *United States v. Alanis*, 335 F.3d 965, 967 (9th Cir. 2003) (emphasis in original). There, the prosecutor used her peremptory strikes to remove men from the jury and provided gender-neutral explanations. *Id.* at 966-67. After hearing the prosecutor's explanations, the court denied the *Batson* motion:

> It does appear—It appears to the court that the government has offered a plausible explanation based upon each of the challenges discussed that is grounded other than in the fact of gender of the person struck. The *Batson* challenge is denied.

*Id.* at 967. The Ninth Circuit found the trial court's finding insufficient: "It is not enough that the district court considered the government's gender-neutral explanations 'plausible.' Instead, it is necessary that the district court make a deliberate decision whether purposeful discrimination occurred." *Id.* at 969.

In this case, the prosecutor claimed it had removed Juror No. 1, the last Black female in the panel, because while the allegations were read aloud, "she was shaking her head and she had her head tilted downward," she had sunglasses on, and took them off only when the Court addressed her, and she was at that time unemployed.  Trial Tr. at 141:5-14.  The defense objected that it did not see Juror No. 1 shake her head and noted that the other reasons given are the type of reasons frequently used as pretexts to remove Black jurors.  *Id.* at 145:2-146:14.  The Court denied the *Batson* motion, noting it had not personally observed the juror's disputed demeanor:

> But I have no reason to discredit the statements of two prosecutors of
> what they observed.  The other explanations were case specific and at
> this point I have no reason to find them to be pretextual and, in fact, I –
> I say I agree with all of them.  I don't need to agree with all of them
> but they certainly were based on factors in the case, questions that
> even some of them the defense had thought were important enough to
> be asked, and they were all legitimate questions.
>
> The motion is denied.

Trial Tr. at 149:25-150:13.

Similar to *Alanis*, the step three *Batson* analysis here improperly focused on the "plausibility" of the prosecutor's race-neutral pretextual reasons, conflating the second and third steps of the analysis.  *Alanis*, 335 F.3d at 969.  There was also no factual finding made as to whether the prosecutor had engaged in purposeful discrimination, as *Batson* requires.  *Id.*  There is no indication in the record that there was an evaluation of whether "the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).  In fact, here, the record contradicts the government's explanation.  After the district court's questioning of Juror No. 1, the court complimented her, saying, "you have done a fine job of showing

1   everybody else how this should be done."  Trial Tr. at 82:12-13.  Had Juror No. 1's

2   demeanor in fact been as the government described, it is highly unlikely that the

3   Court would have complimented her for her forthright answers.  As above,

4   therefore, it is fairly debatable whether the government's racially-motivated

5   exercise of its preemptory strike denied Dr. Ridley-Thomas due process.

6                   **c.     A substantial question exists as to whether a *Batson*
7                           challenge may be based on the government's exercise
                            of peremptory strikes against jurors belonging to
8                           more than one protected class**

9        Finally, the government's pretextual exercise of its preemptory strikes was

10  particularly prejudicial here because it resulted in the removal of all Black women

11  from the jury pool.

12       After the government sought to exclude Juror No. 1, defense counsel

13  highlighted twice that "we are now talking about striking … the only other Black

14  woman on the panel."  Trial Tr. 140:8-12; 147:18-21.  The government's response

15  to this pattern was that, "there are still two Black males and, again, this is a

16  predominantly nonwhite panel."  Trial Tr. 141:15-17.  The government and the

17  Court overlooked that, for reasons discussed below, Black women should be

18  considered an independent, legally cognizable protected group.

19       The California Supreme Court has held that the exclusion of all Black

20  women from a jury was in violation of *Batson*.  The court noted that "black women

21  face discrimination on two major counts – both race and gender – and their lives are

22  uniquely marked by this combination" such that "their exclusion [from the jury]

23  deprives the jury of a perspective on human events that may have unsuspected

24  importance in any case that may be presented."  *People v. Motton*, 39 Cal.3d 596,

25  606 (1985) (citation and quotations omitted).

26       The Ninth Circuit, for its part, has yet to decide whether *Batson* applies to the

27  prosecution's exercise of preemptory strikes against prospective jurors who are

28  members of more than one protected class.  *Nguyen v. Frauenheim*, 45 F.4th 1094,

1100 (9th Cir. 2022) (noting that "[f]ederal courts have recognized mixed race and gender classes in the Title VII context" but had not yet applied similar analysis to a *Batson* challenge).

Given the novelty of this issue, and the lack of controlling precedent, it is fairly debatable whether the government's use of peremptory challenges to exclude all Black women from the jury independently violated *Batson* and denied Dr. Ridley-Thomas his right to a fair trial. *Handy*, 761 F.2d at 1281 (included within the definition of "substantial question" "have been questions that are novel and not readily answerable").

**C.   Dr. Ridley-Thomas Will Raise Substantial Questions on Appeal That Are Likely to Result in Reversal, A New Trial or at Minimum, a Substantially Reduced Sentence**

Besides the *Batson* appellate issues, Dr. Ridley-Thomas's appeal will also raise multiple substantial questions of law that were raised during the presentation of evidence at trial. That a legal issue presents a "substantial question of law" does not mean the District Court decided the underlying issue incorrectly, but only that there is a "substantial question" that is "fairly debatable." *Handy*, 761 F.2d at 1281. Likewise, "[t]he application of well-settled principles to the facts of [a] . . . case may raise issues that are fairly debatable." *Id.*

**1.   The Official Act Requirement For Honest Services Fraud Involved Unique Facts Not Covered by the Controlling Precedents**

A "substantial question" may involve one that "present[s] unique facts not plainly covered by the controlling precedents." *Handy*, 761 F.2d at 1281. That is the case here with respect to the official act requirement for honest services fraud because there is no controlling precedent on whether a failure to object to an item passing on common consent can constitute an "official act."

The government was required to present evidence that Dr. Ridley-Thomas "took an action" or "made a decision" on a pending question, matter, cause, suit, proceeding or controversy or agreed to do so. To satisfy this "official act"

requirement for honest services fraud, the government and the Court's Order denying Dr. Ridley-Thomas's motion for judgment of acquittal and motion for new trial (Dkt. 383 ("Order")) looked to Dr. Ridley-Thomas's "vote" for the Telehealth contract (Item 27).  (Order at 5 ("There is no question that Defendant performed a relevant 'official act' – he voted in favor of the amended Telehealth contract that benefited USC and Flynn."); Dkt. 363 at 27 n.2 ("a vote is a vote").)  But Item 27 was on the consent calendar, meaning that no actual vote took place because the items were deemed noncontroversial.  Dr. Ridley-Thomas is not aware of any authority addressing whether an item passing on common consent can constitute an official act, and the government cites none in support of that proposition.

The Court's Order explained that there was "no reason to conclude that a vote on a 'non-controversial' matter through a streamlined parliamentary process should count as less of an 'official act' than any other vote by a public official." (Order at 6.)  But there is also no reason to conclude that it should.  It was the government's burden to establish that failing to object to an Item passing on the consent calendar could constitute an official act, not Dr. Ridley-Thomas's burden to prove that it couldn't.

Dr. Ridley-Thomas never cast a vote—at best, he failed to object to Item 27's passing.  But the defense is not aware of any precedent addressing whether that failure to object can constitute an official act for purposes of honest services fraud. Any ambiguity as to whether it should must be interpreted in Dr. Ridley-Thomas's favor.  *United States v. Nader*, 542 F.3d 713, 721 (9th Cir. 2008) ("The rule of lenity 'requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.'" (citation omitted)).  And that ambiguity raises a "substantial question" as to whether Dr. Ridley-Thomas's conviction on that basis can be upheld.  *Handy*, 761 F.2d at 1283.

1

2

   **2. Dr. Ridley-Thomas Raises a Substantial Question as to Whether the Government was Required to Prove Breach of Fiduciary Duty and Whether He Breached Any Duty**

3    The government was required to present evidence of a breach of a fiduciary

4 duty, not just the duty itself. *United States v. Milovanovic*, 678 F.3d 713 (9th Cir.

5 2012) (en banc); *see also Skilling v. United States*, 561 U.S. 358, 407 (2010)

6 (citation omitted) (describing the "solid core" of the honest-services doctrine as

7 involving "offenders who, in violation of a fiduciary duty, participated in bribery or

8 kickback schemes"). It failed to do so. Instead, the government argued, and the

9 Court agreed, that if an honest services fraud conviction involves bribery or

10 kickbacks, it has necessarily proven a breach of fiduciary duty. (Order at 7 ("the

11 Court agrees with the government that honest services mail and wire fraud do not

12 require a separate explicit finding of a breach of fiduciary duty because the taking

13 of bribes or kickbacks is, as a matter of law, a breach of the fiduciary duty owed by

14 a public official.").) But that argument is contrary to *Milovanovic*'s holding that a

15 breach of a fiduciary duty is a ***separate*** element of honest services fraud under 18

16 U.S.C. §§ 1341 and 1346. *Milovanovic*, 678 F.3d at 722.

17    *Skilling* requires that a bribe or kickback scheme be present for honest

18 services fraud to exist. *Skilling*, 561 U.S. at 407. The breach of fiduciary duty

19 element of honest services fraud would be rendered superfluous if the government

20 can simply point to the same threshold bribe or kickback it is required to allege for

21 honest services fraud to be present as proof of a breach of fiduciary duty. The

22 government cited no authority other than *United States v. Mandel*, 591 F.2d 1347

23 (4th Cir. 1979), which was in the "amorphous category of cases" *Skilling* rejected.

24 *Skilling,* 561 U.S. at 410. The fundamental question remains about the "character

25 of the 'fiduciary capacity' to which the bribery and kickback restriction applies" to

26 show the criterion of guilt. *Skilling*, 561 U.S. at 421 (Scalia, J., concurrence).

27 *Milovanovic* imposed a standard, which the government failed to meet at trial.

28    At minimum, there is a conflict between *Milovanovic*'s holding that breach

1   of fiduciary duty is a ***separate*** element of honest services fraud and the
2   government's position that it necessarily proved a breach because the offense
3   involved bribery. That issue raises a "substantial question" that, if decided in
4   Dr. Ridley-Thomas's favor, would result in reversal for a failure of proof on a
5   critical element of the charged offense. *United States v. Greenhut*, No. 2:15-cr-
6   477-CAS, 2017 U.S. Dist. LEXIS 29026, at *3-4 (C.D. Cal. Feb. 27, 2007)
7   (granting bail pending appeal even where "defendant has presented no basis for
8   reversal of defendant's conviction on Count I or his sentence" because "the conduct
9   charged is the subject of substantial debate in the wake of the Supreme Court's
10  decision in *McDonnell v. United States*, 136 S. Ct. 2355, 195 L. Ed. 2d 639
11  (2016)"); *United States v. Silver*, 203 F. Supp. 3d 370 (S.D.N.Y. 2016) (granting
12  bail pending appeal where a substantial question raised whether, in light of
13  *McDonnell*, the charge was in error and, if so, whether the error was harmless);
14  *United States v. Antico*, 123 F. Supp. 2d 285 (E.D. Pa. 2000) (substantial questions
15  whether presence of quid pro quo was element of defense).

16   ### 3. There is a "Substantial Question" about Whether the Materiality Requirement was Met
17

18       The jury was instructed that an act is material if it had "a natural tendency to
19  influence, or was capable of influencing a person's or entity's acts." Dkt. 285 at 27.
20  *Manual of Model Jury Instructions for the Ninth Circuit*, 2022 Edition (last updated
21  March 2022). There is a substantial question whether the materiality requirement
22  here was met. The government did not even attempt to provide proof on
23  materiality. The government chose not to call anyone from the County to state that
24  they were influenced by anything that Dr. Ridley-Thomas did, or to even explain
25  the county process and whether anything Dr. Ridley-Thomas did was capable of
26  influencing anyone. And the evidence and witness testimony showed that no one
27  voted against any of the county motions at issue, including the Telehealth
28  Amendment. Trial Tr. at 1805:3-6; 1811:4-5; *see also* Trial Tr. at 1744:22-25

1   (Adkins knew Dr. Ridley-Thomas supported substance of agenda items); 1745:7-11

2   (each agenda item consistent with Dr. Ridley-Thomas's legislative agenda);

3   1797:18-25, 1792:9-24 (Blue Ribbon Commission's recommendations were origin

4   of Telehealth).  The government failed to present any evidence showing that

5   Dr. Ridley-Thomas did anything that influenced, or could have influenced, another

6   Supervisor or County official with respect to Item 27, or that he performed an

7   action that was material relative to the ultimate passage of the item.

8          Instead, the government summarily argued in closing that Dr. Ridley-

9   Thomas's "votes" and "advising of other officials" were "material" because

10  "[e]verything he's doing, it's generating outcomes."  Trial Tr. at 2891:7-10.

11  Assertion is not evidence, and such sweeping generalizations about conduct being

12  material do not satisfy the statute.  *See United States v. Seymour*, 684 F. App'x 662,

13  662-63 (9th Cir. 2017) (without evidence regarding basis for government's

14  assertion, no rational trier of fact could find essential element of crime).

15              **4.     There is a "Substantial Question" as to the Threshold Value**
16                       **of the Telehealth Contract**

17         Section 666 requires a showing beyond a reasonable doubt that the county

18  items at issue in the bribe were valued at $5,000 or more.  *See United States v.*

19  *Simas*, 937 F.2d 459, 463 (9th Cir. 1991).  To establish this, the government and the

20  Court's Order looked to the face value of the Telehealth contract.  (Order at 9 ("The

21  Telehealth contract, on its face, was worth over $500,000.").)  But the government

22  presented no evidence whether there was over $5,000 remaining in the Telehealth

23  Contract at the time the amendment was passed in 2018, nor any evidence of what,

24  if anything, was paid under the contract during the extension period.  The

25  government could have easily called a county witness to explain how the Telehealth

26  Contract functioned and whether there was over $5,000 remaining on it.  It did not.

27         The evidence showed that the original Telehealth Contract—an Item for

28  which Dr. Ridley-Thomas was not charged with any offense—awarded USC

$547,500.  (DTX-1076 at 86-87.)  It also shows that Item 27 did not award USC any additional funds.  The amendment states:  "[t]here is **no fiscal impact**[1] for this extension of agreement," and then clarifies further "[t]here is no net County cost impact associated with the recommended action."  (Ex. 576 at 3.)  The amendment does not state that $530,323 is the amount left over from the original award of $547,500—it states that the "Total Contract Amount (TCA) will remain at $530,323 for the term of the agreement."  (*Id.*)  What that means is not known because the government failed to call a witness to explain it.  There is no evidence to suggest the amendment awarded any money to USC—let alone more than $5,000.

At minimum, it's "fairly debatable" or "fairly doubtful" whether there was over $5,000 remaining in the Telehealth Contract at the time the amendment was passed because the government presented no evidence on this point other than the face value of the contract.  *Handy*, 761 F.2d at 1283.  The question of whether the value of the Telehealth Contract can meet the $5,000 threshold for bribery, if decided in Dr. Ridley-Thomas's favor, would result in reversal of the bribery charge at issue.  *Seymour*, 684 F. App'x at 662-63 (overturning conviction where there was "a total failure of proof of [a] requisite element") (internal quotations and citations omitted) (alteration in original); *United States v. Kidd*, 752 F. App'x 399, 400-01 (9th Cir. 2018) (same).

### 5. Substantial Questions Exist as to Whether the Government Invited the Jury to Convict Under a Conflict of Interest Theory

The Supreme Court held in *Skilling* that a prosecution for honest services fraud cannot be maintained on a conflict of interest theory.  *Skilling*, 561 U.S. at 410 (2010); *see also United States v. Weyhrauch*, 623 F.3d 707, 708 (9th Cir. 2010).  The government's presentation of evidence did just that; it made failure to

---

[1] Emphasis supplied throughout unless otherwise noted.

disclose a conflict of interest a central focus of the trial.

The donation of funds to USC which USC then used to sponsor the Policy, Research, and Practice Initiative was legal under state campaign finance law. The government acknowledged this and argued instead that the point of the "funneling" of the donation through USC was to hide the source of the money to avoid the appearance of "nepotism."

The government repeatedly questioned non-county witnesses to elicit testimony concerning a potential conflict of interest from the donation.[2] The government called witnesses from Community Partners, a nonprofit that was not involved in the donation at issue, to emphasize this theme of conflict of interest.[3] The government further emphasized this theme at closing argument. The government explicitly argued that the "secret[] funneling" of the $100,000 donation

---

[2] John Clapp Testimony, Trial Tr. at 460:17-461:1 (Q. Would you have wanted to know before you expedited any benefit for Sebastian Ridley-Thomas, whether there had been any agreement between Mark Ridley-Thomas and Marilyn Flynn related to county business? A. Yes. Q. Why would you have wanted to know that before you went to work providing these benefits for Sebastian Ridley-Thomas? A. I would have been concerned that it was a potential conflict of interest.); Trial Tr. at 545:18-23 ("if that were true and if you had learned about it at this time, what would you have done?"); Maryrose McMahon Testimony, Trial Tr. at 2024:22-2025:3 (Q. Had you known that the hundred thousand dollars coming from USC was actually to onboard an employee as opposed to a sponsorship for a survey, would you have put that in your invoice? A. If it was understood to me that I was asked to deliver false information, then no, I would not have created an invoice.); Peter Manzo Testimony, Trial Tr. at 2061:8-17; 2082 (asking if Manzo would have wanted to know about Community Partners donation and source of USC donation); 2109-11 (asking if Manzo was told about the source of funds from USC); Gonzalez Testimony, Trial Tr. at 1363:7-9 (Q. If you had known that information, would have you have handled this differently? A. Yeah. Yes.).

[3] Dunn Berry Testimony, Trial Tr. at 910:4-16 (Q. Now, in addition to the concerns you've expressed, did you eventually come to have optics concerns with the hiring of Sebastian Ridley-Thomas as the executive director of AACEP? A. Yes, but -- Q. Can you explain that? A. -- it had nothing to do with the sexual harassment allegations, which I did not connect with Sebastian Ridley-Thomas at the time. For me, it was strictly about funds from his father's campaign going to support -- it was more about nepotism, going to support his -- potentially his son's employment.); Trial Tr. at 2857:20-25 ("this is a man [Vandeventer] who would do almost anything for this man sitting here. But there were red flags. Remember Sheri Dunn Berry? She talked about how it just seemed nepotistic. It put the reputation of the organization – it wasn't illegal but it just didn't feel right.").

---

DEFENDANT MARK RIDLEY-THOMAS'S
MOTION FOR BAIL PENDING APPEAL

18

at issue was to avoid disclosing a conflict of interest related to Dr. Ridley-Thomas's son's relationship with USC:

> He's just voting for this like no big deal. Yeah, I know my son has an application. I know I've been talking to Dean Marilyn Flynn, the dean of that school, about him getting into that school. But I still feel comfortable voting in a way that is financially beneficial to that school as a result of a request specifically from that dean.

> ***That is called a conflict of interest.***

Trial Tr. at 3023:12-19.  The entire closing argument was permeated with similar conflict of interest references.[4]

The government now claims that references to a conflict of interest throughout trial were "not because the scheme was based on a conflict-of-interest theory, but because that testimony was relevant to materiality and to rebut defendant's nothing-to-see-here narrative spun beginning in opening."  (Dk. 363 at 40.)  But this type of backtracking argument is precisely the type the Ninth Circuit has repeatedly rejected.

For instance, in *Garrido*, the government initially argued on appeal that its

---

[4] *See also* Trial Tr. at 2878:21-2879:5 ("There was a reason that the defendant only publicly discloses this. He doesn't want anybody to know that the money was routed through USC, and that's why he writes just USC, the School of Social Work here."); *Id.* at 3010 (arguing that Dr. Ridley-Thomas would know that it would be a conflict of interest to offer Sebastian Ridley-Thomas a thing of value while he was still in the Assembly); *Id.* at 3023-24; *Id.* at 3025:1-3 ("So he votes on this item. No problem. It's okay to vote for contractors and people who are -- who have some impact on family members who are close to you."); 3045:4-8 ("No paper trail whatsoever. No paper trail that the Defendant funneled the money or sent it to USC. No paper trail, according to Ann Ravel, that USC reported it. And paper trail in the same way in the context of a campaign disclosure, a campaign donation disclosure."); *Id.* at 3056:5-10 ("And the real reason is because the Defendant didn't want -- he understood now that there would be political optics around funneling or sending $100,000 to an organization that impacted his son. And the other thing is, maybe no one would do it. Community Partners wouldn't do it."); Trial Tr. 1396:19-23, 1562:14-20 (Adkins testimony of "optics" concerns); *Id.* at 2857 (closing argument discussing "red flags" about donation because of son serving as director of AACEP), *Id.* at 2858:24-2859:1 ("There won't be a trace, publicly anyways, that this money was going from the defendant's campaign account to Sebastian Ridley-Thomas."); *Id.* at 2859:15-17 ("So all of this is to deceive United Ways just as much as it is to deceive the public, and that's how you do it. You funnel the money through USC.").

trial theory was grounded on a conflict of interest theory.  During the appeal, the

Court's opinion in *Skilling* was issued.  *United States v. Garrido*, 713 F.3d 985, 994

(9th Cir. 2013).  After *Skilling*, the government changed its appellate arguments,

claiming its case was founded only on a bribery theory.  *Id.*  The Ninth Circuit

examined the record and noted that the indictment, jury instructions, and closing

arguments at trial "were permeated with the prohibited failure to disclose theory,"

and reversed the honest services fraud convictions.  *Id.* at 998.  Similarly, in *Yates*

the Ninth Circuit held that although the jury instructions were legally correct, the

trial record revealed that the legally invalid fraud theories "did not make up just a

few stray lines on a PowerPoint slide at closing argument; they were the focus of

the entire prosecution from beginning to end."  *United States v. Yates*, 16 F.4th 256,

269 (9th Cir. 2021).  And in *Weyhrauch*, the government initially sought to try their

case on a bribery theory but shifted its focus to a conflict of interest theory at trial.

*Weyhrauch v. United States*, No. 08-1196, 8-9 (oral arg. tr.) (arguing indictment

alleged bribery).  The Supreme Court vacated the judgment, consistent with its

holding in *Skilling*, and the Ninth Circuit reversed its decision, noting that "[u]nder

*Skilling*, nondisclosure of a conflict of interest is no longer a basis for prosecution

under 18 U.S.C. § 1346."  *Weyhrauch*, 623 F.3d at, 708.

   The Ninth Circuit is clear:  courts should look to whether the trial was

permeated with a legally invalid theory, not to post-hoc government arguments

about the intention behind its trial presentation.  Moreover, when the jury could

have convicted on either a permissible or an impermissible basis, reversal and a

new trial is required.  As the Ninth Circuit has explained:  "[W]e cannot read the

jury's mind. . . . When two theories are submitted to a jury, one of which is

incorrect, a general verdict of guilty must be reversed even though the jury was

properly instructed upon the alternate theory."  *Beck v. United States*, 298 F.2d 622,

630-31 (9th Cir. 1962) (quotation marks omitted) (citing *Williams v. North

Carolina*, 317 U.S. 287 (1942); *Stromberg v. California*, 283 U.S. 359 (1931)); *see*

*also United States v. Garcia*, 992 F.2d 409, 416 (2d Cir. 1993) (conviction reversed based on legal defect in instructions even though valid theory existed to support conviction); *United States v. Heller*, 830 F.2d 150, 155-56 (11th Cir. 1987) (conviction reversed where one of two theories was defective, even though evidence existed to support guilt under non-defective theory).

Here, the government presented a conflict of interest theory through its repeated elicitation of testimony on a conflict of interest and repeated references to conflicts of interest during closing argument.  The theme permeated the trial.  The *Skilling* Court held that "undisclosed self-dealing," meaning, "the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty," does not constitute honest services fraud.  561 U.S. at 409-10.  At a minimum, it is "debatable" whether a substantial question of law—whether the conviction rests on a theory precluded by *Skilling*—has been raised likely to result in reversal.

### 6.   Substantial Questions Exist as to Whether a Loss of One's Own Funds Can Constitute a Bribe

*Skilling* precludes the government's bribery theory.  But even assuming *arguendo* that *Skilling* does not preclude it, the theory is legally invalid for another reason.  The government claimed that the "funneling" of funds—Dr. Ridley-Thomas's own ballot committee funds—through USC to United Ways of California constituted a bribe.  But Dr. Ridley-Thomas never received any monetary benefit from the donation.  Nor did his son.  Nobody with the last name Ridley-Thomas made any money from the arrangement.  Once donated, Dr. Ridley-Thomas held no control over the funds.  Nor did his son.  The government did not introduce any evidence showing any financial benefit to Dr. Ridley-Thomas or to his son personally.  The defense is unaware of any binding case law supporting the concept that a voluntary loss of funds from the recipient of the bribe can constitute a bribe under either § 666 or § 1346.

To the extent that there is doubt about whether a loss of funds can constitute a bribe, the Rule of Lenity requires that a court construe the statutes narrowly, "lest the judiciary create, in common-law fashion, offenses that have never received legislative approbation, and about which adequate notice has not been given to those who might be ensnared." *United States v. Thompson*, 484 F.3d 877, 881 (7th Cir. 2007) (citing *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994); *see also Percoco*, 589 U.S. at 328-29 ("*Skilling*'s teaching is clear. '[T]he intangible right of honest services' must be defined with the clarity typical of criminal statutes and should not be held to reach an ill-defined category of circumstances simply because of a smattering of pre-*McNally* decisions."); *Skilling*, 561 U.S. at 424 (Scalia, J., concurring) (noting that § 1346 should be reversed because it provides no "ascertainable standard" for prohibited conduct). On appeal, the Ninth Circuit will decide *de novo* whether the loss of one's funds can constitute a bribe to that person. The closeness of this substantial question warrants bail pending appeal. *Handy*, 761 F.2d at 1283; *Greenhut*, 2017 U.S. Dist. LEXIS 29026 at *3-4.

### 7. Substantial Questions Exist as to Whether there Can be a Deprivation of Honest Services

During its deliberations, the jury submitted eight notes on the instructions, specifically asking for a definition of "honest services." (Dkt. 295 ("Can we get a definition for honest services please?")). The jury's question highlights a foundational issue with this prosecution: there was no criterion for determining whether Dr. Ridley-Thomas's conduct deprived the county and its citizens of "honest services." *Skilling*, 561 U.S. at 424 (Scalia, J., concurring) (noting § 1346 provides no "ascertainable standard" for the conduct it condemns). The Supreme Court has repeatedly criticized the honest services fraud statute, noting that the statute should not criminalize cases that do not fit into the prototypical bribery or kickback cases. *See id.*; *Percoco*, 589 U.S. at 328-29; *McNally v. United States*, 483 U.S. 350 (1987). In *Sorich*, the dissent explained:

1
2
3
4
5

> Without some coherent limiting principle to define what "the intangible right of honest services" is, whence it derives, and how it is violated, this expansive phrase invites abuse by headline-grabbing prosecutors in pursuit of local officials, state legislators, and corporate CEOs who engage in any manner of unappealing or ethically questionable conduct.

6 *Sorich v. United States*, 555 U.S. 1204, 1310 (2009) (Scalia, J., dissenting).  There

7 was no evidence presented here that any of Dr. Ridley-Thomas's underlying

8 conduct was illegal.  No evidence of any broken ethics rules.  No evidence of any

9 broken campaign finance laws.  There was no evidence that Dr. Ridley-Thomas

10 received any financial benefit from his conduct.  There was no evidence that his son

11 received any financial benefit from the $100,000 donation; the money was held by

12 United Ways of California for the salary of its employee.  There was no evidence

13 that the county motion Dr. Ridley-Thomas supported was not good for the

14 community or that it improperly diverted funds for illegitimate services.  The lack

15 of clarity on what exactly constitutes a deprivation of "honest services" is a

16 substantial legal question that Dr. Ridley-Thomas will raise on appeal.

17
18

**8.    Substantial Questions Exist as to Whether the Government Invited the Jury to Convict Under a Gratuities Theory and Whether a Conviction Based on that Theory Can Be Upheld**

19 Neither the text nor legislative history of § 666, nor any Ninth Circuit cases

20 assessing § 666, prohibit accepting something of value of or an official action

21 Dr. Ridley-Thomas already decided to take.  But the government's theory at trial

22 rested on the assumption that § 666 does impose such a prohibition.  The

23 government argued that a reward for an action Dr. Ridley-Thomas had already

24 taken or an action he had already intended to take was sufficient to convict under

25 § 666.  That is a gratuities theory.  The Court's Order notes that:  "Nowhere did the

26 government or the Court's instructions suggest that Defendant could be convicted

27 for accepting a gratuity *alone*."  (Order at 16.)  But there is no alternative theory the

28 government invited the jury to convict Dr. Ridley-Thomas on other than for

purportedly accepting a reward for an action he had already taken or resolved to take (*i.e.*, not objecting to the passing of the Telehealth amendment on common consent).

The Court's Order notes that "There is ***an argument*** that § 666 may encompass the receipt of what could be considered a gratuity in at least some contexts, but the government does not argue that Defendant could have been convicted on a gratuities theory." *Id.* at 16 n.7. The "***argument*** that § 666 may encompass the receipt of what could be considered a gratuity" (*id.*) is precisely the type of "fairly debatable" issue "not plainly covered by the controlling precedents" for which bail pending appeal is appropriate pending its resolution. *Handy*, 761 F.2d at 1281. The Ninth Circuit has never held that § 666 criminalizes gratuities as well as bribery. If it is debatable whether it could, then that argument should be resolved in Dr. Ridley-Thomas's favor. *United States v. Millis*, 621 F.3d 914, 916-17 (9th Cir. 2010).

Even though the government did not use the word "gratuities," it argued that accepting a gratuity is the same as bribery, effectively inviting the jury to convict Dr. Ridley-Thomas for something § 666 does not penalize—

> "It is not a defense that any acts taken in this case were for the good of the community or were acts that the Defendant would have or should have taken without the bribe. In other words, ***even if he were going to do certain things, if he did those things and he accepted a reward for those things, it's still bribery***."

Trial Tr. at 2998:11-16.[5]

---

[5] *See also* Trial Tr. at 2819:2-7 ("But what you cannot do, what it is wrong to do, what it is corrupt to do—and make no mistake about it—what it is illegal to do is put that hand out and make anyone think that they've got to pay to play; that they have to give you or your family member or friend something in connection ***with that thing you're already going to do***."); *id.* at 2822:4-9 ("You do not ever get to go out with your hand out and make people think that something that's already going to happen or you intend to do is in any way connected with somebody having to give you or your family, your friends, or your dog, or whatever, a nice series of benefits and perks."); Trial Tr. at 2891:11-15 ("Remember, ladies and gentlemen, public officials do not -- do not get to monetize their public service. It doesn't matter if what they're working on is also good for citizens. ***Doesn't matter if they***

Accepting a reward for an action Dr. Ridley-Thomas had already taken or resolved to take would be a gratuity, not bribery.  The government explicitly encouraged the jury to convict Dr. Ridley-Thomas under that theory, and it is impossible to rule out if that is the theory the jury leaned on to convict.  That is a "non-frivolous issue that, if decided in [Dr. Ridley-Thomas's] favor, would likely result in reversal or could satisfy one of the other conditions."  *Garcia*, 340 F.3d 1021 n.5.

### 9. Cumulative Errors Warrant Bail Pending Appeal

Errors that are harmless in isolation may cumulatively require reversal. Errors must be viewed together for a proper determination of the full impact they may have on a defendant.  *See, e.g.*, *Dorn v. Burlington N. Santa Fe*, 397 F.3d 1183, 1197 (9th Cir. 2005); *Gonzales v. Police Dep't, City of San Jose, Cal.*, 901 F.2d 758, 762 (9th Cir. 1990) (remanding based on cumulative effects of district court's errors, without analyzing prejudicial effects of errors individually).

Dr. Ridley-Thomas's Rule 33 motion for a new trial (Dkt. 360, 373) presented for appeal numerous "non-frivolous issue[s] that, if decided in [his] favor, would likely result" in a new trial.  *Garcia*, 340 F.3d at 1021 n.5.  When considered individually and collectively, these issues entitle Dr. Ridley-Thomas to bail pending appeal.

For example, the government elicited and failed to correct testimony from Agent Adkins that this Court agreed was "incorrect (or false)."  (Order at 11.)  False testimony from the government's key witness is not a "frivolous" issue.  *Garcia*, 340 F.3d at 1021 n.5; *see also United States v. LaPage*, 231 F.3d 488, 492 (9th Cir. 2000) ("All perjury pollutes a trial, making it hard for jurors to see the truth.");

*always intend to vote for something or do something*."); *id.* at 2996:11-14 ("Sometimes he did things in his official capacity for Dean Marilyn Flynn *that he had already intended to do*. Sometimes he did things for Dean Marilyn Flynn in his official capacity that he would not have otherwise done."); *id.* at 3058:23-3059:1 ("It doesn't matter whether the Defendant was always going to vote in favor of these amendments or contracts *or if he was always going to do what he did*.")

*Towery v. Schriro*, 641 F.3d 300, 309 (9th Cir. 2010) (Even "accurate testimony could be delivered in a sufficiently misleading context to make the evidence false for *Napue* purposes."); *United States v. Agurs*, 427 U.S. 97, 103 (1976) ("[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is ***any*** reasonable likelihood that the false testimony could have affected the judgment of the jury").

The only question on appeal as to the agent's false testimony is whether it was sufficiently prejudicial to warrant a new trial.  There is a reasonable likelihood the Court of Appeals could find that it does.  *LaPage*, 231 F.3d at 492; *Towery*, 641 F.3d at 309; *Agurs*, 427 U.S. at 103.

Agent Adkins made other statements that were arguably false.  He claimed that he uncovered evidence that Dr. Sherin's "recitation[s] of the justifications for the contract extension were not genuine," (Trial Tr. at 1790:7-1791:1) and that Dr. Ridley-Thomas and his staff threatened to cancel or rescind contracts (*id.* at 1995:19-23).  The Court's Order found that the government provided "plausible explanations for Adkins's testimony based on the record." (Order at 12.)  But those explanations are plainly debatable.  While it is true that Dr. Sherin did criticize the ultimate success of the Telehealth program after the program had failed, the government adduced no evidence where Dr. Sherin mentioned the justifications for the contract extension or suggested that his support for it was not genuine at the time. (Dkt. 373 at 4-5.)  And with respect to the statement that Dr. Ridley-Thomas or his staff threatened to cancel or rescind contracts, the government cited only two examples where USC witnesses suggested that Dr. Ridley-Thomas had ***the ability*** to rescind contracts ***in general***.  (*Id*. at 6-7.)  It is doubtful whether the government's explanations are enough to defend the agent's statements.  And, in either event, the jury did not hear those explanations.

The government made several other statements in closing that arguably impugned defense counsel's character, injected personal opinions of the

1   prosecutors, and misstated the law.  (Dkt. 360 at 10-17.)  The Court does not fault

2   the government for claiming that defense counsel misrepresented the record

3   because the government's point may have been that "the evidence was not what

4   defense counsel put in a PowerPoint at closing; the evidence was the testimony as

5   the jurors remembered it."  (Order at 13.)  But it is uncertain whether the jury saw it

6   that way.  The government explicitly characterized defense counsel's transcript

7   cites as "incorrect" and asserted that Dr. Ridley-Thomas created a "manufactured"

8   defense.  Trial Tr. at 2989:5-2990:10.  The issue of whether these statements

9   crossed the "point at which prosecutorial comments are no longer reasonably

10  descriptive and therefore serve no purpose other than to incite prejudice in the

11  jury," if decided in Dr. Ridley-Thomas's favor, would warrant a new trial.  *United*

12  *States v. Rude*, 88 F.3d 1538, 1548 (9th Cir. 1996); *United States v. Sarno*, 73 F.3d

13  1470, 1496 (9th Cir. 1995) ("[W]hile [the government] may strike hard blows, [it]

14  is not at liberty to strike foul ones.") (citations omitted) (alterations in original);

15  *United States v. Tomsha-Miguel*, 766 F.3d 1041, 1047 (9th Cir. 2014) ("[A]

16  prosecutor may not 'distort' the trial process by leading the jury to believe that

17  defense counsel is dishonest.") (citing *United States v. Rodrigues*, 159 F.3d 439,

18  451 (9th Cir. 1998).

19       The government opined that it "seems crazy" that the $100k donation was

20  legal and publicly disclosed.  And it used the term "funneling" *ad nauseum* to

21  imply to the jury that these legal donations were criminal.  The Court's Order notes

22  that it "sees no reason not to allow the use of a word that ***arguably*** fairly

23  characterized what happened," and that though the government "did make the

24  statement that the fact that the 'funneling' did not violate campaign finance laws

25  'seems crazy,'" it "did not contest that the 'funneling' was actually legal."  (Order

26  at 15.)  But prejudicial language like "funneling" that implies criminality without

27  evidentiary support is an error and can be grounds for a new trial.  *United States v.*

28  *Medeiros*, No. CR 18-1966-JCH, 2022 WL 17819698, at *27 (D.N.M. Dec. 20,

2022).  At minimum, as this Court explained, it's "arguabl[e]" whether use of the word "funneling" fairly characterized what happened or whether the jury could interpret the prosecutor's opinions as contesting whether the "funneling" was actually legal.  These types of arguable issues merit bail pending appeal.  *Handy*, 761 F.2d at 1281.

While, in this Court's view, no single issue presented in Dr. Ridley-Thomas's Rule 33 motion may be sufficient to warrant a new trial, Dr. Ridley-Thomas presented several issues that, at minimum, are fairly debatable and are the type that, if decided in his favor on appeal, would require a new trial.  *United States v. Flores*, No. CR 06-641-GAF, 2007 U.S. Dist. LEXIS 107436, at *3 (C.D. Cal. July 27, 2007) ("While this Court carefully considered each of these issues and would not change its ruling even if asked, the Court nevertheless concludes that the issues are of a type that could lead to a reversal of the conviction in this case.").  These issues, considered collectively, justify bail pending appeal.  *Id.*; *see also United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (reversing for cumulative effect of errors); *United States v. Leon-Gonzalez*, 24 F. App'x 689, 692 (9th Cir. 2001) (prejudicial statements in "very close case" mandated new trial).

### 10.     There Are Substantial Questions Concerning Circuit Splits and the Court's Denial of Various Requested Jury Instructions

"A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence."  *United States v. Bello-Bahena*, 411 F.3d 1083, 1088-89 (9th Cir. 2005) (quoting *United States v. Fejes*, 232 F.3d 696, 702 (9th Cir. 2000)).  "Failure to give such an instruction constitutes reversible error: 'the right to have the jury instructed as to the defendant's theory of the case is one of those rights 'so basic to a fair trial' that failure to instruct . . . can never be considered harmless error.'"  *United States v. Rodriguez*, 45 F.3d 302, 306-307 (9th Cir. 1995) (citations omitted).  On appeal, Dr. Ridley-Thomas will raise substantial questions as to

1  circuit splits regarding the proposed jury instructions and the denial of several of

2  the defense's proposed instructions.  These substantial questions of law, if adopted

3  by the Court of Appeals, would compel reversal of Dr. Ridley-Thomas's

4  conviction.

**a.  Proposed Instruction No. 36(c):  Whether Flynn must have intended that Dr. Ridley-Thomas take acts he otherwise would not have taken**

7  Courts have held that an honest services fraud prosecution for bribery post-

8  *Skilling* requires the Government to prove (1) that "the payor provided a benefit to a

9  public official intending that he w[ould] thereby take favorable official acts that he

10  would not otherwise take," and (2) that "the official accepted those benefits

11  intending, in exchange for the benefits, to take official acts to benefit the payor."

12  *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012), as amended (Feb. 7,

13  2012); *see also United States v. Siegelman*, 640 F.3d 1159, 1171 (11th Cir. 2011)

14  (the facts must show that the contribution was given "in return for a specific official

15  action . . . No generalized expectation of some future favorable action will do.");

16  *United States v. Terry*, 707 F.3d 607, 613 (6th Cir. 2013) ("A donor who gives

17  money in the hope of unspecified future assistance does not agree to exchange

18  payments for actions. No bribe thus occurs if the elected official later does

19  something that benefits the donor. On the other hand, if the donor . . . makes a

20  contribution so that an elected official will 'do what I ask him to do,' and the

21  official . . . accepts the payment with the same understanding, the donor and the

22  official have formed a corrupt bargain."); *United States v. Allen*, 10 F.3d 405, 411

23  (7th Cir. 1993) ("Vague expectations of some future benefit should not be sufficient

24  to make a payment a bribe.").

25  Consistent with this authority, Dr. Ridley-Thomas proposed an instruction

26  that "the government must prove that Marilyn Flynn intended to influence an

27  official act or official acts that Ridley-Thomas would not otherwise have taken."

28  (Dkt. 175 at 66.)  There was ample evidence presented at trial that Dr. Ridley-

Thomas and Dean Flynn had years prior worked on the Telehealth Contract, and that they continued their partnership on improving mental healthcare access to young people in Los Angeles.

At minimum, the Third Circuit split in authority on whether such instruction is required leaves open a substantial question for which bail pending appeal is appropriate. *Handy*, 761 F.2d at 1281 (A "substantial question" may involve one that "present[s] unique facts not plainly covered by the controlling precedents."); *United States v. Goldman*, No. 91–CR–59, 1993 WL 48906, at *3 (N.D.N.Y. Feb. 24, 1993) (finding "that defendant has presented a substantial question of law on appeal" where "there is a split in the circuits" on the mens rea requirement for an element of the charged offense); *United States v. Warner*, No. 02 CR 506-1,4, 2006 U.S. Dist. LEXIS 77228, at *6-7 (N.D. Ill Oct. 13, 2006) ("A substantial question may exist where the defendant's argument finds support in Seventh Circuit precedent, or where circuit courts are divided"); *United States v. Boulware*, No. CR 99-239 ER, 2007 WL 9717801, at *2 (D. Hawaii Nov. 15, 2007) ("The Supreme Court has granted certiorari on an issue that it has not previously addressed and that has conflicting circuit court precedent. Thus, how the Supreme Court will settle the law is 'fairly debatable.'").

### b.   Proposed Instruction No. 37(e):  Whether a Quid Pro Quo is Required for § 666 Bribery

In *Sun-Diamond Growers of California* the Supreme Court explained that "[b]ribery requires intent 'to influence' an official act or 'to be influenced' in an official act . . . In other words, for bribery there must a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999) (emphasis in original).  There is currently a circuit split on whether the Supreme Court's quid pro quo requirement for federal public officials, § 201(b), applies also to federal programs bribery, § 666.  The First, Second, Fourth, Fifth, and Eighth Circuits hold

that a conviction under § 666 requires showing a quid pro quo. *See United States v. Fernandez*, 722 F.3d 1, 19, 39 (1st Cir. 2013) (§ 666 convictions vacated where evidence could have supported gratuity, rather than quid pro quo bribery); *United States v. Ford*, 435 F.3d 204, 213 (2d Cir. 2004) ("In short, the recipient must have accepted the thing of value while 'intending to be influenced.' Or, as the Supreme Court put it plainly in *Sun-Diamond Growers*, there must be a quid-pro-quo."); *United States v. Jennings*, 160 F.3d 1006, 1020, 1021 (4th Cir. 1998) ("unless the district court defined 'corrupt intent' to include the quid pro quo requirement, it gave an erroneous instruction on an essential element of bribery"); *United States v. Hamilton*, 46 F.4th 389, 398 (5th Cir. 2022) (analyzing § 201 bribery and § 666 bribery and explaining that "all signs point toward the sensible conclusion that § 666 is more like § 201(b)," meaning that "§ 666 applies only to *quid pro quo* bribery"); *United States v. Griffin*, 154 F.3d 762, 763 (8th Cir. 1998) (affirming finding that § 666 conviction established "the necessary *quid pro quo*").

The Ninth Circuit's *Garrido*, which requires no quid pro quo for federal programs bribery, was primarily focused on whether § 666 requires the "bribe be given or received with the intent to influence the public official in an **official act**." 713 F.3d at 1000-01. It was decided prior to *McCutcheon*, which further limited bribery in the context of officials' interactions with constituents. In *McCutcheon*, the Supreme Court explained the need to "draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192 (2014). Because a "central feature of democracy" is that constituents support candidates with the expectation that those candidates will be responsive to their concerns, the Court stated that "[a]ny regulation must instead target what we have called '*quid pro quo*' corruption or its appearance. That Latin phrase captures the notion of a direct exchange of an official act for money." *Id.* (citation omitted). That such instruction was not given raises a

1 "substantial question" as to whether Dr. Ridley-Thomas's conviction for § 666

2 bribery can be upheld. *See, e.g.*, *United States v. Jordan*, No. 4:18-CR-087, 2022

3 U.S. Dist. LEXIS 167750, at *5 (E.D. Tex. Sept. 16, 2022) (finding "substantial

4 question" warranting bail pending appeal regarding "whether the Court properly

5 instructed the jury that § 666 requires proof of a *quid pro quo*"); *United States v.*

6 *Montoya*, 945 F.2d 1068 (9th Cir. 1991) (reversing appellant's Hobbs Act

7 convictions because the jury instructions failed to require a finding of an explicit

8 quid pro quo as mandated by *McCormick*).

9     A circuit split on this issue is alone sufficient to raise a "substantial question"

10 as to whether Dr. Ridley-Thomas's conviction for § 666 bribery can be upheld

11 without proof of a quid pro quo. *Handy*, 761 F.2d at 1281; *Goldman*, 1993 WL

12 48906, at *3 (finding "that defendant has presented a substantial question of law on

13 appeal" where "there is a split in the circuits" on the mens rea requirement for an

14 element of the charged offense); *Warner*, 2006 U.S. Dist. LEXIS 77228, at *6-7

15 ("A substantial question may exist where the defendant's argument finds support in

16 Seventh Circuit precedent, or where circuit courts are divided"); *Boulware*, 2007

17 WL 9717801, at *2 ("The Supreme Court has granted certiorari on an issue that it

18 has not previously addressed and that has conflicting circuit court precedent. Thus,

19 how the Supreme Court will settle the law is 'fairly debatable.'").

20         **c.**    **Refusal to Give Defense's Proposed Instruction**

21             **No. 37(d)**

22     Dr. Ridley-Thomas's proposed jury instruction No. 37(d) explained that:

23     A benefit given to curry favor, to cultivate a friendship, or to express
gratitude is not a bribe. A benefit given to a politician with the generalized

24 hope or expectation of future benefit likewise does not constitute a bribe. A
benefit made to reward a politician for an act he has already taken or has

25 already determined to take is not a bribe. Nor is a benefit a bribe merely
because there is some connection in time or place between a benefit to a

26 politician and action by the politician that helps the one who made the
benefit.

27

28

1  (Dkt. 175 at 91.[6])  The Court declined to give Dr. Ridley-Thomas's proposed

2  instruction.

3  　　It is well-established that the jury must be instructed adequately on the

4  requisite intent because "[n]ot every gift, favor or contribution to a government or

5  political official constitutes bribery." *Harwin v. Goleta Water Dist.*, 953 F.2d 488,

6  495 (9th Cir. 1991) (citation omitted).  ("It is universally recognized that bribery

7  occurs only if the gift is coupled with a particular criminal intent. . . . That intent is

8  not supplied merely by the fact that the gift was motivated by some generalized

9  hope or expectation of ultimate benefit on the part of the donor. . . . 'Bribery'

10  imports the notion of some more or less specific *quid pro quo* for which the gift or

11  contribution is offered or accepted."); *McCormick v. United States*, 500 U.S. 257,

12  271-274 (1991) (distinguishing between bribery and contributions made for general

13  goodwill or a vague expectation of benefit by holding that bribery requires proof of

14  a quid pro quo); *McDonnell*, 136 S. Ct. at 2372-73 (rejecting government's broad

15  construction of quo requirement because its "standardless sweep" would "cast a

16  pall" over basic functions of representative government whenever a constituent had

17  previously conferred any benefit on an official).

18  　　There was substantial evidence presented at trial that Dean Flynn and

19  Dr. Ridley-Thomas had worked together since at least two years prior on the same

20  Telehealth Program at issue in the case, the two had shared public policy goals, and

21

22  [6] *See Sun-Diamond Growers of California*, 526 U.S. at 405 (finding it insufficient for a federal offense to provide a thing of value merely "to build a reservoir of goodwill"); *Jennings*, 160 F.3d at 1020 n.5 (4th Cir. 1998) ("[G]oodwill gifts are given with no more than 'some generalized hope or expectation of ultimate benefit on the part of the donor'. Clearly, goodwill gifts are neither bribes nor gratuities, since they are made neither with the intent to engage in a 'relatively specific quid pro quo' with an official nor 'for or because' of a specific official act (or omission).") (citations omitted); *United States v. Allen*, 10 F.3d at 411 ("Vague expectations of some future benefit should not be sufficient to make a payment a bribe."); *United States v. Johnson*, 621 F.2d 1073, 1076 (10th Cir. 1980) (holding that, to constitute a bribe, "the money must be given with more than some generalized hope or expectation of ultimate benefit on the part of the donor") (internal quotation marks and citation omitted).

that Dean Flynn wanted the School of Social Work to partner with Sebastian Ridley-Thomas's nonprofit project. This was not a case involving an exchange of money as a bribe—Dr. Ridley-Thomas personally received no money, and his son personally received no money. Because the defense raised the theory that Dean Flynn provided Dr. Ridley-Thomas with goodwill, not bribes, it was entitled to an instruction on its legal theory. The lack of instruction on the difference between legal goodwill favors and illegal bribes raises a substantial question whether the jury instructions were vague. Courts have found that such vagueness in jury instructions with respect to the distinction between bribery and legitimate goodwill expenditures warrants a new trial. *See, e.g.*, *United States v. Arthur*, 544 F.2d 730, 735-36 (4th Cir. 1976).

### d. Refusal to Give Defense's Proposed Instruction No. 38(e)

Dr. Ridley-Thomas's proposed instruction No. 38(e)—that "[a]n intent to defraud is an intent to deceive and cheat"—was derived from the 9th Circuit Pattern Jury Instructions. Ninth Circuit Pattern Instruction, 4.13. (*See also* Dkt. 175 at 119.)

The government relied on Flynn's state of mind, as she communicated it internally to her USC colleagues, to impute Dr. Ridley-Thomas's intent. Flynn's statements were strong evidence of lobbying, but not of an intent to deceive and cheat. Evidence that Flynn thought she was currying favor with Dr. Ridley-Thomas through her lobbying is insufficient to show that Flynn had the intent to defraud, much less that Dr. Ridley-Thomas also had the intent to defraud. *See United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009); *Sun-Diamond Growers of Cal.*, 526 U.S. at 404–06 (acknowledging that there are some noncriminal gifts given to public officials in order "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future"); *United States v. Sawyer*, 85 F.3d 731, 731 n.15 (1st Cir. 1996) ("We do

not think that the desire to gain access, by itself, amounts to an intent to influence improperly the legislators' exercise of official duties. . . . it would be impermissible to rely upon the lobbying position simpliciter to establish a corrupt intent to influence.").

The Ninth Circuit has held that to establish intent to defraud, "a defendant must intend to deceive **and** cheat." *United States v. Miller*, 953 F.3d 1095, 1101 (9th Cir. 2020) (emphasis in original).  The government did not disagree "that in a typical mail and wire fraud case, the government must prove 'an intent to deceive and cheat.'"  (Dkt. 175 at 120.)  Instead, it made the unsupported assertion that "[h]onest services fraud is different." *Id.*  But contrary to the government's claims, courts apply the instruction to honest services fraud cases, and the instruction should have been given here. *United States v. Kail*, No. 18-cr-00172-BLF-1, 2021 WL 3773613, (N.D. Cal. Aug. 25, 2021) (in honest services fraud charge, jury instructed that government had to prove that defendant had the specific intent to deceive and cheat company).  That such instruction was not given raises a substantial question that, if decided in Dr. Ridley-Thomas's favor, would result in reversal. *Miller*, 953 F.3d at 1101-02.  (Error to use Ninth Circuit pattern instruction and instruct intent was to "deceive *or* cheat") (emphasis in original).

### e.   Refusal to Give Defense's Proposed Instruction No. 43

Dr. Ridley-Thomas's proposed instruction No. 43 served to inform the jury that "an individual's participation in the political process is presumptively protected by the First Amendment to the United States Constitution. . . . Ingratiation and access are not corruption." (Dkt. 175 at 152.)  The government opened the door to this instruction.  It introduced Dean Flynn's USC lobbying reports and argued that they showed a quid pro quo and proved Dean Flynn's intent.  The U.S. Supreme Court has made clear that ingratiation and access are not corruption, and the jury should have been instructed on this accurate statement of law. *See Citizens United*

1  *v. Fed. Election Comm'n*, 558 U.S. 310, 361 ("Ingratiation and access, in any event,
2  are not corruption."); *McCutcheon*, 572 U.S. at 192 (same).

3        Without an instruction clarifying that lobbying alone is insufficient to
4  constitute corruption, the jury was allowed to convict on evidence that Dean Flynn
5  was engaging in lawful lobbying activities and that Dr. Ridley-Thomas's
6  knowledge of her lobbying constituted corrupt intent. *Cf. Kincaid-Chauncey*, 556
7  F.3d at 941-42 (political system functions because of lobbyists and evidence that
8  lobbyist had greater access to official is not sufficient to show intent to deprive the
9  public of honest services); *Sun–Diamond Growers of Cal.*, 526 U.S. at 404–06
10  (there are some noncriminal gifts given to public officials in order "to build a
11  reservoir of goodwill that might ultimately affect one or more of a multitude of
12  unspecified acts, now and in the future"); *Sawyer*, 85 F.3d at 731, n.15
13  ("impermissible to rely upon the lobbying position simpliciter to establish a corrupt
14  intent to influence.").

15  **IV.  CONCLUSION**

16        For the reasons stated above, Dr. Ridley-Thomas respectfully requests that
17  the Court order his release during the pendency of his appeal.

19  Dated:    October 2, 2023        MORRISON & FOERSTER LLP

21                             By: */s/ Galia Z. Amram*
22                                 GALIA Z. AMRAM

23                               Attorneys for Defendant
                             MARK RIDLEY-THOMAS

1

## **CERTIFICATE OF SERVICE**

2       I hereby certify that on October 2, 2023 the within document was filed with

3 the Clerk of the Court using CM/ECF which will send notification of such filing to

4 the attorneys of record in this case.

5

                                */s/ Galia Z. Amram*

6                                  GALIA Z. AMRAM

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT MARK RIDLEY-THOMAS'S
MOTION FOR BAIL PENDING APPEAL